### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL FAORO | |
| Plaintiff, | No. 1:25-cv-289 |
| v. | |
| JEWISH VOICE FOR PEACE, INC. D/B/A OCCUPATION FREE DC 2342 SHATTUCK AVENUE #321 BERKELEY, CA 94704 | **VERIFIED COMPLAINT FOR CONSPIRACY TO COMMIT PUBLIC NUISANCE AND FALSE IMPRISONMENT** |
| DISSENTERS 637 SOUTH DEARBORN AVENUE CHICAGO, IL 60505 | |
| PALESTINIAN YOUTH MOVEMENT, A PROJECT OF WESPAC FOUNDATION, INC. C/O HONOR THE EARTH 607 MAIN AVENUE CALLAWAY, MN 56521 | |
| WESPAC FOUNDATION, INC. 77 TARRYTOWN ROAD WHITE PLAINS, NY 10607 | |
| HARRIET'S WILDEST DREAMS, INC. 6368 COVENTRY WAY, SUITE 313 CLINTON, MD 20735-2256 | |
| DORNETHIA "NEE NEE" TAYLOR 6368 COVENTRY WAY, SUITE 313 CLINTON, MD 20735-2265 | |
| PARTY OF SOCIALISM AND LIBERATION 3041 MISSION STREET, #151 SAN FRANCISCO, CA 94110 | |
| BRIAN BECKER 617 FLORIDA AVENUE, NW WASHINGTON, DC 20001 | |
| MARYLAND2PALESTINE C/O HANNAH SHRAIM 13307 QUEENSTOWN LANE GERMANTOWN, MD 20874 | |

1

HANNAH SHRAIM
13307 QUEENSTOWN LANE
GERMANTOWN, MD 20874

23 JOHN AND JANE DOES

     Defendants.

---

1.     Americans rightly celebrate their rights to speak and protest. But this right does not extend to imprisoning motorists in their vehicles. As the Supreme Court has said, "The freedom of association protected by the First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights."[1] Protestors may speak loudly, they may be rude, they may shock audiences, but they cease being protestors when they use force to block roads full of bystanders trapped in their vehicles. This creates a massive public nuisance and puts thousands of individuals at risk. The Defendants did this in a misguided effort to extort political change, and by doing so harmed thousands of ordinary people. Plaintiff Faoro was among those victimized, and he demands damages on behalf of himself and thousands of others wronged by the Defendants on February 1, 2024, when they conspired to block traffic at several key intersections leading into Washington, D.C. Plaintiff Faoro also seeks an injunction to preclude Defendants from repeating this harmful public nuisance.

2.     On February 1, 2024, Defendants conspired to willfully, intentionally, and illegally blockade multiple public highways, bridges and roads in the District of Columbia (the District) or leading into the District to show support for Palestinians in the ongoing conflict between Israel and Palestinians in the Gaza Strip and denounce the United States government's support for the State of Israel. Doing so deprived Faoro and thousands of others of their right to freely and safely travel on public highways and created life-

---

[1] *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 776 (1994).

threatening hazards for the surrounding communities. It also compelled Faoro and his fellow motorists to unwillingly participate in the message being promoted by the Defendants.

3.      The February 1, 2024 blockade was just one of many unlawful and disruptive actions taken by anti-Israel activists in the aftermath of the October 7, 2023 attack by Hamas on Israel. For instance, on October 18, 2023, activists, including members of defendant Jewish Voice for Peace, illegally occupied Congressional office buildings to disrupt Congress, resulting in 300 arrests.[2] Next month, activists attempted to shut down Union Station during rush hour to show support for Hamas.[3] On January 13, 2024, anti-Israel activists violently marched on the White House, disrupting traffic around the White House and Lafayette Square.[4] And later that month, activists flying Palestinian flags used cars to dramatically impede traffic on the George Washington Parkway attempting to access Reagan National Airport.[5] At least four of the named defendants, Palestinian Youth Movement, OccupationFreeDC, MD2Palestine, and the Party of Socialism & Liberation, appear to have organized the action and they proudly publicized it on social media accounts. (Hedley Decl. ¶ 46.)

_____

[2] *More than 300 are arrested in a Capitol Hill protest urging a cease-fire in the Israel-Hamas war*, Associated Press (Apr. 19, 2023), available at https://apnews.com/article/israel-hamas-capitol-hill-congress-protest-arrests-1ac89687ebcd0600217a45aec70a9cff.

[3] Walter Morris, *3 arrested at pro-Palestinian rally outside Union Station*, NBC4 Washington, (Nov. 17, 2023), available at https://www.nbcwashington.com/news/local/3-arrested-at-pro-palestinian-rally-outside-union-station/3474320/.

[4] Andrea Vacchiano, *White House staff 'relocated' after pro-Palestinian rioters damage anti-scale fencing, hurl objects at cops*, Fox News (Jan. 13, 2024), available at, https://www.foxnews.com/politics/white-house-staff-relocated-pro-palestinian-rioters-damage-exterior-fencing-hurl-objects-cops?msockid=16613e4031a.

[5] Vivek Saxena, *Reagan National warns of delays due to pro-Hamas group in vehicles 'exercising 1A rights'*, Biz Pac Review (Jan. 21, 2024), available at https://www.bizpacreview.com/2024/01/21/reagan-national-warns-of-delays-due-to-pro-hamas-group-in-vehicles-exercising-1a-rights-1429691/.

4.      Even after the February 1, 2024 blockade and its arrests, anti-Israel activists continued similar actions. On April 9, 2024, police arrested activists occupying the Dirksen Senate Building for attempting to disrupt Senate business.[6] On June 8, 2024, activists again staged a large protest at and around the White House and Lafayette Square where they attempted to build a fence around the White House and clashed with Park Police, vandalizing structures and park infrastructure.[7] Police arrested approximately 200 anti-Israel activists who attempted to take over the Cannon Office Building on Capitol Hill on July 23, 2024.[8] The next day, a protest at Union Station to condemn Israel Prime Minister Benjamin Netanyahu's speech before Congress devolved into an orgy of violence and vandalism with several arrests.[9]

5.      But the February 1, 2024 blockade was perhaps the most disruptive action by anti-Israel activists. Traffic into the District was impeded severely, and in many instances completely stopped for up to two hours. Thousands of commuters were late for work or school, or missed critical appointments and important events, some of which may have been scheduled weeks in advance. Commuters like Faoro were trapped in their vehicles with no

---

[6] Miranda Nazzaro, *Dozens of Gaza protestors arrested in Senate office building*, The Hill (Apr. 9, 2024), available at, https://thehill.com/blogs/blog-briefing-room/4583221-dozens-of-gaza-protestors-arrested-in-senate-office-building/.

[7] Tara Suter, *Pro-Palestinian protestors gather at White House*, The Hill (June 8, 2024), available at, https://thehill.com/homenews/state-watch/4712150-pro-palestinian-protestors-gather-at-white-house/.

[8] Tara Suter, *Protestors arrested in congressional building ahead of Netanyahu address*, The Hill (July 23, 2024), available at, https://thehill.com/homenews/house/4789080-capitol-police-arrest-pro-palestinian-protestors/.

[9] Chad de Guzman, et al., *Pro-Palestinian Protesters Burn American Flags and Deface Monuments Amid Clashes With Police in D.C.*, Time (July 25, 2024), available at, https://time.com/7003081/photos-netanyahu-washington-dc-protests-demonstrations-police-clashes-arrests-capitol/.

inkling as to when their freedom of movement would be restored or whether their plans for the day were salvageable.

6.    Plaintiff Faoro and other innocent class members traveling into and around the District that morning had nothing to do with the conflict thousands of miles away, or the debate within Congress regarding support for Israel; many probably have no opinion at all on the issue. But Defendants' unlawful actions compelled these innocent Americans like Faoro to unwillingly participate in Defendants' activism.

7.    Plaintiff seeks to hold Defendants accountable for their illegal and tortious conspiracy to falsely imprison unsuspecting motorists and for creating a public nuisance that unreasonably interfered with the Plaintiff and class members' right to freely travel in and around the District.

## PARTIES

8.    Plaintiff Daniel Faoro is a citizen of Virginia who resides in Fairfax County, Virginia. He works in the District and regularly commutes by automobile into the District. On the morning of February 1, 2024, Faoro was driving his car on Route 50 in suburban Virginia, which is the highway he typically travels on when commuting to his office in the District.

9.    On information and belief, Defendant Jewish Voice for Peace, Inc. (JVP) is a California corporation that is a tax-exempt organization under I.R.C. § 501(c)(3) and does business as Occupation Free DC, an affiliate of the District chapter of JVP.[10] JVP has a website,

---

[10] On information and belief, the entity Defendants, except for Palestinian Youth Movement and Maryland2Palestine, are formal legal entities with the capacity to be sued. Plaintiff asserts that any entity Defendant that is not incorporated would qualify as an unincorporated nonprofit association according to D.C. Code § 1102(5) and has the capacity to be sued in their own name pursuant to D.C. Code § 29-1109(a). *See Act Now to Stop War & End Racism Coal. v. Dist. of Columbia*, 846 F.3d 391, 400 (D.C. Cir. 2017). If there is a dispute regarding whether the named Defendants are appropriate jural entities or if different affiliated entities should be named as Defendants, Plaintiff should be permitted to engage in jurisdictional discovery, the standard for which is "quite liberal." *Tatneft v.*

jewishvoiceforpeace.org. JVP maintains an account on the social media platform X, @jvplive, and also maintains an Instagram account, @jewishvoiceforpeace. The District chapter of JVP maintains a website, jvpdc.org, an Instagram account, @jvpdcmetro, and an account on X, @jvpdcmetro. (Hedley Decl. ¶¶ 23, 25.)

10.    On information and belief, the District chapter of JVP manages the affiliate, Occupation Free DC, which has a website [www.occupationfreedc.org](www.occupationfreedc.org). The home page notes that Occupation Free DC is "[a] campaign from: Jewish Voice for Peace DC Metro." Occupation Free DC maintains an Instagram account, @occupationfreedc, as well as an X account, @OFDC_Campaign.  There is a link to a donation page on Occupation Free DC's web site that opens a page allowing for donations to the DC Metro chapter of JVP and notes that donations by check may be mailed to P.O. Box 589, Berkeley, California 94701. The page further notes that JVP is a 501(c)(3) exempt organization and provides JVP's taxpayer identification number. On information and belief, the address on file with the California Secretary of State for JVP is 2342 Shattuck Avenue, #321, Berkeley, CA 94704. (Hedley Decl. ¶¶ 21-25, 27-28.)

11.    On information and belief, Defendant WESPAC Foundation, Inc. is a New York corporation and is a tax-exempt organization under I.R.C. § 501(c)(3). During the relevant time WESPAC acted as the fiscal sponsor of the Palestinian Youth Movement (PYM) and during the relevant time PYM was a project of WESPAC. (Hedley Decl. ¶¶ 15, 18.)

12.    Defendant PYM maintains a website, [www.palestinianyouthmovement.com](www.palestinianyouthmovement.com) and describes itself as "a transnational, independent, grassroots movement of young Palestinians in Palestine and in exile in worldwide" and has 14 chapters in North America, including one for the District, Virginia and Maryland (DMV PYM). PYM maintains two accounts on the social media platform Instagram, @palestinianyouthmovement and @palyouthmvmt. It also maintains an account on the social media platform X with a username of @palyouthmvmt. DMV PYM maintains an Instagram account, @dmvpym. The

_Ukraine_, 301 F.Supp.3d 175, 194 (D.D.C. 2018) (cleaned up).

PYM website states that it has a National Executive Board ("NEB") and provides generic email addresses to contact those board members (for example, General Coordinator is gc@pymusa.com; Vice General Coordinator is vgc@pymusa.com; and so on), but provides no names for Board members.  (Hedley Decl. ¶¶ 11-14.)

13.    During the relevant time, a link on the PYM website to make donations directed visitors to a page maintained by Goodbricks.org, a fundraising website where individuals can make online donations. The webpage stated "[a]ll donations are tax-deductible. You will receive a follow-up email with the relevant info. We also accept checks payable to 'WESPAC Foundation' and mailed to 77 Tarrytown Rd, Suite 2W, White Plains, NY 10607. Please indicate 'PYM' in the memo line." On information and belief, this is the address on file with the Internal Revenue Service for WESPAC Foundation. (Hedley Decl. ¶ 15.)

14.    Neither PYM nor any of its affiliated chapters like DMV PYM are formal legal entities or tax-exempt organizations under I.R.C. Section 501(c)(3). WESPAC Foundation is a 501(c)(3) organization and acted as the fiscal sponsor for PYM and other similar organizations like National Students for Justice in Palestine (NSJP). (Hedley Decl. ¶¶ 14, 18.) As fiscal sponsor, WESPAC was responsible to "retain control and discretion over the use of funds" allocated to PYM, and to "maintain[] records establishing that the funds were used for section 501(c)(3) purposes. *See* Rev. Rul. 68-489, 1968-2 C.B. 210. WEPAC's fiscal sponsorship agreement with PYM provided PYM with access to WESPAC's administrative services, staff, and facilities. Upon information and belief, WESPAC's fiscal sponsorship, whereby it received donations for PYM, which has no formal corporate entity of its own, caused PYM to become an integrated project of WESPAC with no separate legal identity at times relevant to this complaint.

15.    Alternatively, even if WESPAC's fiscal sponsorship did not cause PYM to act as an integrated part of WESPAC, WESPAC was required to maintain "control and discretion" over PYM to avoid jeopardizing its own tax-exempt status. The high level of control and oversight in acting as a fiscal sponsor creates an agency relationship between the fiscal

sponsor, WESPAC, and PYM, wherein the fiscal sponsor directs the use of funds, as required under federal tax rules. Upon information and belief, WESPAC maintained oversight of PYM's activities and the use of funds derived from WESPAC to support PYM's activities.

16.    In the alternative, to the extent WESPAC asserts that it did not exercise control and discretion over PYM, WESPAC acted tortiously by breaching its duty under federal law to exercise such control and discretion and is liable for its negligent or reckless supervision of PYM for PYM's tortious acts.

17.    Sometime after April 22, 2024, another organization, Honor the Earth, became PYM's fiscal sponsor, and the donation page on the PYM website currently states "We also accept checks payable to 'Honor the Earth' and mailed to 1430 Haines Ave STE 108 #225, Rapid City, SD, 57701. Please indicate 'PYM' in the memo line." This is the address listed as Honor the Earth's address on its website. According to most recent IRS Form 990 filed with the Internal Revenue Service, Honor the Earth's business address is 607 Main Street, Calloway, MN, 56521. (Hedley Decl. ¶ 19.) One of Honor the Earth's Board Members listed on its website, www.honorearth.org/board, is Lenna Zahran Nasr. Her biography states "She currently serves as a lead organizer with Palestinian Youth Movement." (Hedley Decl. ¶ 20.) On information and belief, Nasr is also known as Courtney Lenna Schirf and Lenna Schirf, who is a named defendant because of her role as a PYM organizer in relation to a violent protest outside a synagogue in Los Angeles, California. *Helmann et al. v. Codepink Women for Peace, et al.*, First Amended Complaint, Dkt. 15. No. 24-cv-5704 (C.D. Cal.).

18.    On information and belief, Defendant Dissenters is an Illinois corporation and is a tax-exempt organization under I.R.C. § 501(c)(3) and has a chapter in the District, DMV Dissenters. Dissenters maintains a webpage, www.wearedissenters.org; an X account, @wearedissenters; and an Instagram account, @wearedissenters. The DMV chapter also maintains an Instagram account, @dmvdissenters. On information and belief, the address on file with the Internal Revenue Service for Dissenters is 637 South Dearborn Street, Chicago, Illinois, 60605. (Hedley Decl. ¶¶ 29-32.)

19.     On information and belief, Defendant Harriet's Wildest Dream (HWD) is a Maryland corporation and is a tax-exempt organization under I.R.C. § 501(c)(3). HWD's website, harrietsdreams.org, lists its address as 6368 Coventry Way, Suite 313, Clinton, Maryland, 20735, which is the same address on file with the Internal Revenue Service. HWD maintains an account on X, @HarrietsDreams, and an Instagram account, @harrietsdreams. (Hedley Decl. ¶¶ 33-34.)

20.     HWD's website identifies Defendant Nee Nee Taylor as a co-founder and Executive Director of the organization. On information and belief, Taylor has an Instagram account with a username @neeneetay. The Maryland Secretary of State's office indicates that Dornethia Taylor is the president and registered agent for HWD and lists the address in ¶ 15 as the mailing address. On information and belief, Dornethia Taylor is Nee Nee Taylor. (Hedley Decl. ¶ 35.)

21.     On information and belief, Defendant Party for Socialism & Liberation (PS&L) is a political party dedicated to ending capitalism. PSL has a website, www.pslweb.org. The website notes that PS&L has a branch in the District. The address on the PS&L website for donations by check is 3401 Mission Street, #151, San Francisco, California, 94110. PS&L maintains an X account, @pslnational, and an Instagram account, @pslnational. The PSL chapter in the District also has an Instagram account, @psldc. (Hedley Decl. ¶¶ 36, 38-40.)

22.     PS&L publishes a newspaper online called Liberation News, which has a website www.liberationnews.org. The Liberation News website lists Defendant Brian Becker as a "founder of and central organizer for the Party of Socialism and Liberation." Becker is also the National Coordinator of the ANSWER Coalition and has been involved in other anti-Israel actions in the District. For instance, Becker was listed as the Person In Charge for a Public Gathering Permit issued by the National Park Service for a gathering outside Union Station on July 23, 2024 to protest Israeli President Benjamin Netanyahu's speech before a joint session of Congress. (Hedley Decl. ¶ 37.)

23.     Defendant Maryland2Palestine (MD2Palestine) is an unincorporated entity that maintains a website, www.md2palestin.com; has an account on Instagram, www.instagram.com/md2palestine, with a username @md2palestine; an account on X, www.twitter.com/md2palestine, with a username @md2palestine; and an account on Facebook, www.facebook.com/MD2Palestine. There are icons for each of these social media platforms on the MD2Palestine website that link directly to these accounts. MD2Palestine was one of the six entities that organized the February 1, 2024 action in the District in which activists blockaded several roads and intersections. (Hedley Decl. ¶¶ 41-43.)

24.     On information and belief, Defendant Hannah Shraim is the co-chair of MD2Palestine and a resident of Maryland, and attends law school in Williamsburg, Virginia. Shraim maintains an Instagram account with a username @falastinnah which notes that she is an organizer for @md2palestine. There are posts on Shraim's Instagram account that reference @md2palestine and joint posts to both her and the @md2palestine Instagram account. Several MD2Palestine social media posts highlight Shraim as the featured speaker at a protests and rallies sponsored by Maryland2Palestine. In March 2023, Shraim represented MD2Palestine at a forum at the University of Maryland to discuss Palestine advocacy. (Hedley Decl. ¶ 43.)

**JURISDICTION AND VENUE**

25.     This Court has original jurisdiction pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d).

26.     There are 100 or more Class Members from multiple states and the aggregate amount in controversy exceeds Five Million Dollars ($5,000,000) exclusive of interests and costs.

27.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**FACTS**

28.     On the morning of Thursday, February 1, 2024, hundreds of Defendants' co-conspirators descended on several highways and roads in the District and blockaded traffic for approximately two hours. This was all part of a carefully planned and coordinated plan by Defendants who organized the blockade to exert pressure on Congress and the Biden administration to end arms sales to Israel.

29.     Thousands of people commute from Virginia to Washington, DC across the Potomac River every weekday. Defendants and their co-conspirators blocked traffic at several critical chokepoints and exits of most of the major routes into downtown Washington, Foggy Bottom, and Capitol Hill. (Hedley Decl. ¶¶ 53-62, 64.)

30.     These blockades caused thousands of motorists to be trapped in their vehicles with traffic back-ups in the District and for miles into Virginia.. (Hedley Decl. ¶ 54.) Media reports from that day showed traffic at a standstill in several places. Significant traffic delays remained even after police removed the blockaders.[11]

31.      Activists chanted slogans such as "We Don't Want No Jewish State" and "If We Don't Get It, Shut It Down!"

32.     Some individuals chained themselves together in the middle of highways and roads as part of the effort to blockade traffic.  Others used pieces of PVC piping attached over

---

[11] Joe DeVoe, *New: Protests blocking major roadways in D.C. lead to big backups in Arlington,* ARLnow (Feb. 1, 2024), available at, https://wwwarlnow.com/2024/02/01/new-protests-blocking-major-roadways-in-d-c-lead-to-big-backups-in-arlington/; Ellis Silverman, *23 arrested in protest for Gaza cease-fire that blocked D.C. roads, police say*, THE WASHINGTON POST (Feb. 1, 2024); available at, https://web.archive/web/20240204032319/http://www.washingtonpost.com/dc-md-va/2024/02/01/dc-traffic-portest-israel-gaza-war-ceasefire/; *23 people arrested after demonstrators block traffic in DC, briefly snarling morning commute*, WTOP News (Feb. 1, 2024), available at, https://wtop.com/traffic/2024/02/demonstrators-block-traffic-thoughout-dc-and-virginia-snarling-morning-commute/.

their linked arms—the so-called "sleeping dragon" tactic designed to prevent police from quickly clearing roads—to form human chains to block roads. (Hedley Decl. ¶¶ 53, 60.)

33.    Law enforcement arrested at least 23 individuals for blockading traffic and charged them with "crowding, obstructing, or incommoding" and at least three of those arrested were also charged with resisting arrest. (Hedley Decl. ¶ 63.)

34.    The blockades lasted for up to two-and-a-half hours. Not surprisingly, the result was massive traffic jams and delays. Traffic into the District was backed up miles into suburban Virginia. And it wasn't only motorists on the blockaded highways or streets that were trapped or inconvenienced because the blockades impeded traffic on multiple side-streets and other roads that feed into the highways and streets that had been blockaded by the activists.

35.    As a result of the intentional illegal actions of Defendants and their co-conspirators, Plaintiff, Daniel Faoro, along with thousands of other motorists, was trapped on the highway and confined in his car.

36.    Faoro was on Route 50 near where it curves past Fort Myer when he finally learned the cause of why he was stuck in traffic. The blockade confined Faoro in his car without moving or barely moving for close to an hour before he could navigate out of the blocked traffic and return to his home.

**Evidence of Conspiracy**

37.    The actions of Defendants and their co-conspirators were not spontaneous. The Defendants, agreeing to blockade traffic, planned and organized their unlawful conduct in advance and promoted it on various social media platforms before, during and after the February 1, 2024 action. Some of this social media activity by the Defendants was independent, but frequently the posts were done in collaboration with other Defendants or allied organizations.  (Hedley Decl. ¶¶ 47-52.)

38.     This type of disruptive action was not novel to the Defendants. Prior to the February 1, 2024 blockade in the District, Defendant JVP organized similar actions in other cities where activists also blockaded traffic on major roads and highways or have disrupted commuters. It is not ashamed of these lawbreaking activities, but uses them to promote their organization to the public. (Hedley Decl. ¶¶ 44-45.)

39.     For instance, on October 27, 2023, JVP organized a sit-in in Grand Central Station in New York City, disrupting commuters as they made their way to and from train platforms during the busy rush hour commute. (Hedley Decl. ¶ 44.)

40.     JVP's website brags that "the main terminal was fully shut down" and that police were forced to close all the entrances to the station and that 350 people were arrested. (Hedley Decl. ¶ 44.)

41.     Similarly, JVP's website touts that on December 14, 2023, the organization in conjunction with other allied organizations, "blocked traffic for hours" in eight major cities (Philadelphia, Atlanta, Chicago, Minneapolis, Seattle, Portland, Los Angeles, San Diego, and the District) by shutting down bridges and highways in those cities.  (Hedley Decl. ¶ 45.)

42.     In the days leading up to February 1, 2024, the Defendant organizations started to post on their social media accounts flyers and notices about an upcoming demonstration scheduled for February 1, 2024 at 7:00 a.m. at Union Station.  (Hedley Decl. ¶¶ 47-52.)

43.     For instance, a joint Instagram post from Dissenters and DMV Dissenters on January 25, 2024 included a flyer advertising a general strike for February 1, 2024 at 7:00 a.m. at Union Station. The flyer notes the six entities organizing the action: PYM, HWD, OccupationFree DC, Dissenters, PS&L and MD2Palestine. (Hedley Decl. ¶ 48.)

44.     That same day, the Instagram accounts of all the entities organizing the planned action posted a similar flyer on their respective Instagram accounts.  (Hedley Decl. ¶ 47.)

45.    Instagram posts by one or more of the Defendants on January 27, 29, 30, and 31, 2024, also advertised the scheduled action on February 1, 2024 at Union Station. (Hedley Decl. ¶¶ 49-52.)

46.    The advertised location of Union Station as the site of the action was intended to deceive law enforcement, thereby allowing the activists to spread out to the five separate locations and create the massive traffic back-ups across the District and into suburban Virginia. (Hedley Decl. ¶ 64.)

47.    On February 1, 2024, the Defendants flooded social media with posts highlighting the blockade with pictures and videos of activists blocking traffic at multiple locations and proudly proclaiming that traffic into the District had been shut down. (Hedley Decl. ¶¶ 53-62, 68.)

48.    For instance, Instagram account @dmvpym, in collaboration with @palestinianyouthmovement, @occupationfreedc, @md2palestine, and @dmvdissenters published a post with photos and images of the action, including activists that had chained themselves together and linked together by PVC piping. The post also showed multiple activists being arrested and proudly touted that "[a]nother major US-city was shutdown for Palestine" and that the blockade caused "severe traffic jams all throughout the capital." (Hedley Decl. ¶ 53.)

49.    Similarly, another Instagram post from @dmvpym, @occupationfreedc, @palestinianyouthmovement, @psldc, and @dmvdissenters included a traffic map showing traffic stopped into suburban Virginia and had the caption "HAPPENING NOW! Pro-Palestine, anti-Zionist protestors stage an act of mass civil disobedience today, blocking traffic in and out of Washington, DC while Congress is in session." (Hedley Decl. ¶ 54.)

50.    Likewise, PS&L used its national and DC affiliate Instagram accounts to post two videos showing activists marching or blockading roadways and causing vehicle traffic to halt. One post was accompanied by text stating "Right now: Protestors in Washington DC have blocked the intersection in front of the State Department." And the other post had text

stating "HAPPENING NOW: Hundreds take to the streets of Washington DC to disrupt business as usual." (Hedley Decl. ¶ 60.)

51.    Defendant Dissenters used the Instagram accounts @wearedissenters and @dmvdissenters to post a video showing individuals blockading traffic, which included interviews of some of the activists participating in the blockade. The caption on the post stated "NO BUSINESS AS USUAL FOR WAR CRIMINALS" and text accompanying the post stated "FIVE major roadways blocked coming into DC." (Hedley Decl. ¶ 62.)

52.    The Defendants continued to use their own or affiliated social media accounts to post images and videos of the blockades throughout the day. Many of those images and videos showed traffic backed up and motorists confined to their vehicles with no way to extricate themselves.

53.    Also on February 1, 2024, some of the Defendants and their allies used social media accounts to solicit support for the 23 activists who had been arrested for participating in the blockades. (Hedley Decl. ¶ 59.) The Defendants continued to use social media to advocate for the arrested activists even after February 1, 2024. (Hedley Decl. ¶¶ 63, 67.)

54.    The Defendants proudly hailed their illegal actions following the February 1 blockade. For instance, on February 3, 2024, @dmvpym, in collaboration with @dmvdissenters, @psldc, @occupationfreedc and @palestinianyouth, posted a video to Instagram approximately one minute and 30 seconds long. The video was polished and of high production quality with dramatic music and contained video and images of the blockades, listing the five different locations where activists blocked traffic. It also contained video clips from local news media coverage of the action that also showed individuals blockading intersections and traffic halted for miles. The news media clips further noted that the organizers had used "decoy" flyers to deceive law enforcement into believing that the action would be located at Union Station. (Hedley Decl. ¶ 64.)

55.    Similarly, on February 6, 2024, DMV Dissenters published on its Instagram account a post that included a video of the action with a caption stating "FIVE MAJOR

INTERSTATES INTO DC SHUT DOWN FOR PALESTINE." The text accompanying the post stated "Last week DMV Dissenters joined @dmvpym @md2palestine @psldc @shutdowndc_ @occupationfreedc @jvpdecmetro and others to SHUT DC DOWN." The post also emphasized that activists blocked an "intersection for two and half hours to disrupt business as usual." (Hedley Decl. ¶ 65.)

56.    On February 9, 2024, Defendant JVP used its @jvpmetrodc Instagram account to publish a post that contained images and videos of the blockades. The text accompanying the post stated "One week ago, JVP-DC Metro helped @dmvpym @dmvdissenters @harrietsdreams @occupationfreedc @psldc and others shut down 5 main roadways into downtown DC." (Hedley Decl. ¶ 66.)

57.    Then again, on February 21, 2024, the Instagram accounts @dmvpym, @palestinianyouthmovement, @harrietsdreams, @md2palestine, and @psldc collaborated on a post that advocated on behalf of the arrested activists and encouraged supporters to attend virtual court hearings scheduled for the following week. (Hedley Decl. ¶ 67.)

58.    Defendants made no attempt to conceal their involvement in organizing and participating in the blockades. On the contrary, Defendants, both during and after the February 1, 2024 action, proudly took credit for it and celebrated that it had caused major traffic delays and disruptions to the lives of those commuting into and around the District.

## CLASS ACTION ALLEGATIONS

### A.  Class Definition

59.    Plaintiff brings this action individually and on behalf of all persons as the Court may determine to be appropriate for class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3). Plaintiff seeks to represent a Class of persons preliminarily defined as: all drivers and passengers of vehicles traveling on the morning of February 1, 2024 between the hours of 8:00 a.m. and 11:00 a.m. in the District of Columbia; the City of

Alexandria, Virginia; Arlington County, Virginia; and Fairfax County, Virginia, who were confined in their vehicles because of the actions blockading traffic in Washington, DC.

60.    Excluded from the class are Defendants; officers and directors of Defendants and their parents, subsidiaries, and affiliates; and all judges assigned to hear any aspect of this case, as well as their immediate family members.

61.    Plaintiff reserves the right to propose one or more subclasses if discovery reveals that such subclasses are appropriate.

62.    This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure in that:

    a.  The Class, which includes thousands of members, is so numerous that joinder of all members is impracticable;

    b.  There are substantial questions of law and fact common to the Class, including those set forth in further detail herein;

    c.  Questions of law and fact which are common to the Class predominate over any questions of law or fact affecting only individual members of the Class;

    d.  The claims of the representative parties are typical of the claims of the Class;

    e.  A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

    f.  The relief sought in this class action will effectively and efficiently provide relief to all members of the Class;

    g.  There are no unusual difficulties foreseen in the management of this class action; and

    h.  Plaintiff's claims are typical of those of the Class and, through experienced counsel, will zealously and adequately represent the Class.

**B.  Numerosity**

63.    The approximate number of commuters within the Class is over 10,000.

64.    The Class consists of thousands of members and therefore is so numerous that joinder is impracticable.

### C. Commonality

65.     The common questions of law and fact predominate over any individual questions affecting Class Members, including but not limited to: (1) elements of the tort of public nuisance; (2) the elements of the tort of false imprisonment; and (3) the elements of civil conspiracy.

### D. Typicality

66.     Plaintiff has the same interests in this matter as all the other members of the Class and his claims are typical of all the members of the Class. If brought and prosecuted individually, the claims of each Class Member would require proof of many of the same material and substantive facts, utilize the same evidence, rely upon the same legal theories and seek the same type of relief.

67.     The claims of the Plaintiff and the other Class Members have a common cause and their damages are of the same type. The claims originate from the same unlawful, willful and concerted actions of the Defendants.

68.     All Class Members have suffered injury in fact because of Defendants' concerted actions because they were unlawfully confined to their vehicles during the action and because Defendants' actions unreasonably interfered with their right to freely travel on public roads and highways.

### E. Adequacy of Representation

69.     Plaintiff's claims are sufficiently aligned with the interests of absent Class Members to ensure that the Class claims will be prosecuted with diligence and care by Plaintiff as representatives of the Class. Plaintiff will fairly and adequately represent the interests of the Class and they do not have interests adverse to the Class.

70.     Plaintiff has retained the services of counsel who are experienced litigators, particularly with respect to class actions, Rule 23 of the Federal Rules of Civil Procedure, and the Class Action Fairness Act (CAFA). Plaintiff's counsel will vigorously prosecute this action

and will otherwise protect and fairly and adequately represent Plaintiff and all absent Class Members.

**F.  Class Treatment is the Superior Method for Adjudication**

71.    A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in the Complaint because:

    a.  Individual claims by the Class Members would be impracticable as the costs of pursuit would exceed what any one Class Member has at stake;

    b.  Little or no individual litigation has been commenced over the controversies and conduct alleged in the Complaint and individual Class Members are unlikely to have an interest in separately litigating individual actions;

    c.  The concentration of litigation of these claims in one action will achieve efficiency and promote judicial economy; and

    d.  The proposed action is manageable.

72.    The prosecution of separate actions by individual members of the Class would create the risk of (1) inconsistent or varying adjudications with respect to individual Class Members which could establish incompatible standards of conduct for one or more of the Defendants; and (2) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interest of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

73.    Notice can be provided to members of the Class by publication and broadcast including but not limited to news media, social media platforms and commercial radio, including satellite radio.

**CLAIMS**

**Count I: Public Nuisance**

74.    Plaintiff restates the allegations set forth in all previous paragraphs of this Complaint.

75.     Plaintiff commutes from his home in Fairfax County, Virginia into the District for work and was doing so the morning of February 1, 2024, when he was impeded by Defendants' traffic blockade.

76.     Because of the Defendants' conspiracy and concerted actions in furtherance of that conspiracy, a public nuisance was created in the District of Columbia, the City of Alexandria, Virginia, and Arlington County, Virginia for over two hours. Defendants organized and conspired to create, and participated in this public nuisance. Their unlawful conduct inhibited freedom of movement, with Plaintiff and thousands of others deprived of their right to freely travel public roads and highways without unreasonable interference.

77.     Plaintiff did not consent to being denied the right to travel freely on public highways and roads.

78.     As a foreseeable, direct and proximate result of Defendants' concerted actions, Plaintiff and others impeded by the public nuisance suffered damages, including but not limited to:

      a.   Loss of wages or income;

      b.   Annoyance, inconvenience and physical discomfort, anxiety and emotional distress by being confined in a stationary vehicle for an unreasonable period of time and uncertainty about when they might be free to resume traveling; and

      c.   Loss of time that could otherwise have been spent working, taking care of personal business, or enjoying time with family or friends.

79.     Defendants proudly promoted the public nuisance, have engaged in similar actions in the past, and are likely to do so again in the future in the absence of criminal prosecution. District law entitles the Plaintiff and the class to an injunction against future illegal blockades of roads and similar public nuisances.

**Count II: False Imprisonment**

80.     Plaintiff restates the allegations set forth in all previous paragraphs of this Complaint.

81. A direct and foreseeable result of Defendants' conspiracy and concerted actions on February 1, 2024, was that the Plaintiff and class members were restrained and deprived of their physical liberty without consent or legal justification.

82. A further direct and foreseeable result of Defendants' actions was that Plaintiff and class members suffered damages including, but not limited to:

    a. Lost wages and income;

    b. Annoyance, inconvenience and physical discomfort, anxiety and emotional distress by being confined in a stationary vehicle for an unreasonable period of time and uncertainty about when they might be free to resume traveling; and

    c. Loss of personal freedom.

83. Defendants' substantial restraint of Plaintiff's and other class members' physical liberty without consent or legal justification constitutes false imprisonment for which Defendants are liable to Plaintiff and class members for all damages arising from such unlawful conduct, including compensatory, punitive and injunctive relief.

### Count III in the Alternative: Negligence or Recklessness

84. Plaintiff restates the allegations set forth in all the previous paragraphs of this Complaint.

85. As PYM's fiscal sponsor during the relevant time, WESPAC had a legal duty to control and supervise the activities of PYM, which had and continues to have no corporate structure. WESPAC is thus liable for the acts of PYM, whether it is because WESPAC is during the relevant times the alter ego of PYM; because WESPAC controlled and supervised PYM's activities; or, in the alternative, because WESPAC negligently or recklessly breached its duty to control and supervise the activities of PYM, whose foreseeable illegal actions caused foreseeable injury to the Plaintiff and the Class, causing damages.

21

**PRAYER FOR RELIEF**

Plaintiff respectfully request that this Court:

a.        Certify the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.        Designate Plaintiff as representatives of the proposed Class and designate his counsel as Class Counsel;

c.        Enter Judgment in favor the Plaintiff and the Class Members against the Defendants; and

d.        Award Plaintiff and the Class Members compensatory and punitive damages and attorneys' fees and costs, including pre-judgment interest and post-judgment interest;

e.        Order injunctive relief prohibiting Defendants' from further engaging in the unlawful conduct alleged in this Complaint; and

f.        Award any other legal or equitable relief that the Court deems appropriate, including but not limited to attorneys' fees and nominal damages.

Dated: January 31, 2025

Respectfully Submitted,

By:    /s/ Anna St. John
Anna St. John (D.D.C. Bar No. 983914)
Neville S. Hedley (D.C. Bar No. 458259)
        (admitted but not yet sworn)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Telephone: (917) 327-2392
anna.stjohn@hlli.org
Telephone: (312) 342-6008
ned.hedley@hlli.org

*Attorneys for Plaintiff Daniel Faoro*

Pursuant to 28 U.S.C. § 1746, I, Daniel Faoro, have personal knowledge of the matters alleged in the foregoing Verified Complaint concerning myself, my activities, and my intentions. I verify under the penalty of perjury that the statements made therein are true and correct.

Executed on January 29, 2025

Daniel Faoro