## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DANIEL FAORO** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.:  25-CV-00289** |
| | ) | |
| **JEWISH VOICE FOR PEACE,** | ) | **Oral Argument Requested** |
| **INC., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## DEFENDANTS PARTY FOR SOCIALISM AND LIBERATION AND BRIAN BECKER'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND FOR SANCTIONS AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................... 1

**ALLEGATIONS IN THE COMPLAINT** ........................................................................ 3

**I.**    **Allegations Pertaining to Brian Becker** ........................................................ 4

**II.**   **Allegations Otherwise in the Complaint and Pertaining to the Party for Socialism and Liberation (PSL)** ................................................................................. 4

**III.** **Allegations in the Complaint of Particularized Injury to Plaintiff** ............... 5

**IV.** **Allegations in the Complaint of Injury to the Putative Class** ....................... 6

**LEGAL STANDARDS** .................................................................................................... 6

**ARGUMENT** ................................................................................................................... 7

**I.**    **The Court Should Dismiss the Complaint Because Plaintiff Does Not Identify Cognizable Injury Nor Causation to Establish Article III Standing** ..................... 7

    A.   Plaintiff fails to claim a cognizable particularized concrete injury and merely advances general grievances or ideological complaints ..................................... 8

    B.   Claims of anxiety or emotional distress, loss of time, or inconvenience are not cognizable Article III injuries for standing purposes ........................................ 10

    C.   Expansion of Article III standing is unjustified and would open the floodgates to federal lawsuits over ordinary traffic congestion and against the incidental consequences of protest activity, leading to lawfare complaints and SLAPP suits .................................................................................................................. 10

    D.   The complaint should be dismissed on standing grounds due to lack of causation .............................................................................................................. 11

**II.** **The Court Should Dismiss the Complaint for Failure to State a Claim** ........................ 12

    A.   Plaintiff's Count I: Public Nuisance fails to state a claim and should be dismissed ........................................................................................................... 12

        1.   Plaintiff does not have standing to bring a public nuisance claim ....... 13

        2.   Nuisance is not a stand-alone tort and no other tort besides false imprisonment, which is inapplicable, has been pled ........................... 15

3.  Traffic impediment is not an unreasonable interference with a right common to the public ............................................................................. 16

4.  Plaintiff's assertion that PSL and Brian Becker participated in a conspiracy to create a public nuisance is conclusory and unsupported by factual allegations ................................................................................. 17

B. Plaintiff's Count II: False Imprisonment fails to state a claim and should be dismissed ............................................................................................................ 22

1.  The Restatement (Second) of Torts establishes that the blocking of a roadway does not constitute false imprisonment ................................. 23

2.  The false imprisonment claim fails without the necessary element of a confinement "within boundaries fixed by the defendant" ................... 23

3.  The false imprisonment claim fails without the necesary element of a "total" restraint upon freedom of movement ....................................... 24

4.  The false imprisonment claim fails without any allegation of use of force, threat of force, or assertion of authority by PSL or Becker against Plaintiff .............................................................................................. 25

5.  The false imprisonment claim fails without any allegation of intent to falsely imprison .................................................................................... 25

6.  The false imprisonment claim fails if the Court applies Virginia law . 25

7.  Plaintiff's claim that PSL and Becker participated in a conspiracy to falsely imprison Plaintiff is conclusory and unsupported by factual allegations ......................................................................................... 26

III.   **The Plaintiff's Complaint Should be Dismissed with Prejudice Without Leave to Amend .................................................................................................. 26**

IV.   **The Court Should Award Sanctions Pursuant 28 U.S.C. § 1927 and This Court's Inherent Authority .................................................................................. 28**

V.   **PSL and Becker Join in the Motions Filed or to be Filed by Any Co-Defendant to Dismiss Plaintiff's Complaint to the Extent They or Their Reasoning Apply to PSL or Becker ............................................................................................ 29**

**CONCLUSION ............................................................................................... 30**

# INTRODUCTION

Washington, D.C., as the nation's capital, hosts hundreds and sometimes thousands of protests every year, bringing hundreds of thousands of people -- at times in a single day -- into the streets of the District. The District has been the historic location for a range of mass assemblies and marches including those for women's suffrage, anti-lynching protests, civil rights demonstrations, anti-war mobilizations, and rallies for nuclear disarmament; marches for the Equal Rights Amendment, labor rights, environmental protections, abortion rights and LGBTQ liberation; marches against abortion rights; and annual slow rolling motorcycle assemblies for POWs. People from across the country come to petition their government for a redress of grievances in Washington, D.C. These assemblies often take over District streets and roadways. They can cause vehicular traffic delays or the inability to travel on certain roadways. Sometimes people march. Sometimes they rally. Sometimes they sit down.

Over the past year and half, among the multitude of other free expression assemblies that have occurred in Washington, D.C., those opposed to Israel's war in Gaza and the U.S. government's support for genocide[1] have also protested.

Plaintiff and his counsel oppose the message of those who protest the war in Gaza and

---

[1]    *See Def. for Child. Int'l-Palestine v. Biden*, 714 F. Supp. 3d 1160 (N.D. Cal.), *aff'd,* 107 F.4th 926 (9th Cir. 2024) ("[T]he undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law."); International Court of Justice, Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel), Order dated January 26, 2024, ¶ 30,  https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf ("[S]ome of the acts and omissions alleged by South Africa to have been committed by Israel in Gaza appear to be capable of falling within the provisions of the Convention[.]"); International Criminal Court, Press Release, *Situation in the State of Palestine: ICC Pre-Trial Chamber I Rejects the State of Israel's Challenges to Jurisdiction and Issues Warrants of Arrest for Benjamin Netanyahu and Yoav Gallannt*¸(Nov. 21, 2024), https://www.icc-cpi.int/news/situation-state-palestine-icc-pre-trial-chamber-i-rejects-state-israels-challenges; Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territory Occupied Since 1967 to Human Rights Council, *Anatomy of a Genocide*, (July 1, 2024), https://docs.un.org/en/A/HRC/55/73.

call for a ceasefire, so they constructed a sanctionable lawsuit abusing the court system in order to punish and attempt to suppress viewpoints on matters of public interest with which they disagree. Plaintiff complains that he was "inconvenienced" by protest.

At bar is a quintessential SLAPP suit (Strategic Lawsuit Against Public Participation), filed in federal court to circumvent the anti-SLAPP law of the District of Columbia. It is not brought in good faith.  If this baseless lawsuit is permitted, this Court and others will be deluged by lawsuits brought by ideological opponents of protected speech, protest, political advocacy, or similar activities. Union members and leaders could be haled into court because their protests have an adverse effect on businesses engaged in unfair labor practices. Labor protests outside buildings or restaurants will be met with lawsuits constructed of persons claiming that noise disturbed their work or a peaceful dinner. ACT UP would have spent a significant amount of time in court sued by adversaries tying up its historic fight to change government policy that was allowing death and suffering. Indeed, the targeting of those advocating for AIDS treatments, on the basis of traffic "inconvenience," could even occur today.[2] Rolling Thunder, or others who intentionally occupy and congest the roadways ever so slowly to draw attention to a political issue, could be sued out of existence on the same basis by those who oppose their advocacy. Whatever the interest group, right or left, conservative or liberal, no matter what the expression, will find themselves targeted by politically motivated and funded legal institutions or organizations with lawsuits that, notwithstanding lack of merit, will endeavor to drain them in terms of funds, human resources, and to divert their work.

It bears reminder that, as discussed below, the D.C. Council has enacted broad permissive legislation in the First Amendment Assemblies Act of 2004 that welcomes mass assembly and demonstration in the streets, including that which may be unplanned or unpermitted and may disrupt traffic or slow other activities, unless and until a lawful determination is made pursuant to guidelines to disperse participants via multiple orders to disperse. That reflects a balancing of

---

[2] *Rubio lies, people with AIDs die' -Demonstrators block D.C. streets over cuts to PEPFAR.* Reuters, February 7, 2025, Doc. No. LVA001944906022025RP1, available at https://reuters.screenocean.com/record/1956150

2

interests in the nation's capital, that free speech is valued in a democracy and worth the cost of some inconvenience and disruption, and policymakers have required that police be trained to facilitate unplanned, planned, or spontaneous protest activity. It reflects a recognition that the inconvenience of being delayed in traffic pales in comparison with the long-term consequences of suppressing democratic freedoms. Freedom of expression, rightfully, is considered the lifeblood of democracy. Freedom from inconvenience and traffic congestion in a major metropolitan area is a different issue, perhaps an issue of generalized interest but not a core constitutional pillar.

As discussed below, the Complaint is devoid of fundamental elements to state a claim of relief under either of the two asserted counts, public nuisance and false imprisonment and should be dismissed based on these failures and other bases set forth below, including Plaintiff's glaring lack of Article III standing.

For reasons set forth herein, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Plaintiffs Brian Becker and the Party for Socialism and Liberation respectfully move to dismiss Plaintiff's Complaint.

## ALLEGATIONS IN THE COMPLAINT

Plaintiff claims that, while driving in Northern Virginia on Route 50, he experienced stop-and-go traffic for a period of less than one hour during the morning rush hour period of February 1, 2024, conditions which he alleges were caused by politically expressive assemblies, including sit-ins, that occurred in five streets or intersections in different locations miles away from him in Washington, D.C. for a corresponding period of time. The object of widespread demonstration activity that day was to focus attention on atrocities and genocide committed by the State of Israel against the people of Gaza, as well as U.S. support for such activity.

Plaintiff does not allege that the Party for Socialism and Liberation (PSL) and Becker participated in sitting down in any of the five locations.

### I.    Allegations Pertaining to Brian Becker

Plaintiff advances precisely zero allegations, either general or specific, that Brian Becker engaged in any acts in relation to the Complaint or underlying events.

The sole allegations regarding Mr. Becker are that an online newspaper website identifies him as a "founder of and central organizer for the Party of [sic] Socialism and Liberation" Compl. ¶ 22, that he is a National Coordinator of the ANSWER Coalition, *id.*, which is not a defendant in this litigation nor otherwise referenced in the Complaint, that he is allegedly associated with "*other* anti-Israel actions in the District," *Id.* (italics added to emphasize the attenuation and irrelevancy setting aside the political characterization), and that he was listed as a person in charge of a Public Gathering Permit in connection with a demonstration that occurred July 23, 2024, in which the speech and assembly was "to protest Israeli President Benjamin Netanyahu's speech before a joint session of Congress." *id*. No other paragraph of the twenty-three (23) page complaint references Mr. Becker.

### II.    Allegations Otherwise in the Complaint and Pertaining to the Party for Socialism and Liberation (PSL)

The gravamen of the Complaint is that on February 1, 2024, "hundreds" of unnamed and unidentified persons "blockaded traffic for approximately two hours," Compl. ¶ 28, at "five separate locations*," id.* ¶ 46.

"Some" unidentified "individuals chained themselves together" to block traffic. *Id.* ¶ 32.

The most specificity offered by Plaintiff's averments is that "at least 23 individuals" were arrested for blockading traffic, presumably after refusing orders to disperse. *Id.* ¶ 33.

None of these unnamed individuals, whether they constitute twenty-three (23) persons or hundreds, are alleged to have engaged in communication with the PSL or Becker or to have, in advance of February 1, 2024, reached an agreement that involved the PSL or Becker to engage in unlawful conduct.

None of the named defendants are alleged with any particularity to have reached an

agreement with the PSL or Becker to engage in unlawful blocking of highways or streets. There is no averment alleging a meeting, a communication, a date or time or place, of any such agreement involving the PSL or Becker.

Plaintiff's particular allegations regarding the PSL consist of averments that PSL made certain statements. Plaintiff alleges that the PSL was associated with advance calls for demonstration activity for February 1, 2024. *Id.* ¶¶ 43, 44 (calls for a "general strike"). Plaintiff alleges that, after persons had assembled and sat down in certain District of Columbia streets, PSL reported on such activity. *Id.* ¶¶ 49-50 (posts displayed images and said "Happening now!"). Such reporting and imagery was also posted after-the-fact, on February 3, 2025. *Id.* ¶ 54. Plaintiff alleges that, on February 21, 2024, the PSL collaborated on a post that "advocated on behalf of the [23] arrested activists and encouraged supporters to attend virtual court hearings" for them. *Id.* ¶ 57.

Plaintiff alleges that the sit-down actions by unidentified individuals caused "massive traffic back-ups across the District and into suburban Virginia." *Id.* ¶ 46.

Throughout the Complaint, Plaintiff broadly alleges that Defendants share a common political perspective that is critical of Israel's actions against Gazans and Palestinians. Plaintiff, likewise, makes clear that he is upset at this message and considers his experience of congested traffic conditions to have "compelled these innocent Americans like Faoro to unwillingly participate" in activism and messages that are critical of Israel. *Id.* ¶¶ 2, 3.

### III.    Allegations in the Complaint of Particularized Injury to Plaintiff

Plaintiff does not allege himself to have been in Washington, D.C. during the period of the sit-ins but to have been miles away in Virginia.

He alleges his individual damages with particularity in paragraphs 35 and 36 of the Complaint. He alleges that as a consequence of the sit-down actions in Washington, D.C., for less than one hour the vehicle he was driving on Route 50 near Fort Myer was caused to move in slow or stop-and-go traffic for a period of time that was less than one hour. *Id.* ¶¶ 35, 36. He alleges that he was able to "navigate out of the blocked traffic and return to his home." *Id.* ¶ 36.

He does not allege with any particularity that he suffered any other injury.

## IV.    Allegations in the Complaint of Injury to the Putative Class

Plaintiff seeks to represent a class consisting of "all drivers and passengers of vehicles traveling on the morning of February 1, 2024 between the hours of 8:00 a.m. and 11:00.m. in the District of Columbia; the City of Alexandria, Virginia; Arlington Country, Virginia; and Fairfax County, Virginia" who suffered similar traffic delays and congestion. *Id.* ¶ 59.

Class-wide damages, *see id.* ¶¶ 78, 82, are broader than the damages Plaintiff himself alleges with particularity that he specifically experienced, *see id.* ¶¶ 35-36, to include collectively for the class supposed lost wages and income, annoyance and inconvenience and physical discomfort, anxiety and emotional distress, and loss of personal freedom for having experienced traffic delays, congestion, or stop-and-go traffic conditions during the morning commute into D.C. *But see Am. Jewish Cong. v. Vance*, 575 F.2d 939, 944 (D.C. Cir. 1978) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)) ("[T]he possibility that other members of the class might have standing had they brought suit does not thereby confer standing on the named [plaintiff.]").

Plaintiff seeks damages be imposed against the defendants, to include the PSL and Brian Becker, in an amount that "exceeds Five Million Dollars ($5,000,000) exclusive of interests and costs." *Id.* ¶ 26.

## LEGAL STANDARDS

When assessing a motion to dismiss under Rule 12(b)(6), the Court must accept the plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "[t]hreadbare recitals" and "mere conclusory statements" do not suffice. *Id.* "A claim cannot survive a motion to dismiss if based on inferences 'unsupported by facts' or legal conclusions disguised as factual allegations." *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 866 (D.C. Cir. 2022) (quoting *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018)).

If a complaint lacks sufficient facts—"setting 'mere conclusory statements' aside"—to state a claim "that is plausible on its face," then the Court must dismiss it. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Iqbal*, 556 U.S. at 678). This "plausibility" standard requires "more than a sheer possibility that a defendant has acted unlawfully" *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 590 (D.C. Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678). In determining whether a claim is plausible, the Court may "draw on its judicial experience and common sense." *Id.* at 591 (quoting *Iqbal*, 556 U.S. at 676).

The Plaintiff bears the burden of invoking the Court's subject matter jurisdiction, including establishing the elements of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Plaintiff cannot establish his standing to sue on the basis of purported injuries to others, including putative class members not before the Court. It is well-settled that a "plaintiff must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499–500.

Where, as here, the Plaintiff invokes the Court's jurisdiction to issue declaratory and injunctive relief on the basis of future predicted injury, he bears a "more rigorous burden" to establish standing. *Arpaio*, 797 F.3d at 21 (quoting *United Transp. Union v. I.C.C.*, 891 F.2d 908, 913 (D.C. Cir. 1989)). Plaintiff has not made even a cursory effort to demonstrate standing for injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 – 106 (1983) (requirement of showing real and immediate threat of future injury, not based on speculation or conjecture); *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987).

## ARGUMENT

### I.     The Court Should Dismiss the Complaint Because Plaintiff Does Not Identify Cognizable Injury Nor Causation to Establish Article III Standing

Defendants move pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss the complaint for lack of subject matter jurisdiction, as plaintiff has failed to allege he suffered specific, individualized harm capable of invoking federal court jurisdiction. *See Haase*,

835 F.2d at 906 (a defect in standing is a defect in subject matter jurisdiction); *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 – 14 (D.D.C. 2001) (allegations require "closer scrutiny" than in a Rule 12(b)(6) motion because the Court has an obligation to ensure it is acting within the scope of jurisdictional authority).

Here, Plaintiff alleges he experienced the inconvenience of stop-and-go traffic conditions for less than one hour, conditions which he alleges affected drivers generally within the region.

### A. Plaintiff fails to claim a cognizable particularized concrete injury and merely advances general grievances or ideological complaints

To invoke federal court jurisdiction, a plaintiff must claim a concrete, particularized injury that affects "the plaintiff in a personal and individual way" and not be a generalized grievance. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *Lujan*, 504 U.S. at 573–74; *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 198 F. Supp. 2d 744, 755 (E.D. Va. 2002), *aff'd,* 320 F.3d 475 (4th Cir. 2003) (citing *Lujan*, 504 U.S. at 573–74) ("[A] plaintiff must claim a specific, personalized injury in order to invoke the jurisdiction of a federal court because courts do not sit to entertain generalized grievances that are shared by the public at large.").

The *Taubman* court held that adverse regional traffic conditions attributable to challenged conduct failed to constitute the necessary individualized injury as to confer Article III injury-in-fact or standing. "To the contrary, such an interest is common to anyone living or working in the affected region. The federal courts are not appropriate fora in which to seek generalized grievances of this sort." *Id.*; *see also Reudiger v. U.S. Forest Serv.*, 427 F. Supp. 2d 974 (D. Or. 2005) (The prevention of "traffic related impacts to a region are not the type of concrete, litigant-specific interests upon which a party" may base their injury to confer standing); Restatement (Second) of Torts § 36 (1965), comment d ("[T]he public is merely privileged to travel the public highways and has not a right to do so; that is the interests of the members of the public in such travel is not protected by a right of action[.]").

In the context of alleged traffic delays (setting aside issues of causation) from an

allegedly illegal protest activity, a plaintiff's injury must be more than a generalized grievance shared by the public.

The concrete harm requirement of Article III is essential for the separation of powers, the "single basic idea" on which all of Article III standing is built, placing the role of the courts within certain bounds vis-à-vis the other branches, and often requiring a "restricted role for Article III courts." *United States v. Texas*, 599 U.S. 670, 675, 681 (2023); *Lewis v. Becerra*, 111 F.4th 65, 74 (D.C. Cir. 2024).

Plaintiff's alleged injuries are exactly the sort of generalized grievances -- traffic delays caused by First Amendment assembly activity -- that are the province of the legislative branch of government and <u>not</u> the federal courts.

The District of Columbia Government has enacted broadly permissive statutory authority establishing the right to assemble in the streets for politically expressive activity <u>without</u> a permit. *See, generally* D.C. Code § 5-331.01, *et seq.* (First Amendment Assemblies Act of 2004). Assembling in the streets for political expression has been expressly decriminalized. It is not unlawful for persons to assemble or demonstrate or sit down in the roadways of the District of Columbia in the context of First Amendment activity, including in the absence of prior notice or approval by authorities. D.C. Code § 5-331.05 ("It shall not be an offense to assemble or parade on a District street . . . without having provided notice or obtained an approved assembly plan."). Protestors may do so, and they may remain in the streets (notwithstanding the impact on traffic) until and unless there is a lawful police determination that the assembly should be dispersed due to adverse effects or other lawful consideration, and protestors are ordered to disperse and given ample opportunity to disperse prior to such conduct being either illegal or subjecting a participant to arrest. D.C. Code §§ 5-331.03, 5-331.07. It is only at this point, after orders and opportunity to disperse and failure to comply with such orders, that an individual who is in the roadway for protest activity has committed an unlawful act by their mere presence, assembly, or demonstration activity in the street.

"By requiring the plaintiff to show an injury in fact, Article III standing screens out

plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular" course of conduct. *All. for Hippocratic Med.*, 602 U.S. at 381. "The injury in fact requirement prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Id.* at 382 (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)); *see id.* ¶ 2 (Plaintiff's assertion of ideological or political objection to a message that "shows support for Palestinians" and that "denounces the United States government's support for the State of Israel").

### B. Claims of anxiety or emotional distress, loss of time, or inconvenience are not cognizable Article III injuries for standing purposes

Plaintiff cannot manufacture standing by claiming anxiety or emotional distress. *Humane Soc. of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995) ("general emotional 'harm, [to include depression, sleeplessness, anger, and the like] no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes") (collecting cases). "[A] plaintiff's loss of time and convenience is not generally sufficient to establish standing." *Armstrong v. Navient Sols., LLC*, 292 F. Supp. 3d 464, 474 (D.D.C. 2018) (citing *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 25 (D.C. Cir. 2000)).

### C. Expansion of Article III standing is unjustified and would open the floodgates to federal lawsuits over ordinary traffic congestion and against the incidental consequences of protest activity, leading to lawfare complaints and SLAPP suits

There is no precedent for federal standing to be expanded in this novel and unprecedented manner to permit federal lawsuits where conduct creates or contributes to traffic delays of the sort ordinarily encountered in a major metropolitan area. In an apolitical setting this would open the floodgates to federal lawsuits whenever a developer intentionally closed off streets or caused congestion, whenever one of the many Washington, D.C. motorcades caused traffic tie ups, when there is a corporate-sponsored 5k run that blocks roads, or when there is a large military parade that shuts major roadways, highways and the bridges entering into the District from Virginia for days, as well as cancels flights in and out of Reagan National Airport.

The immediate lawsuit, however, shows exactly how this novel expansion of standing would open a new front in lawfare and SLAPP suits, wide-reaching and vexatious lawsuits against those who engage in street protest on the basis that the exercise of this precious constitutional right has a ripple effect upon others.

In this context, it opens retaliatory litigation against protestors for any person who, as Plaintiff here, is ideologically opposed to the message of any protests to bring a lawsuit in order to punish those engaged in expression with which he disagrees. If this is permitted here, in this nation's capital and land of protests, demonstrations, petitions, grievances, and fundamental democratic expression that is the lifeblood of a democracy, this Court can expect to be deluged by hostile litigious attacks to entangle political opponents in lengthy and expensive legal proceedings, which can be well-funded by ideological opponents of any message. It would flood the court system in Washington, D.C., the site of hundreds of protests annually, with such lawsuits, enable private censorship of political movements, and undermine the tradition of peaceful dissent as a form of democratic expression.

### D.  The complaint should be dismissed on standing grounds due to lack of causation

The Complaint, additionally, should be dismissed on standing grounds based on lack of causation. See *Collins v. Yellen*, 594 U.S. 220, 243 (2021) (for Article III standing purposes, "the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant" (quoting *Allen*, 468 U.S. at 751). The "'line of causation between the illegal conduct and injury' -- the 'links in the chain of causation' -- must not be too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383 (internal citations omitted).

Recognizing that there was widespread lawful protest activity in the District on the day in question, there is no way to extricate or trace or quantify what delay is caused by alleged illegal sitting in each or any of the five locations Plaintiff generally references, from delay caused by lawful protest or from any poor driving or accidents or common congestion on Route 50 during morning rush hour. The D.C. metropolitan area was, in 2024, the eighth or ninth most congested

11

in the United States.[3]

It is further utterly impossible for Plaintiff to plead causation, to establish that the alleged delay and traffic congestion he experienced miles away in a different state is traceable and attributable to what he alleges were "illegal street blockades" at five different locations which requires extricating lawful assembly or sitting in the street prior to any dispersal order (expressive assembly which itself is not unlawful or a criminal offense unless and until the participant refuses an order to disperse), from that which is traceable to the specific period of time in which 23 persons allegedly disobeyed an order to leave the street. It is also implausible that the actions of these 23 people who allegedly disobeyed police orders to disperse from the street caused widespread regional congestion, as Plaintiff has alleged.

There are insufficient allegations in the Complaint to establish causation, except on a speculative and far-too-attenuated basis.

## II.      The Court Should Dismiss the Complaint for Failure to State a Claim

In the alternative, Plaintiff's Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### A. Plaintiff's Count I: Public Nuisance fails to state a claim and should be dismissed

While Plaintiff may have experienced his less-than-one-hour-long traffic delay as a "nuisance" in the colloquial sense, his claim that such a traffic delay is actionable under the legal framework of "public nuisance" is entirely frivolous -- and Plaintiff's counsel knows it. "Public nuisance" is a tort claim that is cabined by narrow legal requirements. An individual cannot just challenge any conduct he personally finds annoying or contrary to his political beliefs as a "public nuisance." As discussed further below, the defects in this conception of public nuisance

---

[3] *See, e.g.,* INRIX, INRIX 2024 Global Traffic Scorecard: Employees & Consumers Returned to Downtowns, Traffic Delays & Costs Grew (Jan. 6, 2025) (Washington DC ranked 9th in 2024 among most congested metropolitan areas in the U.S.), available at https://inrix.com/press-releases/2024-global-traffic-scorecard-us/; TomTom, TomTom Traffic Index, 14th Edition, (2024) (ranking D.C. the eighth most-congested city in the U.S.) available at https://www.tomtom.com/traffic-index/ranking/?country=US

are known to Plaintiff's counsel, through Rule 11 notice provided in another case they filed on behalf of a motorist delayed in traffic by a pro-Palestine protest. *Manhart v. SJP*, No. 1:24-cv-8209 (N.D. Ill.). Faced with that Rule 11 notice, they dropped the public nuisance claim in that case yet knowing its frivolity, press the same theory here even as they are aware that the legal requirements are not met.

District of Columbia law defines the tort of public nuisance as "an unreasonable interference with a right common to the general public." *D.C. v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 646 (D.C. 2005). "As an independent tort, claims of nuisance have … not been viewed favorably by [D.C. courts]." *Id.* at 646.

Plaintiff has failed to adequately allege a claim for this disfavored tort because (1) he lacks standing, (2) he has not pled any underlying tortious conduct, (3) he fails to allege an unreasonable interference with a public right, and (4) he has not alleged any facts supporting his conclusory claim that PSL or Becker participated in a conspiracy underlying the public nuisance claim.

### 1.    Plaintiff does not have standing to bring a public nuisance claim

Plaintiff's public nuisance claim fails for lack of standing. Typically, "only governmental authorities or other representatives of the general public have standing to attack a public nuisance in court."" *Nat'l Tel. Co-op. Ass'n v. Exxon Corp.*, 38 F. Supp. 2d 1, 13 (D.D.C. 1998) (quoting *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 (D.C. 1982)). The "lone exception" to this longstanding, common law rule is that a private party may have standing if that party "can allege and prove 'special damages, distinct from that common to the public.'" *Id.* (quoting *B & W Management, Inc.*, 451 A.2d at 881); *see also Openshaw v. Consol. Eng'g Servs., Inc.*, No. CIV.A.06 1884 CKK, 2007 WL 1087482, at *1 (D.D.C. Apr. 10, 2007). "It is not enough that he suffers the same inconvenience or is deprived of the same enjoyment . . . as everyone else who may be exercising the same public right." Restatement (Second) of Torts § 821C (1979), comment a (1979).

Faoro has not alleged any special damages. He alleges he suffered annoyance and

inconvenience and being delayed by traffic, but none of that is distinct from damages common to any member of the public experiencing a traffic delay of less than one hour, as Plaintiff alleges he personally experienced. *See* Compl. ¶ 36. His complaint references "loss of wages or income" but he does not allege that he, personally, suffered lost wages or income. With some sleight of hand, Plaintiff alleges that "Plaintiff *and others* . . . suffered damages, including but not limited to loss of wages or income*." Id.* ¶ 78 (cleaned up); *Id.* ¶ 82 (similar). He does <u>not</u> allege that he, personally, suffered lost wages or income or any unique or special damages whatsoever.

Quite the contrary. The Complaint emphatically describes general damages to a large class, not special damages to an individual. Plaintiff emphasizes that his "damages are of the same type" as "a class of over 10,000 people." *Id.* ¶¶ 63, 67. Plaintiff is clear that his claims and injuries are typical of that of the public. He alleges that the public consists of the "[t]housands of people [who] commute from Virginia to Washington, D.C. across the Potomac River every weekday." *Id.* ¶ 29. He advances claims of damages on behalf of the public, consisting of "thousands of motorists" and their passengers. *Id.* ¶ 30; *see also id.* ¶ 35 ("Plaintiff, Daniel Faoro, along with thousands of other motorists…"); *Id.* ¶ 64 ("The Class consists of thousands of members."). Plaintiff is explicit that, far from "special" or atypical, "his claims are typical of all the members of the Class." *Id.* ¶ 66.

Regarding damages specifically, Plaintiff eschews that his damages are special, alleging and his "damages are of the same type" as thousands of other class members. *Id.* ¶ 67.

The class definition is, basically, every driver and passenger in Washington, D.C. and three counties in northern Virginia who suffered traffic delays between the hours of 8:00 a.m. and 11:00 a.m. on February 1, 2024. *See Id.* ¶ 59; *id.* ¶ 6 (class consists of "Faoro and other innocent class members traveling into and around the District"). In his own words set forth in the Complaint, the operative document, Plaintiff was one among many "thousands of ordinary people" who experienced traffic delays. *Id.* ¶ 1.

Plaintiff has pled repeatedly that his damages are <u>not</u> atypical or special, but are emphatically "typical" of those of the general public affected by traffic delays on February 1,

2024. For this reason, Faoro does not have standing to bring a public nuisance claim.

This exact meritless claim was previously brought by Plaintiff's Counsel, Hamilton Lincoln Law Institute, in another matter and was withdrawn after notice by Rule 11 letter, yet they persist with regurgitating it here. Plaintiff's counsel, in their SLAPP lawsuit *Manhart v. SJP*, No. 1:24-cv-8209 (N.D. Ill.) also targeted various defendants for their pro-Palestine advocacy. Counsel represented another motorist who claimed to experience traffic delays allegedly related to a pro-Palestine protest, and brought public nuisance and false imprisonment claims against organizations and fiscal sponsors. *See* Compl., ECF No. 1, *Manhart v. SJP*, No. 1:24-cv-8209 (N.D. Ill. Sept. 9, 2024). The public nuisance cause of action initially filed in *Manhart* is virtually identical to the public nuisance cause of action in this case. *Compare id.* ¶¶ 94–98 *with* Compl. ¶¶ 74–79. After receiving proposed Rule 11 motions from Defendants which identified that the public nuisance claim was meritless, Plaintiff amended his complaint to drop the public nuisance claim. Pl.'s Mot. for Leave to File SAC ¶¶, 1, 8, ECF No. 55, *Manhart v. SJP*, No. 1:24-cv-8209 (N.D. Ill. Jan. 22, 2025); SAC ¶¶ 94–146, ECF No. 69, *Manhart v. SJP*, No. 1:24-cv-8209 (N.D. Ill. Jan. 29, 2025) (omitting public nuisance claim); Def. JVP's Mot. to Dismiss SAC at 11–12, ECF No. __. *Manhart v. SJP*, No. 1:24-cv-8209 (N.D. Ill. February 25, 2025) (noting Plaintiff's counsel's "implicit acknowledge[ment] that several of the claims he originally brought"—including public nuisance—"were meritless"). Plaintiff's counsel now pleads their meritless public nuisance claim here, even as they are on notice and have apparently acknowledged its meritlessness.

### 2. Nuisance is not a stand-alone tort and no other tort besides false imprisonment, which is inapplicable, has been pled

In addition, Plaintiff's public nuisance claim fails because he has not pled any underlying tortious conduct. "Nuisance, in short, is not a separate tort in itself. . . Liability must be based on some [other identified] underlying tortious conduct, such as negligence." *Tucci v. D.C.*, 956 A.2d 684, 696–97 (D.C. 2008). Plaintiff identifies only one such other tort, false imprisonment, which for reasons stated below is inapplicable to the allegations at bar.

15

### 3.  Traffic impediment is not an unreasonable interference with a right common to the public

A plaintiff bringing a public nuisance claim "must at minimum identify a violation of some common public right, i.e. 'damage to property, damage to human health, or damage to anything remotely approximating a right common to the general public.'" *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 101 (D.D.C. 2010) (quoting *Nat'l Tel.*, 38 F.Supp.2d at 13). Here, Plaintiff fails to do so.

Plaintiff alleges a violation of the public's "right to freely travel public roads and highways without unreasonable interference" because Plaintiff was waiting in traffic for "close to an hour." Compl. ¶¶ 36, 68.

Driving on the public highways or roadways is not a right common to the public. "[N[o one has a right to drive; driving on public highways is a privilege subject to revocation for a number of reasons." *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009); *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999) (Plaintiff "does not have a fundamental 'right to drive'"); *Andreaccio v. Weaver*, 674 F. Supp. 3d 1011, 1021 (D. Nev. 2023) ("there is no 'fundamental right to drive a motor vehicle.'"); *Thomas v. Haslam*, 303 F. Supp. 3d 585, 620 (M.D. Tenn. 2018) ("no fundamental right to drive a motor vehicle"); Restatement (Second) of Torts § 36 (1965), comment d ("the public is merely privileged to travel the public highways and has not a right to do so; that is, the interests of the members of the public in such travel is not protected by a right of action").

Even were driving on the roadway deemed a right common to the public, an interference has not been pled that is unreasonable. In order to be an unreasonable interference, the Complaint would need to aver more interference than that which is commonly experienced in major metropolitan areas as a traffic jam or traffic backup or traffic delay or stop-and-go traffic.

To be pled as an unreasonable interference, the degree of hazard would have to be substantially greater than the instant claimed circumstances. "The essential characteristic of a public nuisance as it relates to highways is that the condition imperils the safety of a public

16

highway and is dangerous and hazardous in itself." *Taylor v. City of Charlottesville*, 240 Va. 367, 372 (1990). No such hazard is pled in the instant case.

> **4. Plaintiff's assertion that PSL and Brian Becker participated in a conspiracy to create a public nuisance is conclusory and unsupported by factual allegations**

Even if a traffic delay could constitute a public nuisance (which it does not), Plaintiff has not pled that PSL or Becker had any connection whatsoever to the conduct of persons which allegedly caused the traffic delay—protesters "block[ing] traffic at several critical chokepoints and exits of most of the major routes into downtown Washington, Foggy Bottom, and Capitol Hill."[4] Plaintiff attempts to impose liability on PSL and Becker for the acts of persons he does not identify or name by alleging that the unidentified persons participated in a sprawling civil conspiracy with co-defendants and hundreds of unidentified others for the purposes of illegally blockading traffic and presumably, failing to respect law enforcement's directives to move out of the street, but Plaintiffs' conspiracy allegations are woefully inadequate.

To adequately plead a civil conspiracy a plaintiff must allege: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001) (quoting *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994)).

"[C]ourts in this Circuit have repeatedly held that '[t]he mere repetition of a conclusory statement that a conspiracy exists and that the alleged events occurred as a result of a conspiracy are insufficient as a matter of law.'" *Lemon v. Kramer*, 270 F. Supp. 3d 125, 142–43 (D.D.C. 2017) (quoting  *Bush v. Butler*, 521 F. Supp. 2d 63, 69 (D.D.C. 2007)); *see also Brady v.*

---

[4] The complaint includes very few specifics about the so-called "blockades." For example, Plaintiff does not specify the locations of the blockades. He provides scant details about the formation of the blockades and precisely how they impeded traffic. He does not describe what efforts were made by the police to clear protesters from the streets and/or redirect traffic. One of the only details included is a description of the protesters' political chants—First Amendment speech that should have no bearing on this case but does demonstrate the actual motivation behind the frivolous lawsuit which is to punish protected expression. Compl. ¶ 31.

*Livingood*, 360 F. Supp. 2d 94 (D.D.C. 2004) ("A plaintiff must set forth more than just conclusory allegations of an agreement to sustain a claim of conspiracy against a motion to dismiss").

"[O]ne who alleges a conspiracy must allege an event, conversation, or document showing that there was an agreement among the alleged conspirators." *Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 42 (D.D.C. 2013). A plaintiff may not "rely upon conclusory statements that defendants engaged in allegedly [unlawful] activity 'in concert and by agreement or understanding' as the sole basis for the existence of an unlawful agreement." *Cadet v. Draper & Goldberg, PLLC*, No. CIV.A. 05-2105 (JDB), 2007 WL 2893418, at *14 (D.D.C. Sept. 28, 2007). In *Bush v. Butler*, the Court found conspiracy claims to be deficient where "plaintiff provide[d] no description of the persons involved in the agreement, the nature of the agreement, what particular acts were taken to form the conspiracy, or what overt acts were taken in furtherance of the conspiracy." 521 F. Supp. 2d at 69.

Despite devoting four pages of his brief to what he titles "evidence of conspiracy," Plaintiff fails to plead specific facts which establish the elements of conspiracy. Instead, Plaintiff's "evidence of conspiracy" boils down to a single conclusory statement: "The Defendants, agreeing to blockade traffic, planned and organized their unlawful conduct in advance and promoted it on various social media platforms before, during and after the February 1, 2024 action." Compl. ¶ 37. This statement is followed by a listing of social media posts, none of which purports to depict that PSL or Becker "agreed to blockade traffic" or planned or organized any unlawful conduct with co-defendants or other unnamed individuals. Indeed, Becker is not mentioned at all, and the references about PSL are sparse and do not make out an agreement to engage in an illegal traffic blockade.

There are no allegations that PSL or Becker participated in an illegal blockade of traffic. There are no allegations that PSL or Becker sat down in any street. PSL and Becker are sought to be swept into the sweeping assertions of conspiracy based solely on allegations of an unspecified agreement between each Defendant and unidentified others.

18

There are no allegations at all about where, when, and how PSL and/or Becker allegedly entered into an agreement to illegally blockade traffic. There are no allegations that PSL or Becker ever communicated with any of the hundreds of unnamed alleged individual co-conspirators to illegally blockade traffic, much less any allegations about a supposed "plan" or steps that PSL or Becker took to organize an illegal blockade of traffic

Instead of alleging facts about PSL joining an agreement to illegally blockade traffic, Plaintiff lists social media posts. Only a handful of those posts, which are attached as exhibits to counsel's declaration, involve PSL. *See id.* ¶¶ 42–45, 49, 50, 53, 54, 57. One cluster of posts consists of flyers displaying the logo of PSL calling for a general strike and/or rally at Union Station on February 1, 2024. *See id.* ¶¶ 42–45. These flyers, are not evidence that PSL agreed with anyone to engage in or plan an illegal traffic blockade on February 1. The content is protected speech calling for demonstration activity, which is lawful.

It bears emphasis (as it is relevant to the fundamental necessity of an agreement to engage in *unlawful* conduct, specifically an *illegal* traffic blockade) that under District of Columbia law it is <u>not</u> illegal for persons to assemble to engage in politically expressive activity or to demonstrate on D.C. streets, including if such activity impedes traffic through sitting down in a street, standing in it, assembling upon it, or otherwise. There is not a requirement for a permit to assemble on District streets to engage in expressive activity, including being in the streets such that vehicular traffic is precluded, and it is not unlawful to do so. The District of Columbia has expressly decriminalized assembling or demonstrating in the streets for purposes of political expression without a "permit" and there is no longer a permitting requirement. Persons are encouraged but not required to provide notice of a planned assembly and where no such notice has been provided, police are directed to treat the assembly "in substantially the same manner as it responds to and handles assemblies with approved plans." D.C. Code § 5-331.07(f); D.C. Code § 5-331.05 ("It shall not be an offense to assemble or parade on a District street . . ,. without having provided notice or obtained an approved assembly plan."); *see also* D.C. Code § 5-331.02 (2) ("'First Amendment assembly' means a demonstration, rally, parade, march, picket

line, or other similar gathering conducted for the purposes of expressing their political, social, or religious views."). By extension, it is not illegal to agree or plan to assemble (or even sit down) in the streets without an approved assembly plan for purposes of political expression.

District of Columbia law establishes that persons "have the right to organize and participate in peaceful First Amendment assemblies on the streets" and that law enforcement is prohibited from engaging in group arrest for such street assemblages absent the transformation of such activity "into an activity subject to dispersal or arrest" and after the issuance of "an order to disperse" and the subsequent disobeyal of such order. D.C. Code § 5-331.03.

Where street blockades are not in and of themselves unlawful, those individuals who disobey lawful orders to disperse where law enforcement chooses to enforce reasonable restrictions on such conduct, may be subject to citation. *See*, D.C. Code § 5-331.04(c) (police may enforce reasonable restrictions on street demonstration activity or assemblages where activity or assembly was not approved in advance); D.C. Code § 5-331.07 ("An order to disperse or arrest assembly participants shall not be based solely on the fact that a plan has not been approved for the assembly."); D.C. Code § 5-331.03(2) (authorizing arrests where activities began as a First Amendment assembly, but only after issuances and disobedience of an order to disperse); D.C. Code § 5-331.07 (mandating those who have been so ordered, be provided with clear and audible warnings and opportunity to disperse prior to arrest).

In other words, under District law, it is not illegal to assemble or demonstrate in the streets for political expression, nor to "agree" or "plan" to assemble or demonstrate in the streets for political expression, including without advance notice and including such assemblages that block the street. It is illegal, however, for a person who engages in such conduct expression to refuse a dispersal order.

For the purpose of Plaintiff's obligation to state a claim for conspiracy to engage in unlawful conduct, Plaintiff's complaint cannot rest merely on an allegation that co-conspirators "planned" to assemble or sit down on District streets for purposes of political expression, as is the legal right of persons under District of Columbia statutory law.

There is no allegation that PSL or Becker agreed that persons should assemble or sit down in the streets (which would be perfectly legal to do), much less an allegation that PSL or Becker agreed with others that the individuals at the five locations that Plaintiff generally complains of, would refuse orders to disperse and refuse to desist such activity upon lawful police order.

The Complaint avers that only twenty-three (23) persons were arrested across the whole of the protests in the District including all five locations complained of, presumably after refusing such lawful orders, Compl. ¶ 33, a concession that indicates that there simply was no widespread plan or agreement for persons to refuse such orders.

Plaintiff also cites PSL posts that were posted *after* protesters sat down in the street on February 1. *See id.* ¶¶ 49, 50, 53, 54. These posts reported outwards on the protests, that protesters were engaged in a sit-down action in support of Palestine and expressed support for the cause the protesters were advocating for. Such posts are First Amendment-protected speech, not tortious conduct, and do not evidence nor indicate any advance plan or agreement whatsoever. Many people liked or reshared those posts or made their own social media posts about the February 1 sit-down actions. It would be absurd to assert that all of those people are co-conspirators because they reported on the action and expressed support for Palestine. Similarly, PSL's post about showing moral support for the activists who were arrested during the sit-down action*, id.* ¶ 57, is protected speech that is not evidence of any agreement in advance to engage in unlawful conduct. Such arrestees have a right to due process, to assert a defense, to argue for mitigation of penalty or dropping of charges, and for others to be supportive of those rights.

PSL's social media posts are "lawful actions conducted in a lawful manner" that do not demonstrate participation in a conspiracy. *See B & H Nat. Place, Inc. v. Beresford*, 850 F. Supp. 2d 251, 263 (D.D.C. 2012) (dismissing a conspiracy claim where "plaintiffs have failed to provide any evidence of an agreement to participate in an unlawful act" and "plaintiffs' cited evidence relates only to lawful actions conducted in a lawful manner"). Absent concrete,

specific, plausible allegations of an agreement to engage in unlawful conduct, PSL cannot be held responsible for the actions of protesters that they posted about on social media.

### B. Plaintiff's Count II: False Imprisonment fails to state a claim and should be dismissed

Plaintiff, and Plaintiff's counsel, raise utterly frivolous claims of false imprisonment by attempting to stuff his allegation that he was stuck in traffic for less than an hour into a tortious framework without even remotely satisfying the fundamental elements.

Plaintiff voluntarily entered his car, voluntarily drove it upon a roadway, found himself in stop-and-go traffic for less than an hour, and chose to drive home. At no time did anyone lock him into his car or restrain his person. At no time did anyone physically restrain him from departing the traffic conditions in his car by taking an exit off of Route 50 and an alternate route home. At no time did anyone approach him, much less use force against him or threaten force against him. There was no detention within fixed boundaries. There was no detention at all, notwithstanding Plaintiff's claims of delay. There was no false imprisonment. It is frivolous to claim otherwise.

Under District of Columbia law, false imprisonment is defined as the restraint by one person of the physical liberty of another without consent or legal justification. *Faniel v. Chesapeake & Potomac Tel. Co. of Maryland*, 404 A.2d 147, 150 (D.C. 1979) (citing *Tocker v. Great Atl. & Pac. Tea Co.*, 190 A.2d 822, 824 (D.C. 1963)).

"The essential elements of the tort are (1) the detention or restraint of one against his will, within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint." *Id.* The restraint upon freedom of movement must be "total." *Smith v. D.C.*, 306 F. Supp. 3d 223, 260 (D.D.C. 2018). The restraint must be forcible, meaning that the plaintiff himself must have yielded to the use of force, threat of force, or assertion of authority. *Id.* None of these elements are present here.

Plaintiff's subjective and hyperbolic claim that he felt "trapped or inconvenienced" by stop-and-go traffic is no substitute for meeting the well-established elements of this claim.

22

Haling Brian Becker and the Party for Socialism and Liberation and so many others into federal court on this knowingly false pretense constitutes an abuse of the judicial process. It is sanctionable lawfare.

**1. The Restatement (Second) of Torts establishes that the blocking of a roadway does not constitute false imprisonment**

This jurisdiction holds by the Restatement (Second) of Torts § 36 (1965). *Faniel*, 404 A.2d at 150 (citing Restatement (Second) of Torts § 36 (1965)); *see also Jones v. D.C.*, No. 16-CV-2405 (DLF), 2019 WL 5690341, at *5 (D.D.C. June 13, 2019) (relying on *Faniel* and the Second Restatement of Torts); *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 342–43 (D.D.C. 2016) (relying on the Restatement (Second) of Torts § 35 (1965)).

The Restatement expressly establishes that the circumstances alleged by Plaintiff do <u>not</u> constitute an actionable detention or false imprisonment.

> *Blocking highway.* In order to make the actor liable for false imprisonment under the rule stated in c 35, it is necessary that he shall have confined another in a particular area, the boundaries of which are fixed by the will of the actor. It is not enough that the other's freedom of movement has been improperly restricted. Thus, one who blocks off a highway, intending to prevent the public from passing along it, is not liable for false imprisonment to one whose privilege to use the highway has been thus denied. Indeed, the actor does not incur any liability by so doing, since the public is merely privileged to travel the public highways and has not a right to do so; that is, the interest of the members of the public in such travel is not protected by a right of action in them.

Restatement (Second) of Torts § 36 (1965).

**2. The false imprisonment claim fails without the necessary element of a confinement "within boundaries fixed by the defendant"**

There can be no allegation of false imprisonment without a confinement "within boundaries fixed by the defendant." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911 – 12 (D.C. Cir. 2015); *Smith*, 306 F. Supp. 3d at 260 (quoting *Faniel*, 404 A.2d at 150). The Complaint alleges no such boundaries fixed by the PSL, Becker, or any defendant(s). The Complaint alleges no boundaries fixed by any defendant whatsoever.

On the contrary, the gravamen of the Complaint is that certain unnamed persons "blocked

23

traffic at several critical" highways or roads causing "traffic delays" and standstills "in several places." Compl. ¶¶ 29, 30. The words "boundary" or "fixed boundary" or any particular area fixed by any defendant are not alleged in the complaint, neither explicitly nor implicitly.

Plaintiff does not allege that his physical person was restrained. He alleges his car was in traffic and that he voluntarily remained within his car because he wanted to continue driving. He could have exited his vehicle. He could have pulled to the side of the road and stepped out and travelled for miles. He had the capacity to continue driving his vehicle on the roadway, which is exactly what he did. *Id.* ¶ 36. He had the capacity to drive off the congested portion of the roadway via an exit, which is exactly what he did. *Id.* He had the capacity to drive home, which is exactly what he did. *Id.* He was never restrained nor confined. Regional traffic does not constitute mass imprisonment. *See Brendlin v. California*, 551 U.S. 249, 262 (2007) (no Fourth Amendment seizure where a vehicle "is stuck in traffic" on a "road [that] is suddenly clogged" due to police action pulling over another and causing a blockage); *Illinois v. Lidster*, 540 U.S. 419, 426 (2004).

### 3. The false imprisonment claim fails without the necessary element of a "total" restraint upon freedom of movement

"To constitute imprisonment, the restraint of [plaintiff's] freedom of movement by [defendant] must have been total." *Smith*, 306 F. Supp. 3d at 260 (citing *Faniel*, 404 A.2d at 151); *Faniel*, 404 A.2d at 151 (citing Restatement (Second) of Torts §§ 35, 36 (1965)). The plaintiff alleges "he was stuck in traffic." Compl. ¶ 36.

Plaintiff alleges that for less than an hour, his vehicle was stuck in stop-and-go traffic, was delayed, and was moving at a slow rate of speed. *See id.* ¶ 36. He admits that his vehicle, during this less than one hour period, was "barely moving," which is to say that it *was* moving. *Id.* This does not constitute the necessary total restraint of a person's freedom of movement. Plaintiff admits that he was able to "navigate out of the blocked traffic" and transport both his vehicle and person "to his home." *Id.* None of this constitutes a total restraint of Plaintiff's movement.

24

Plaintiff was free to leave his car. He was not physically confined. He was free to drive his car, as he in fact did, to an exit and depart from the inconvenience of a traffic delay. He was free, as he did, to return home.

### 4. The false imprisonment claim fails without any allegation of use of force, threat of force, or assertion of authority by PSL or Becker against Plaintiff

To state a claim of false imprisonment, the complaint "must [allege] a restraint against the plaintiff's will, as where she yields to force, to the threat of force or to the assertion of authority." *Smith*, 306 F. Supp. 3d at 260 (citing *Faniel*, 404 A.2d at 151–52). There is no allegation of force by Defendant against Plaintiff, no allegation of threat of force by Defendant against Plaintiff, and no allegation of any assertion of authority by Defendant against Plaintiff. Nor is such alleged against any other defendant(s). There is no allegation of communication nor even physical proximity as between Plaintiff and the PSL or any defendant. There was no means intentionally applied to Plaintiff by the PSL or any defendant.

### 5. The false imprisonment claim fails without any allegation of intent to falsely imprison

The tort of false imprisonment requires intent. *Marshall v. D.C.*, 391 A.2d 1374, 1380 (D.C. 1978). The element of intent required to constitute a false imprisonment claim is absent from the Complaint. The sole allegation of "intent" in the Complaint is that other unnamed persons (notably not the PSL or Becker) "intentionally . . . blockade[d] multiple public highways, bridges and roads," Compl. ¶ 2, and that conduct did foreseeably result in traffic jams. The Plaintiff's Complaint manifests the complete absence of allegation of any intent to confine Plaintiff personally, the *sine qua non* of a false imprisonment claim under District of Columbia law.

### 6. The false imprisonment claim fails if the Court applies Virginia law

Were the Court to apply Virginia law to Plaintiff's false imprisonment claim, the plaintiff would need to prove that his liberty was restrained "either by words or acts that she would fear to

disregard, and that there was no sufficient legal excuse to justify the restraint. *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 114 (2021) (quoting *Montgomery Ward & Co. v. Wickline*, 188 Va. 485, 489 (1948)). Plaintiff has alleged neither words nor acts directed by Defendant, or any defendants to him. There is nothing in the Complaint that could be construed as words or acts attributable to PSL that Plaintiff "fear[ed] to disregard."

### 7.   Plaintiff's claim that PSL and Becker participated in a conspiracy to falsely imprison Plaintiff is conclusory and unsupported by factual allegations

In the interests of brevity, Defendants incorporate herein the argument and presentation set forth above regarding the allegations of conspiracy to create a public nuisance, as that presentation is equally applicable to this allegation. There is no allegation that PSL or Becker sat in the street, never mind that they would have had to assemble in the street and refuse orders to disperse in order for such street assembly to be illegal. The allegations of conspiracy are, as above, pled in a conclusory manner and they do not reflect concrete, specific, plausible, allegation of an agreement by PSL or Becker to engage in unlawful conduct, let alone to falsely imprison Plaintiff.

### III.   The Plaintiff's Complaint Should be Dismissed with Prejudice Without Leave to Amend

Leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15. The decision whether to grant leave "rests within the sound discretion of the District Court." *Lover v. D.C.*, 248 F.R.D. 319, 322 (D.D.C. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

A complaint may be dismissed without leave to amend for reasons such as undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing parties by allowing amendment, and futility of the amendment. *Id.* at 322 (citing *Foman*, 371 U.S. at 182).

The court may dismiss a claim with prejudice when amending the complaint would be futile. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (dismissal with prejudice appropriate when "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency") (internal punctuation omitted); *Jarrell v. U.S. Postal Serv.*, 753

F.2d 1088, 1091 (D.C. Cir. 1985); *Vince v. Mabus*, 956 F. Supp. 2d 83, 92 (D.D.C. 2013).

In the interest of justice, leave to amend should not be granted where, as here, any amendment would be futile. Plaintiff has submitted a voluminous attachment and record to his Complaint. He has garnered all available, and even exaggerated, allegations at his disposal. There simply are no viable claims here and no substantial factual basis for any new or additional or expanded assertions of claim.

This lawsuit is a SLAPP suit, a prime example of lawfare and an effort to hale into court every organization that is conceivably associated with a protest or political expression that is disfavored by the Plaintiff.

Brian Becker is before this Court with not a scintilla of allegation that he is connected to the underlying events. Plaintiff has explained why he chose Becker to be included: He "has been involved in other anti-Israel actions in the District." Compl. ¶ 22. And so, Becker is faced with the burden of defending a lawsuit in U.S. District Court, even though there is not even a single allegation referencing his connection with the underlying events. This is the archetype of a SLAPP suit and an abuse of legal process to oppress persons for having associated with free speech or dissent with which Plaintiff and his counsel disagree.

Plaintiff is undisguised in his political motivations. He feels offended by the pro-Palestinian speech of activists and complains, in what can only be described as a remarkable stretch and specious presentation, that he was "compelled . . . to unwillingly participate in the message being promoted by the Defendants" which Plaintiff describes as "show[ing] support for Palestinians" and "denounc[ing] the United States government's support for the State of Israel." *Id.* ¶¶ 2, 6 (complaining that "innocent Americans" have been compelled to "unwillingly participate in Defendants' activism"). As such, he wants to shut down that sort of activism.

Plaintiff even asks this Court -- again frivolously, without even remotely approaching the elements needed for injunctive relief -- to enjoin all of those summoned in this lawsuit from engaging in such and similar activism as alleged in the Complaint. *See id.* ¶ 3 (referencing "anti-Israel activists" marching on the White House and "disrupting traffic" with their marches and

slogans, flying Palestinian flags from cars) which Plaintiff casts as "unlawful conduct." Plaintiff's effort to target and suppress constitutionally protected speech is not cloaked.

The fact that the Complaint is devoid of meeting the elements of the two torts pled does not matter to Plaintiff or Plaintiff's counsel. A SLAPP is a meritless lawsuit filed to chill defendants' exercise of First Amendment rights, their expression of a disfavored political view. The archetype of a SLAPP suit is characterized by its lack of merit and the primary objective of burdening the defendant with legal defense costs and the threat of liability. *See* John C. Barker, *Common-Law and Statutory Solutions to the Problem of Slapps*, 26 Loy. L.A. L. Rev. 395, 396 (1993). The function of the SLAPP suit is the suit, itself, and the intended crippling consequences on defendants: tying defendants up in protracted litigation, diversion of resources from activism, delay, expense, distraction, financial risk, and potential ruin just from the cost of litigation. *Id.* at 405; *see also* Comment, Victor J. Cosentino, *Strategic Lawsuits Against Public Participation: An Analysis of the Solutions*, 27 Cal. W. L. Rev. 399, 402 (1991).

> SLAPP suits function by forcing the target into the judicial arena where the SLAPP filer foists upon the target the expenses of a defense. The longer the litigation can be stretched out, the more litigation that can be churned, the greater the expense that is inflicted and the closer the SLAPP filer moves to success.6 The purpose of such gamesmanship ranges from simple retribution for past activism to discouraging future activism. Needless to say, an ultimate disposition in favor of the target often amounts merely to a pyrrhic victory. Those who lack the financial resources and emotional stamina to play out the "game" face the difficult choice of defaulting despite meritorious defenses or being brought to their knees to settle. The ripple effect of such suits in our society is enormous. Persons who have been outspoken on issues of public importance targeted in such suits or who have witnessed such suits will often choose in the future to stay silent. Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined.

*Gordon v. Marrone*, 155 Misc. 2d 726, 736 (N.Y. Sup. Ct. 1992), *aff'd,* 202 A.D.2d 104 (N.Y. App. Div. 1994)

### IV.    The Court Should Award Sanctions Pursuant 28 U.S.C. § 1927 and This Court's Inherent Authority

Plaintiff's counsel, referring to this lawsuit and a predecessor similar lawsuit, *Manhart v. National Students for Justice in Palestine, et al.*, No. 24-cv-8209 (N.D. Ill. 2025), describes the

instant litigation as "the second lawsuit [Plaintiff's counsel] has filed against pro-Hamas protestors." Hamilton Lincoln Law Institute, *Faoro v. Jewish Voice for Peace, et al.,*https://hlli.org/faoro-v-jvp/. The political hostility and false presentation behind this lawsuit is evident in counsel's assertion that those who condemn the killing of over 57,000 Gazans, the dismemberment of children, the use of starvation as a weapon, the destruction of the infrastructure necessary to support human life, and the proposal to forcibly expel over 2 million Gazans from their homeland to ethnically cleanse the nation to create new Trump hotels and a new "Riviera of the Middle East," are "pro-Hamas," which has been designated as a foreign terrorist organization.

Plaintiff's counsel states it is "dedicated" to filing such lawsuits and "advocating for those whose daily lives were disrupted by anti-Israel activists' unlawful actions." Id. Their promise is to multiply such and similar vexatious and frivolous federal lawsuits.

As such, it is appropriate to award sanctions pursuant to 28 U.S.C. § 1927, the purpose of which is to sanction those attorneys who multiply proceedings unreasonably and vexatiously.

An alternate sanctioning mechanism is the inherent authority of the Court to impose sanctions for conduct that abuses the judicial process, such as bad-faith litigation practices. This frivolous lawsuit is filed for an improper purpose. The inherent authority to issue sanctions to manage judicial affairs and sanction abusive conduct is broader than that set forth in the statute above. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017); *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

### V.    PSL and Becker Join in the Motions Filed or to be Filed by Any Co-Defendant to Dismiss Plaintiff's Complaint to the Extent They or Their Reasoning Apply to PSL or Becker

PSL and Becker join in the arguments that may be presented in other co-defendants' motions to dismiss Plaintiff's Complaint, including arguments about lack of standing, the non-existence of the underlying primary torts or conspiracy, or requests for sanctions.

## CONCLUSION

For all the reasons stated herein, the Court should grant the Party for Socialism and Liberation and Brian Becker's Motion to Dismiss and order Plaintiff and Plaintiff's counsel to pay all appropriate sanctions, attorneys' fees, and costs.

June 16, 2025                    Respectfully submitted,

/s/ *Mara Verheyden-Hilliard*
Mara Verheyden-Hilliard [450031]
mvh@justiceonline.org

/s/ *Carl Messineo*
Carl Messineo [450033]
cm@justiceonline.org

/s/ *Sarah Taitz*
Sarah Taitz [5784285]
sarah.taitz@justiceonline.org

/s/ *Nick Place*
Nick Place [LA0021]
nick.place@justiceonline.org

PARNERSHIP FOR CIVIL JUSTICE FUND
617 Florida Ave. NW
Washington, D.C. 20001
(ph): 202-232-1180
(Fax) 202-747-7747

*Counsel for Defendants Party for Socialism and*
*Liberation and Brian Becker*