## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Daniel Faoro,<br><br>                       Plaintiff,<br>     v.<br><br>Jewish Voice for Peace, Inc. D/B/A Occupation Free DC, Dissenters, Palestinian Youth Movement, WESPAC Foundation, Inc., Harriet's Wildest Dreams, Inc., Dornethia "Nee Nee" Taylor, Party of Socialism and Liberation, Brian Becker, Maryland2Palestine, Hannah Shraim, and 23 John And Jane Does,<br><br>                     Defendants. | Case No.      1:25-cv-00289-ABJ |

## DEFENDANT HANNAH SHRAIM'S
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## Table of Contents

I.   INTRODUCTION ................................................................................1

II.   BACKGROUND................................................................................4

III.   FACTUAL ALLEGATIONS ................................................................7

IV.   ARGUMENT.....................................................................................10

      A.    Plaintiff Failed to Effectuate Service on Maryland2Palestine ............10

      B.    Plaintiffs Lack Article III Standing to Sue Hannah Shraim ................12

      C.    All of Plaintiff's Claims Should Be Dismissed Under Fed. R. Civ. P 12(b)(6) for Failure to State a Claim Upon Which Relief Can Be Granted ...................................13

            1.    Plaintiff Fails to State a Claim for Public Nuisance (Count I).....................13

            2.    Plaintiff Fails to State a Claim for False Imprisonment (Count II)..............15

            3.    If Plaintiff Pleads a Civil Conspiracy Claim, He Fails to State a Claim.......16

            4.    Plaintiff Pleads No Specific Factual Allegation Against Hannah Shraim ....18

      D.    Plaintiff's Retaliatory Lawsuit Targets Protected Speech and Association, Designed to Punish Voices for Justice in Palestine, and Create a Chilling Effect on First Amendment Rights ...................................................................20

      E.    Plaintiff's Retaliatory Lawsuit is Sanctionable and Should be Dismissed with Prejudice..................................................................................21

V.   CONCLUSION ................................................................................23

## I.    INTRODUCTION

Since October 7, 2023, Israel has carried out a relentless genocide against the people of Palestine. Defendant Hannah Shraim does not use the term "genocide" as a rhetorical device, but as a concrete legal prohibition that exists in federal and international law. *See* 18 U.S.C § 1091 (implementing the Genocide Convention).[1] Israel's genocidal conduct in Palestine has been recognized by international courts,[2] United Nations experts,[3] genocide scholars,[4] leading medical professionals,[5] and even U.S. courts,[6] among others. Demanding

---

[1] The crime of genocide occurs when someone "whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such—(1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force children of the group to another group." 18 U.S.C. § 1091; *see also* Convention on the Prevention and Punishment of the Crime of Genocide, December 9, 1948, General Assembly Resolution 260, entered into force on January 12, 1951, ("The Genocide Convention"), Article II.

[2] *See* International Court of Justice, Dkt. No. 87, ICJ opinion dated January 26, 2024, at ¶ 30.

[3] *See, e.g.,* United Nations, "Anatomy of a Genocide, Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Francesca Albanese," A/HRC/55/73 (March 25, 2024), https://perma.cc/9GRF-XR7K; United Nations, "Gaza: UN Human Rights Experts Call on International Community to Prevent Genocide Against the Palestinian People—OHCHR Press Release" (November 16, 2023), https://perma.cc/XDS8-PJF2.

[4] *See, e.g.,* "Declaration of William A. Schabas in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-5 (November 16, 2023), https://perma.cc/4MH2-ENU5; *see also* "Declaration of Dr. John Cox, Dr. Victoria Sanford and Dr. Barry Trachtenberg in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-6 (November 16, 2023), https://perma.cc/3RPE-F6AN.

[5] *See, e.g.,* "[Proposed] Brief of Amici Curiae Medical Doctors in Support of Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss," 4:23-cv-05829-JSW, Document 52-1 (December 30, 2023), https://perma.cc/A68V-DU4C.

[6] In his decision in *Defense for Children International-Palestine v. Biden*, Judge Jeffrey S. White noted that "the undisputed evidence before this Court comports with the finding of the ICJ

an end to this genocide and justice for the people being annihilated is not only lawful and constitutionally protected, but also a legal imperative upon all nations under the Genocide Convention.[7]

In a blatant overreach, Plaintiff alleges in this suit that Ms. Shraim orchestrated and conspired to commit public nuisance and false imprisonment through a February 1, 2024 traffic blockade she did not organize, did not attend, and had no role in planning. Plaintiff's entire "case" against Ms. Shraim rests on nothing more than stale allegations of an organizational affiliation she no longer maintains. Meanwhile, Plaintiff simultaneously attempts to circumvent basic due process protections through improper service of process that treats Ms. Shraim's former residence as a fictional headquarters for an unincorporated association she does not lead.

Plaintiff has presented this Court with a Complaint that falls far short of legal sufficiency. The Complaint represents a dangerous attempt to intimidate and malign conscientious voices on Palestine by penalizing their constitutionally protected speech and association—fundamental rights at the core of our First Amendment. Plaintiff must be

---

and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law. Both the uncontroverted testimony of the Plaintiffs and the expert opinion proffered at the hearing on these motions as well as statements made by various officers of the Israeli government indicate that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide." 714 F.Supp.3d 1160, 1163 (N.D. Cal. 2024). (Because the Judge granted Defendants' Motion to Dismiss based on the political question doctrine, this section of the opinion does not have legal force as a factual finding).

[7] The Genocide Convention, supra note 1, Article I; *see also* Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro), Judgment, 2007 I.C.J. 43, 221, ¶ 430.

mindful that the Court sits in a nation where the suppression of speech is anathema to our foundational principles and that prohibiting speech is the essence of tyranny.

The Complaint not only fails to meet basic pleading standards but also poses a significant threat to civil liberties. It seeks to penalize public advocacy organizations and individuals for engaging in humanitarian discourse and political activism, activities that have long been recognized as essential to a functioning democracy and vibrant civil society. By attempting to silence voices through legal action (a.k.a. lawfare), Plaintiff risks chilling free speech in public forums—spaces traditionally revered as marketplaces of ideas and venues for democratic expression.

When stripped of its baseless and conclusory assertions, the Complaint merely alleges that these advocacy organizations and individuals exercised their First Amendment rights to protest U.S. government support for genocide in Gaza, where some activists remarked on the defiant spirit of Palestinians, who—despite living under a brutal occupation, violent dispossession from homes and lands, being corralled into suffocating gulags, concentration camps, ghettos, and prisons—are resisting that genocide with incredible steadfastness, perseverance, and faith.

More to the point, Plaintiff's overreach demonstrates a fundamental misunderstanding or willful misapplication of tort law. Public nuisance and false imprisonment statutes were never intended to be wielded against advocacy organizations exercising their right to political expression in public forums, no matter how controversial their views may be. Such an application threatens to dilute the serious purpose of these laws and trivialize the real dangers of weaponizing the courts to suppress First Amendment activity.

In essence, this Court is being asked to sanction an assault on the very freedoms it exists to protect. The First Amendment's guarantees are not mere platitudes but vital safeguards against tyranny and oppression. To uphold these principles, this Court must dismiss the Complaint with prejudice.

## II.    BACKGROUND

Within hours of the actions of October 7, 2023 that allegedly harmed Plaintiff, Israel launched its genocidal assault. That same day, Israel began immediate, indiscriminate aerial bombing of civilian infrastructure and population centers across Gaza.[8] Israel's Prime Minister immediately declared that "the enemy will pay an unprecedented price," signaling the acts of genocide that would follow.[9] Within the first twenty-four hours of Israel's genocide, it had already killed 313 Palestinians and injured more than 2,000, while 20,000 had been forcibly displaced.[10]

By October 9, 2023, Israeli political and military leaders had openly proclaimed their genocidal intentions to the world, the Minister of Defense declared that "no electricity, no food, no water, no fuel" would be allowed to the "human animals" in Gaza.[11] The Energy

---

[8] "Damning Evidence of War Crimes as Israeli Attacks Wipe Out Entire Families in Gaza," Amnesty International (October 20, 2023), https://perma.cc/AY8W-38K5.

[9] "Active Genocide Alert – Israel-Palestine: There is No Justification for Genocide," Lemkin Institute for Genocide Prevention and Human Security (October 13, 2023), https://perma.cc/B9BZ-E62R.

[10] United Nations, "Identical Letters Dated 8 October 2024 from the Permanent Observer of the State of Palestine to the United Nations Addressed to the Secretary-General, the President of the General Assembly and the President of the Security Council" A/ES-10/1012-S/2024/719 ("Letter from Permanent Observer of the State of Palestine") (October 8, 2024), https://perma.cc/B957-TDL.

[11] Sanjana Karanth, "Israeli Defense Minister Announces Siege on Gaza to Fight 'Human Animals,'" Huffington Post (October 9, 2023), https://perma.cc/HXN5-DQRJ.

Minister declared that "[w]hat *was* will not *be*."[12] Israeli Major General Ghassan Alian

declared "there will only be destruction."[13]

By the end of the first week of Israel's genocide, the Israeli military had already

begun using chemical weapons such as white phosphorous,[14] and had murdered 2,800

Palestinians, the majority women and children.[15] Israel also began its campaign of targeting

life-sustaining civilian infrastructure, which now includes hospitals, pharmacies, refugee

camps, sanitation facilities, electricity networks, apartment complexes, mosques, and

churches.[16] Within less than a month, Israel had dropped the equivalent of two nuclear

bombs on Gaza.[17]

It was with this sense of urgency that people of conscience—Jews, Christians,

Muslims, agnostics, and atheists—organically and swiftly rose into action to demand an end

to these horrifying atrocities. They organized emergency rallies and protests across the

country, and in Washington D.C., in hopes of averting the ongoing annihilation by Israel.

By February 2024—for almost four months—people of conscience had watched as

the Zionist occupation carried out its genocide in Palestine. According to conservative

---

[12] Israel Katz, @Israel_Katz, Tweet (12:48 pm, 9 October 2023) ("I ordered to immediately cut off the water supply from Israel to Gaza. Electricity and fuel were cut off yesterday. What was will not be."), https://perma.cc/33TM-5Z2F.

[13] Gianluca Pacchiani, "COGAT Chief Addresses Gazans: 'You Wanted Hell, You Will Get Hell,'" Times of Israel (October 10, 2023), https://perma.cc/6J5E-SYKH.

[14] White phosphorous is a chemical weapon that causes burns that penetrate through skin and flesh straight to the bone, and reignite whenever exposed to oxygen. *See* "Questions and Answers on Israel's Use of White Phosphorus in Gaza and Lebanon," Human Rights Watch (October 12, 2023), https://perma.cc/5TNA-PY8J.

[15] Chris McGreal, "The Language Being Used to Describe Palestinians is Genocidal," The Guardian (October 16, 2023), https://perma.cc/XT6C-7FSC.

[16] Letter from Permanent Observer of the State of Palestine, *supra* n.11, at 1.

[17] Euro-Med Human Rights Monitor, "Israel Hits Gaza Strip With the Equivalent of Two Nuclear Bombs," November 2, 2023, https://perma.cc/U45J-PET7.

estimates, the Zionist occupation had killed more than 29,000 Palestinians, permanently disabled over 69,000, destroyed 60 percent of housing units, 392 schools, 11 bakeries, 123 ambulances, and at least 3 churches and 184 mosques.[18] The Zionist occupation had completely massacred at least four generations of more than 900 Palestinian families.[19] People of conscience have spent each day watching thousands of ordinary Palestinian civilians livestream their own extermination. People of conscience wake up each day and wonder: which of their friends or family have been killed in the night? Which of their neighborhoods has the Zionist occupation wiped off the map? Understanding that silence is complicity, the advocacy organizations and individuals named as Defendants in this lawfare have bravely protested these unprecedented crimes against humanity through peaceful demonstration in the nation's capital.

Now, Plaintiff seeks to weaponize the courts against First Amendment freedoms, punishing Defendants for exercising their constitutional rights over less than an hour of traffic "inconvenience." Ms. Shraim invites Plaintiff to learn and reflect on the systematic, globally state-sponsored persecution and murder of the Palestinian people. Zionism—a radical white supremacist ideology—has declared Palestinians the primary enemy, implementing calculated policies of isolation, impoverishment, starvation, and annihilation. These genocidal tactics include forced ghettoization, mass displacement into concentration and death camps, systematic mass shootings, and indiscriminate carpet-bombing. The Zionist occupation deliberately engineered the Gaza Strip as an instrument of mass murder.

---

[18] United Nations, *Gaza Casualties Info-graphic (Snapshot as of 19 February 2024)* (Feb. 19, 2024), https://www.un.org/unispal/wp-content/uploads/2024/02/Gaza_casualties_info-graphic_19_Feb_2024.pdf.
[19] Letter from Permanent Observer of the State of Palestine, *supra* n.11, at 3.

Perhaps upon honest reflection, Plaintiff will join people of conscience from all walks of life and demand a decisive end to the Zionist occupation, apartheid, and genocide. In doing so, he would discover a diverse, principled, and welcoming community of moral clarity.

### III.    FACTUAL ALLEGATIONS

This lawsuit represents yet another example of the weaponization of the court system to silence constitutionally protected political speech and activism opposing the ongoing genocide in Gaza. Plaintiff's targeting of Ms. Shraim exemplifies the dangerous trend of attempting to intimidate and criminalize solidarity with Palestinian liberation through frivolous litigation designed to chill First Amendment expression.

*The Threadbare Allegations Against Ms. Shraim*

Plaintiff's factual allegations against Ms. Shraim are startlingly sparse and reveal the frivolous nature of this lawsuit. According to the Complaint, Ms. Shraim is "the co-chair of MD2Palestine and a resident of Maryland, and attends law school in Williamsburg, Virginia." Compl. ¶ 24. The Complaint alleges she "maintains an Instagram account with a username @falastinnah which notes that she is an organizer for @md2palestine" and has made "posts on Instagram that reference @md2palestine." *Id.* The Declaration supporting the Complaint adds only that "in March 2023, Shraim represented MD2Palestine at a forum at the University of Maryland, the college from which she graduated, to discuss Palestine advocacy." Hedley Decl. ¶ 43.

That is it. That is the entirety of Plaintiff's factual allegations against Ms. Shraim.

*No Connection to the February 1, 2024 Events*

Most tellingly, Plaintiff makes no allegation whatsoever that Ms. Shraim participated in, planned, funded, promoted, or had any knowledge of the February 1, 2024 protest

activities that form the basis of this lawsuit. The Complaint contains no allegations that Ms. Shraim:

- Was physically present at any of the five alleged blockade locations on February 1, 2024;

- Posted anything on social media promoting the February 1, 2024 action;

- Communicated with any other defendant about the February 1, 2024 action;

- Provided funding for the February 1, 2024 action;

- Had any advance knowledge of the February 1, 2024 action;

- Participated in any planning meetings for the February 1, 2024 action; or

- Took any action whatsoever in connection with the February 1, 2024 events.

In fact, Ms. Shraim was literally sitting in a classroom more than 165 miles away in Williamsburg, Virginia, when the alleged events occurred in Washington, D.C.

### *Reliance on Stale Organizational Association*

Plaintiff's hollow conspiracy allegations against Ms. Shraim rest entirely on her alleged past association with MD2Palestine—an association in which she ceased to have any meaningful leadership role since at least August 2023. The only specific factual allegation connecting Ms. Shraim to MD2Palestine activities is from "March 2023," more than ten months before the February 2024 events at issue. Hedley Decl. ¶ 43.

Plaintiff's attempt to construct a conspiracy case against Ms. Shraim exemplifies the dangerous logic underlying this retaliatory lawsuit: that anyone who has ever expressed support for Palestinian rights, or been associated with organizations advocating for Palestinian liberation, can be hauled into federal court and held liable for the independent actions of complete strangers simply because they share similar political views.

### Multiple Layers of Hearsay and Circular References

In a desperate attempt to construct a case against Ms. Shraim, Plaintiff relies heavily on multiple layers of hearsay allegations and guilt by association. Much of these allegations appear to originate from sources that create circular reference patterns rather than independent, verifiable evidence. The Complaint's conspiracy allegations are built on nothing more than the unfounded assumption that anyone associated with Palestinian advocacy organizations must be coordinating their activities in some vast conspiracy—a premise that is both factually baseless and legally insufficient.

### Improper Service of Process Designed to Circumvent Due Process

Perhaps most egregiously, Plaintiff has attempted to serve Defendant MD2Palestine, an unincorporated association, through Ms. Shraim by listing her personal address as the organizational address: "MARYLAND2PALESTINE C/O HANNAH SHRAIM, 13307 QUEENSTOWN LANE, GERMANTOWN, MD 20874." Compl. at 1. This violates basic due process requirements under Federal Rule of Civil Procedure 4(h), which require service on unincorporated associations to be made on "an officer, a managing or general agent, or any other agent authorized by appointment or by law to accept service of process."

Ms. Shraim has held no leadership role in MD2Palestine since at least August 2023, and Plaintiff's use of her former residence as a "made-up" organizational address contravenes established precedent. *See United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 881 (Fed. Cir. 1997) (service invalid where defendant lacks affiliation with entity). This improper service reflects Plaintiff's broader strategy of targeting individuals for their political speech rather than seeking legitimate legal redress.

*A Textbook SLAPP Suit*

The factual allegations against Ms. Shraim reveal this lawsuit for what it truly is: a Strategic Lawsuit Against Public Participation (SLAPP) designed to chill First Amendment-protected speech and political association. Plaintiff seeks to hold Ms. Shraim liable not for anything she did, but for her past association with an organization that advocates for Palestinian rights. This represents exactly the type of retaliatory litigation that anti-SLAPP statutes were designed to prevent—using the courts as a weapon to punish and silence those whose political views Plaintiff finds objectionable.

The complete absence of any factual allegations connecting Ms. Shraim to the February 1, 2024 events, combined with the improper service of process and reliance on stale organizational associations, demonstrates that this lawsuit was not brought to seek legitimate legal redress but to harass and intimidate advocates for Palestinian liberation. While this Court may not be able to enforce the District of Columbia's anti-SLAPP law, these very infirmities mandate dismissal under Rule 12 of the Federal Rules of Civil Procedure.

## IV.    ARGUMENT

### A. Plaintiff Failed to Effectuate Service on Maryland2Palestine

Federal Rule 4(h) authorizes service on an unincorporated association only by (i) following state law for serving an individual, or (ii) delivering process to "an officer, a managing or general agent, or any other agent authorized by appointment or by law." Fed. R. Civ. P. 4(h)(1)(A)–(B). Courts strictly enforce that mandate. For instance, when plaintiffs served a building manager rather than a managing partner, service was quashed because the manager was not a proper Rule 4(h) recipient. *Quann v. Whitegate-Edgewater*, 112 F.R.D.

649, 653–54 (D. Md. 1986). Likewise, service on an unauthorized employee was set aside in *Brown v. Am. Insts. for Research*, 487 F. Supp. 2d 613, 618 (D. Md. 2007). Plaintiffs here ignored Rule 4(h) by handing the summons to Ms. Shraim—a private individual with no role in Maryland2Palestine ("MD2P"). Such service is facially defective.

Ms. Shraim lacked any authority to accept service. Since at least August 2023, Ms. Shraim has not served as co-chair, officer, or agent of MD2P. Rule 4(h) requires actual authority at the moment of service; past titles are irrelevant. "Where actual appointment to accept service is not shown, the service is invalid." *Quann*, 112 F.R.D. at 653–54; *accord Armco Inc. v. Penrod-Stauffer Bldg. Sys., Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984) (rule cannot be "liberally construed" to bypass express requirements). Ms. Shraim's undisputed resignation from MD2P, well before the allegations underlying this Complaint, let alone when service was effectuated, therefore nullifies service.

Plaintiff mailed the summons "c/o Hannah Shraim, 13307 Queenstown Ln., Germantown, MD"—her former personal residence—not any registered office for MD2P. Using a "made-up" address violates the core notice function of service and mirrors defects condemned in *Trademark Remodeling, Inc. v. Rhines*, 853 F. Supp. 2d 532, 539–40 (D. Md. 2012) (seller left papers "on the table"; rule demands delivery to a qualified agent at a bona fide address); *see also Free State Receivables, Ltd. v. Claims Processing Corp.*, 76 F.R.D. 85, 89–90 (D. Md. 1977) (improper office delivery invalid).

Ms. Shraim had no continuing affiliation with MD2P. Courts reject service on individuals lacking any present nexus to the entity. In *American Football League v. NFL*, 27 F.R.D. 264, 267 (D. Md. 1961), the court emphasized that the recipient must be "so integrated with the organization that he will know what to do with the papers." Ms.

Shraim—now a Virginia law student—possesses no MD2P e-mail, phone, or authority; thus service gives the association no meaningful notice, flunking *AFL*'s integration test. Even if Ms. Shraim informally accepted the papers—which she did not—that alone cannot cure the defect.

Because Plaintiff ignored the federal service rule, service of process on Maryland2Palestine via Ms. Shraim is void and the Complaint must be dismissed under Rule 12(b)(5).

### B.  Plaintiffs Lack Article III Standing to Sue Hannah Shraim

Traffic delays are not concrete, particularized injuries under Article III. An interruption in a routine commute "is an unfortunate but unavoidable fact of life," and delay alone cannot confer standing. *See Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 391–92 (2024); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021).

Plaintiff's complaints amount to "generalized grievances," shared by all motorists stuck in traffic, rather than injuries "personal and individual" to him. S*ee Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992); *Alliance for Hippocratic Med.*, 602 U.S. at 382. The mere inconvenience of driving in a protest-ridden capital cannot sustain a federal suit.

Standing requires that the injury be "fairly traceable" to the defendant's conduct, not the result of independent third-party acts. *See id.* at 383–84; *Robbins v. U.S. Dep't of Hous. & Urb. Dev.*, 72 F. Supp. 3d 1, 11 (D.D.C. 2014). Here, there is no plausible link between Shraim's social-media activity and the extensive traffic backups.

Likewise, where "the links in the chain of causation" are "too speculative or too attenuated," Article III standing fails. *Alliance for Hippocratic Med.*, 602 U.S. at 383; *see*

*Robbins*, 72 F. Supp. 3d at 11; *Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028, 1033 (D.C. Cir. 2022). Predicting how social-media posts translate into virus-like protest mobilization and resulting traffic is entirely conjectural.

Neither does alleged "loss of time" and inconvenience from a protest-induced delay qualify as injury in fact. *See Armstrong v. Navient Sols., LLC*, 292 F. Supp. 3d 464, 474 (D.D.C. 2018); *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 25 (D.C. Cir. 2000). A temporary commute interruption is not a legally cognizable harm.

Claims of annoyance, anxiety, or emotional distress absent a violation of a legally protected interest cannot confer standing, either. *See Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 98 (D.C. Cir. 1995); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 25 (D.D.C. 2010); *Alliance for Hippocratic Med.*, 602 U.S. at 391–92. Without a concrete, common-law or statutory right infringed, Plaintiffs' emotional harms are non-justiciable.

### C. All of Plaintiff's Claims Should Be Dismissed Under Fed. R. Civ. P 12(b)(6) for Failure to State a Claim Upon Which Relief Can Be Granted

#### 1. Plaintiff Fails to State a Claim for Public Nuisance (Count I)

Under District of Columbia law, only governmental authorities or other representatives of the public may pursue a public nuisance claim absent "special damage, distinct from that common to the public." *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881–82 (D.C. 1982); *see also Nat'l Tel. Co-op. Ass'n v. Exxon Corp.*, 38 F.Supp.2d 1, 13–14 (D.D.C. 1998). A private party who alleges no greater harm than other motorists—mere delay and inconvenience—lacks standing to sue.

Plaintiff concedes that his alleged injuries are identical to those suffered by every commuter in the rush-hour traffic jam—loss of time, annoyance, and inconvenience.

Compl. ¶78. Absent a distinct, individualized injury (e.g., damage to property), courts uniformly dismiss public nuisance claims. *See B & W Mgmt.*, 451 A.2d at 881; *Tucci v. D.C.*, 956 A.2d 684, 696 n.11 (D.C. 2008).

Public nuisance in the District "is not a separate tort in itself but a type of damage," and "the plaintiff must recover, if at all, on the theory of negligence or some other tort." *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 934 (D.C. 1995); *see District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 646 (D.C. 2005). Here, Plaintiff pleads no underlying tort against Ms. Shraim.

A public nuisance also requires "unreasonable interference with a right common to the general public." *Beretta*, 872 A.2d at 646 (quoting Restatement (Second) of Torts § 821B(1) (1979)). Traffic delays from the ordinary commute "do not constitute unreasonable interference" but are "delay or inconvenience of a detour" that "will not support an action." Restatement (Second) of Torts § 821C, cmt. i; *see Holloway v. Bristol-Myers Corp.*, 327 F.Supp. 17, 24 (D.D.C. 1971).

The District's law reflects the common-law principle that highway travel is a privilege, not a protected right. "The public is merely privileged to travel the public highways and has not a right to do so," and thus "delay or inconvenience … will not support an action for public nuisance." Restatement (Second) of Torts § 36, cmt. d (1965); *see Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 167 (D.C. 2013) (public streets are "traditional public forum[s]" with First Amendment protections).

Because Plaintiff lacks standing and fails to plead any element of a viable public nuisance claim, Count I must be dismissed with prejudice.

## 2. Plaintiff Fails to State a Claim for False Imprisonment (Count II)

Plaintiff's false imprisonment claim fails under D.C. law and the Restatement because he has not alleged any element of that tort. The Restatement (Second) of Torts § 36 specifically excludes highway blockades from false imprisonment: "one who blocks off a highway . . . is not liable for false imprisonment" because "the public is merely privileged to travel the public highways and has not a right to do so". The D.C. Court of Appeals adopted this rule in *Faniel*, holding that highway obstructions cannot support false imprisonment.

Rather, false imprisonment requires detention "within boundaries fixed by the defendant." *Smith v. D.C.*, 306 F. Supp. 3d 223, 260 (D.D.C. 2018). Plaintiff alleges only that blockades slowed traffic on public roads, with no fixed perimeter imposed by Ms. Shraim. Imprisonment must be "total"; a mere delay or slowdown does not suffice. *Id.*; *Briscoe v. U.S.*, 268 F. Supp. 3d 1, 12 (D.D.C. 2017). Plaintiff acknowledges he was "able to navigate out of the blocked traffic" and drive home, precluding total restraint.

False imprisonment also requires detention "by force, threat of force, or assertion of authority." *Faniel*, 404 A.2d at 151–52; *Saidi v. WMATA*, 928 F. Supp. 21, 24–25 (D.D.C. 1996). The complaint contains no allegation that Ms. Shraim or her co-defendants used force or threats to keep motorists in place. The Restatement provides that "it is not enough that the other's freedom of movement has been improperly restricted" if the plaintiff voluntarily remains and reasonable means of exit are available. Restatement (Second) of Torts § 36 cmt. d (1965); *Smith*, 306 F. Supp. 3d at 261. Plaintiff's choice to remain in his vehicle underscores the absence of actionable confinement.

Because the complaint pleads only a highway blockade causing stop-and-go traffic—excluded from false imprisonment—and lacks any allegations of fixed bounds, total restraint, force, or non-voluntary detention, it fails to state a claim upon which relief can be granted under Rule 12(b)(6).

### 3. **If Plaintiff Pleads a Civil Conspiracy Claim, He Fails to State a Claim**

It is "long-settled law in D.C. that civil conspiracy is not actionable as a stand-alone claim." *J.H.C. by Clarke v. District of Columbia*, No. 20-cv-1761 (CRC), 2021 WL 4462359, at *6 (D.D.C. Sept. 29, 2021); *Nader v. Democratic National Committee*, 567 F.3d 692, 697 (D.C. Cir. 2009). Because Plaintiff's underlying claims for public nuisance and false imprisonment are legally deficient, "any derivative conspiracy claim necessarily fails as well." *J.H.C.*, 2021 WL 4462359, at *6.

Even if viable underlying torts existed, Plaintiff has failed to plausibly allege the "essential element of a conspiracy claim"—an agreement between two or more parties. *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 51 (D.D.C. 2019). "To establish the existence of an agreement, the plaintiff must set forth more than just conclusory allegations of the agreement," but must provide "facts to support its existence." *Id.* at 51–52. Plaintiff's bald assertion that Defendants "agreed" to blockade traffic is "wholly conclusory and unsupported by any factual allegations." *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004) (allegations that defendants "agreed among themselves" insufficient); *Mattiaccio v. DHA Group, Inc.*, 20 F. Supp. 3d 220, 230–31 (D.D.C. 2014) (dismissing conspiracy claim where allegations of agreement were "conclusory, unsupported, and provided no indication of when or how such an agreement was brokered").

Plaintiff's conspiracy theory rests entirely on social media posts and past organizational associations—evidence that is woefully insufficient to establish an agreement. "Without more, parallel conduct does not suggest conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). Allegations that defendants acted in a "coordinated fashion" and had a "common goal" are insufficient to plead agreement, as such allegations merely describe "parallel conduct that could just as well be independent action." *Kurd*, 374 F. Supp. 3d at 52. Plaintiff's "bald speculation" that social media activity constituted conspiracy planning is "insufficient to support a claim for conspiracy at the motion to dismiss stage." *Harvey v. Kasco*, 109 F. Supp. 3d 173, 178 (D.D.C. 2015).

Most damningly, Plaintiff makes no allegations whatsoever that Ms. Shraim agreed to participate in the February 1, 2024 action. The Complaint contains no allegations that she:

- Communicated with any other defendant about the February 1 action;

- Attended any planning meetings;

- Made any statements promoting the February 1 action;

- Had any advance knowledge of the specific protest plans; or

- Took any action in furtherance of the February 1 events.

This complete absence of factual allegations connecting Ms. Shraim to any agreement renders the conspiracy claim "speculative or [too] attenuated" to survive dismissal. *Kurd*, 374 F. Supp. 3d at 52. Where a plaintiff fails to allege when, where, or how an alleged conspiracy was formed, dismissal is required. *Mattiaccio*, 20 F. Supp. 3d at 230–31.

Because Plaintiff has failed to state any viable underlying tort claims and has provided no factual basis for alleging an agreement involving Ms. Shraim, the conspiracy claim must be dismissed with prejudice.

### 4.   Plaintiff Pleads No Specific Factual Allegation Against Hannah Shraim

Even if we accept every allegation in the Complaint as true, the claims against Ms. Shraim collapses under settled tort-liability principles because there are no factual allegations of any personal wrongdoing by her.

"To be liable for false imprisonment or public nuisance, the defendant must personally participate in or authorize the wrongful act." *Abourezk v. New York Airlines, Inc.*, 705 F. Supp. 656, 663 (D.D.C. 1989) (rejecting respondeat superior liability where service was accepted by unauthorized employee); *see Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982) (false imprisonment requires "restraint of one against his will . . . by the defendant"). Here, there is no allegation that Ms. Shraim ever took part in planning, executing, or approving the February 1 alleged blockade.

Liability for a protest-based tort also requires at least a showing that the defendant was present at the site of the interference. *Douglas v. United States*, 796 F. Supp. 2d 1354, 1359 (M.D. Fla. 2011) ("No imprisonment arises when the actor is not at the location of the restraint."). There is no allegation that Ms. Shraim was ever at any of the five blockade locations in Washington, D.C.

A conspiracy or aiding-and-abetting claim must allege facts showing communications or coordination with co-conspirators. *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 43 (D.D.C. 2020) (dismissing claim where complaint contained "no factual allegations to support its conclusory allegation" of an unlawful agreement). The Complaint

does not allege that Ms. Shraim ever communicated with any protest organizer or participant about February 1.

Vicarious liability may sometimes turn on financial support, but only when money is actually provided for the wrongful act. *Mollenhauer Labs., Inc. v. U.S.*, 267 F.2d 260, 263 (7th Cir. 1959) (no liability where no evidence funds were used for the alleged conduct). The Complaint does not allege that Ms. Shraim provided any funds to MD2Palestine, its fiscal sponsor, or any protest participant for the February 1 event.

"An allegation that a defendant merely 'belongs to' or 'associates with' an organization without more is too indefinite to put the defendant on notice." *Robertson v. D.C.*, 762 F. Supp. 3d 34, 43 (D.D.C. 2025) (dismissing tort claims where complaint "contain[ed] only formulaic or conclusory allegations"). The bare allegation that Ms. Shraim "is a co-chair of MD2Palestine" (Compl. ¶ 24) provides no factual nexus to the blockade.

Put simply, to survive a Rule 12(b)(6) motion, a plaintiff must plead facts establishing a direct connection between the defendant's conduct and the claimed harm. *Ciox Health*, 435 F. Supp. 3d at 43 ("'An adequate claim must show that the injury was proximately caused by the defendant's wrongful conduct.'" (quoting *Doe v. U.S. Capitol Police*, 899 F.3d 1279, 1284 (D.C. Cir. 2018))). The Complaint does no such thing. It offers no factual basis linking Ms. Shraim's purported social-media or organizational ties to the actual traffic delays experienced by Plaintiff on February 1, 2024.

Because these deficiencies make it impossible for Plaintiff to prove any set of facts showing Ms. Shraim's individual liability, the claims against her must be dismissed with prejudice under Rule 12(b)(6).

### D. Plaintiff's Retaliatory Lawsuit Targets Protected Speech and Association, Designed to Punish Voices for Justice in Palestine, and Create a Chilling Effect on First Amendment Rights

This lawsuit is a textbook example of a retaliatory action aimed at punishing Defendants for engaging in core political speech and association protected by the First Amendment. The Supreme Court has long recognized that "litigation is a vehicle for effective political expression and association" and that the First Amendment "protects vigorous advocacy of lawful ends" in public debate. *Jenner & Block LLP v. U.S. Dep't of Justice*, --- F. Supp. 3d ----, ----, 2025 WL 1482021, at 5 (D.D.C. May 23, 2025)*; Bond v. Floyd*, 385 U.S. 116, 136 (1966). Lawsuits that target individuals or organizations for their political advocacy in public forums are presumptively unconstitutional. *Perkins Coie LLP v. U.S. Dep't of Justice*, --- F. Supp. 3d ----, ----, 2025 WL 1276857, at 7 (D.D.C. May 2, 2025)*.

The very purpose of a SLAPP suit is to chill the exercise of constitutionally protected rights by burdening defendants with costly, protracted litigation. Though not controlling here, the D.C. Anti-SLAPP Act was enacted precisely to "protect the free exercise of political rights by allowing defendants to quickly dispense with suits 'filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view.'" *Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 577 (D.C. 2022) (quoting *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016)). The chilling effect of such litigation is "antithetical to a free society," as it deters not only the named defendants but also others from engaging in protected advocacy. *Perkins Coie LLP*, 2025 WL 1276857, at *7.*

The Supreme Court has repeatedly held that "streets and parks… have immemorially been held in trust for the use of the public and, time out of mind, have been used for

purposes of assembly, communicating thoughts between citizens, and discussing public questions." *United States v. Grace*, 461 U.S. 171, 180 (1983) (internal quotation marks omitted); *Snyder v. Phelps*, 562 U.S. 443, 456 (2011). The District of Columbia's own First Amendment Assemblies Act codifies this principle, affirming that protest activity in public streets is a protected form of expression. *See* D.C. Code § 5-331.01 et seq. Lawsuits seeking to penalize protest activity in these forums are subject to the strictest constitutional scrutiny. Here, Plaintiff's own pleadings and public statements reveal a transparent effort to weaponize the courts against political opponents, not to redress any cognizable legal harm.

In sum, this action is a paradigmatic SLAPP suit: it targets protected political speech and association in a traditional public forum, is motivated by a desire to punish disfavored views, and would chill the exercise of First Amendment rights by any person of ordinary firmness. The Complaint must be dismissed under Rule 12(b)(6).

### E. Plaintiff's Retaliatory Lawsuit is Sanctionable and Should be Dismissed with Prejudice

Federal Rule of Civil Procedure 11 authorizes sanctions where a pleading is presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. *See* Fed. R. Civ. P. 11(b)(1); *McLaughlin v. Bradlee*, 602 F. Supp. 1412, 1417 (D.D.C. 1985) (sanctions imposed where pleadings were filed for improper purposes and unreasonably increased costs). Courts have repeatedly held that lawsuits targeting protected political speech, brought without a good faith basis, are sanctionable as frivolous and abusive. *SeeChambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (affirming inherent power to sanction bad-faith litigation); *Robertson v. Cartinhour*, 883 F. Supp. 2d 121, 127 (D.D.C. 2012) (sanctions for "excessive and frivolous pleadings").

Federal courts possess inherent authority to sanction parties who act in bad faith, including by filing lawsuits to harass or oppress political opponents. *Chambers*, 501 U.S. at 45–46; *Akl v. Virginia Hosp. Ctr.*, 471 B.R. 1, 8 (D.D.C. 2012) (sanctions for "bad faith, vexatiously, wantonly, or for oppressive reasons"). The D.C. Circuit has emphasized that sanctions are warranted where litigation is initiated "wantonly, for purposes of harassment or delay, or for other improper reasons." *Yeh v. Hnath*, 294 A.3d 1081, 1092 (D.C. 2023). Here, Plaintiff's serial targeting of advocacy organizations and activists for their protected speech is the very definition of bad faith litigation.

Under 28 U.S.C. § 1927, any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *See Reynolds v. U.S. Capitol Police Bd.*, 357 F. Supp. 2d 19, 23–24 (D.D.C. 2004) (sanctions for "vexatious and dilatory litigation"); *Hall v. Dep't of Homeland Sec.*, 219 F. Supp. 3d 112, 119 (D.D.C. 2016) (sanctions for "unreasonably and vexatiously" multiplying proceedings). The pattern of duplicative, meritless lawsuits against Palestinian rights advocates and their supporters is precisely the type of conduct § 1927 was designed to deter.

Federal courts have an inherent duty to prevent abuse of the judicial process, especially where litigation is weaponized to suppress First Amendment rights. *Chambers*, 501 U.S. at 44–46; *McLaughlin*, 602 F. Supp. at 1417 (sanctions for "harass[ing] the court and defendants with pleadings filed for improper purposes"). The Supreme Court has made clear that "official reprisal for protected speech . . . threatens to inhibit exercise of the protected right." *Perkins Coie LLP*, --- F. Supp. 3d ----, 2025 WL 1276857, at *7. When the courts are conscripted as instruments of political retaliation, sanctions are not only

appropriate—they are necessary to safeguard the integrity of the judicial system and the constitutional rights it exists to protect.

In sum, this action is a paradigmatic example of sanctionable litigation: it is frivolous, brought in bad faith to harass political opponents, part of a pattern of vexatious lawsuits, and constitutes a gross abuse of the judicial process. Sanctions under Rule 11, 28 U.S.C. § 1927, and the Court's inherent authority are warranted and should be imposed.

## V.    CONCLUSION

Defendant Hannah Shraim respectfully submits that Plaintiff's lawsuit exemplifies a brazen misuse of the judicial process—a political harpoon launched at students exercising core First Amendment rights, without a shred of personal participation, jurisdictional basis, or viable cause of action. Plaintiff's amended complaint, now bloated to 207 paragraphs and nine exhibits yet still devoid of plausible allegations against Ms. Shraim, cannot be cured by further amendment. For these reasons, and for the independent grounds set forth above, this Court should:

- Dismiss this action with prejudice for lack of Article III standing, lack of personal jurisdiction, lack of subject-matter jurisdiction, and failure to state any claim upon which relief can be granted;

- Decline to permit further leave to amend, as any additional pleading would be futile and made in bad faith; and

- Impose sanctions on Plaintiff and counsel under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent authority, to compensate Ms. Shraim for the costs, fees, and wasted judicial resources incurred in defending this scurrilous SLAPP suit.

Ms. Shraim has been dragged into federal court based on outdated organizational ties, half-baked hearsay, and reckless procedural gamesmanship. Allowing this retaliatory litigation to proceed would reward the very lawfare this motion condemns. The requested dismissal and sanctions will vindicate fundamental due-process rights, deter future abuse of the courts, and uphold the constitutional guarantee of free speech and association.

Respectfully submitted,

*/s/ Abdel-Rahman Hamed*

ABDEL-RAHMAN HAMED, ESQ.
DC Bar No. 1632130
**Hamed Law**
P.O. Box 25085
Washington, D.C. 20027
(202) 888-8846
advocates@hamedlaw.com

*Attorney for Hannah Shraim*