## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DANIEL FAORO,**

       Plaintiff,

   v.

**JEWISH VOICE FOR PEACE, INC., et al.,**

    Defendants.

No. 1:25-cv-289-ABJ

ELECTRONICALLY FILED

---

## PLAINTIFF FAORO'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' RULE 12 MOTIONS (ECF NOS. 46, 47, 49, 50, 52, 55)

---

## Table of Contents

**Table of Contents** ................................................................................................... ii

**Table of Authorities** ............................................................................................. iv

**Introduction** .............................................................................................................. 1

**Factual Background** ................................................................................................. 3

**Legal Standard** .......................................................................................................... 5

**Argument** .................................................................................................................... 6

I.     Faoro has Article III standing to seek damages and injunctive relief for himself and the class. ...................................................................................................................... 6

    A.     Defendants misunderstand injury-in-fact requirements for historical common-law causes of action such as those alleged by Faoro. ............................... 6

    B.     Faoro has standing to pursue injunctive relief for public nuisance. ................... 12

    C.     Faoro's injury is traceable to every Defendant's conduct. ...................................... 14

    D.     Redressability flows from Faoro's injury caused by Defendants' conduct. ...... 16

II.    Neither the First Amendment nor the First Amendment Assemblies Act undermines Faoro's standing or provides grounds for dismissing his complaint. ............................. 17

III.   Faoro has pleaded valid false imprisonment and public nuisance conspiracies for which relief can be granted. ........................................................................................... 21

    A.     False imprisonment is a valid claim. ................................................................... 21

    B.     Faoro's public nuisance claim is a valid claim for injunctive relief. ................... 27

    C.     Faoro has adequately pleaded that Defendants engaged in a conspiracy ........ 29

IV.    Faoro has properly alleged claims against WESPAC based on its fiscal sponsorship of PYM, and D.C.'s long-arm statute triggers personal jurisdiction. ........................................ 32

    A.     WESPAC is liable for the actions of PYM. ......................................................... 32

    B.     The Court has personal jurisdiction over WESPAC because it has specific personal jurisdiction over PYM and the other co-conspirator Defendants. ..... 38

V.     Faoro's complaint satisfies Rule 8. ........................................................................... 42

    A.     The allegations against Becker and Shraim are sufficient under Rule 8. .......... 43

    B.     Shraim's brief includes phony citations that suggest improper reliance on AI or excessive carelessness and may require court attention. ................................. 44

C.      To the extent that the Court believes Rule 8 is not met because of the absence of factual allegations, dismissal with leave to amend is appropriate. .................47

VI.    Service of Process on Shraim and Maryland2Palestine was valid. ....................47

VII.   Defendants' request for sanctions. ....................................................................49

**Conclusion** ...........................................................................................................................**50**

**Certificate of Service** ..........................................................................................................**51**

# Table of Authorities

<u>Cases</u>

*Abourezk v. New York Airlines, Inc.,*
    705 F. Supp. 656 (D.D.C. 1989) ................................................................... 22, 45

*Alliance of Nonprofits for Ins. Risk Retention Grp. v. WESPAC Found., Inc.,*
    ECF 1, 1:25-cv-1320 (S.D.N.Y. Feb. 13, 2025) ........................................... 37

*Amer*ican Football League v. National Football League
    27 F.R.D. 264 (D. Md. 1961) ......................................................................... 48

*Arent v. Shalala,*
    70 F.3d 610 (D.C. Cir. 1995) .................................................................. 43, 47

*Arm. Genocide Museum & Mem'l., Inc. v. Cafesian Family Found., Inc.,*
    607 F. Supp. 2d 185 (D.D.C. 2009) ............................................................. 38

*Armstrong v. Navient Solutions*,
    292 F. Supp. 3d 464 (D.D.C. 2018)............................................................... 11

*Ashton v. Brown,*
    339 Md. 70 (1995) ............................................................................................ 9

*B&W Management, Inc. v. Tasea Inv. Co.,*
    451 A.2d 879 (D.C. 1982) ............................................................... 12, 27, 28

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................... 42

*Bigelow v. Garrett,*
    299 F.Supp.3d 34 (D.D.C. 2018) ................................................................. 38

*Blount v. U.S. Sec. Assocs.,*
    930 F. Supp. 2d 191 (D.D.C. 2013) ............................................................. 41

*Bulluck v. Hana Indus., Inc.,*
    2024 U.S. Dist. LEXIS 25374, 2024 WL 620440 (D.D.C. Feb. 14, 2024) ......................... 49

*Brown v. Argenbright Sec., Inc.,*
    782 A.2d 753 (D.C. 2001) .............................................................................. 35

*Brunson v. Kalil & Co.,*
    404 F. Supp. 2d 221 (D.D.C. 2005) ...................................................................... 38

*Ciox Health, LLC v. Azar,*
    435 F. Supp. 3d 30 (D.D.C. 2020) ........................................................................ 45

*Chelsea Condo. Unit Owners Ass'n v. 1815 A St.,*
    468 F. Supp. 2d 136 (D.D.C. 2007) ................................................................... 5, 42

*Conley* v. Gibson,
    355 U.S. 41(1957) ............................................................................................... 42

*Cox v. Louisiana,*
    379 U.S. 536 (1965)................................................................................... 2, 17, 18

*Crano v. 5 Star Nutrition, LLC,*
    3998 F.3d 686 (5th Cir. 2021) ................................................................................ 8

*Dingle v. Dist. of Columbia,*
    571 F. Supp. 2d 87 (D.D.C. 2008) ....................................................................... 23

*Direct Mail Specialists, Inc. v. Eclat Computerized Tech., Inc.*
    840 F.2d 685 (9th Cir. 1988) ............................................................................... 48

*Dist. of Columbia v. Gandy,*
    450 A.2d 896 (D.C. 1982) .................................................................................... 21

*Dist. of Columbia v. Proud Boys Int'l, LLC,*
    2023 U.S. Dist. LEXIS 57433, 2023 WL 2733767 (D.D.C. Mar. 31, 2023) ...................... 29

*Doe v. AFGE,*
    554 F. Supp. 3d 75 (D.D.C. 2021) ....................................................................... 15

*Doe v. Roman Catholic Diocese of Greensburg,*
    581 F. Supp. 3d 176 (D.D.C. 2022) ................................................................. 29, 36

*Douglas v. United States,*
    796 F. Supp. 2d 1354 (M.D. Fla. 2011) ............................................................... 45

*Drs. For Am. v. OPM,*
    766 F. Supp. 3d 39 (D.D.C. 2025) ....................................................................... 11

*El-Fadl v. Cent. Bank of Jordan,*
 75 F.3d 668 (D.C. Cir. 1996) ................................................................................41

*Estate of Kleinman v. Palestinian Auth.,*
 547 F. Supp. 2d 8 (D.D.C. 2008) ....................................................................48, 49

*Estate of Manook v. Research Triangle Inst., Int'l,*
 683 F. Supp. 2d 4 (D.D.C. 2010) .........................................................................41

*Faniel v. Chesapeake & Potomac Tel. Co.,*
 404 A.2d 147 (D.C. 1979) ..............................................................................21, 25

*Farrell v. Blinken,*
 4 F.4th 124 (D.C. Cir. 2021) ................................................................................12

*FDA v. All. for Hippocratic Med.,*
 602 U.S. 367 (2024) ...............................................................................11, 15, 16

*First Am. Corp. v. Al-Nahyan,*
 948 F. Supp. 1107 (D.D.C. 1996) .........................................................................39

*Flyers Rights Educ. Fund, Inc. v. U.S. Dep't of Transp.,*
 810 Fed App'x 1 (D.C. Cir. 2020) .........................................................................11

*Fox v. Dist. of Columbia,*
 851 F. Supp. 2d 20 (D.D.C. 2012) ........................................................................13

*Gustave-Schmidt v. Chao,*
 226 F. Supp. 2d 191 (D.D.C. 2002) ........................................................................5

*G'Sell v. Carven,*
 724 F. Supp. 2d 101 (D.D.C. 2010) ......................................................................22

*Halberstam v. Welch,*
 705 F.2d 472 (D.C. Cir. 1983) .............................................................................29

*Helmer v. Doletskaya,*
 393 F.3d 201 (D.C. Cir. 2004) .............................................................................38

*Hetta v. Museum of the Bible,*
 2021 D.C. Super. LEXIS 134  (D.C. Super Ct. 2021) ...............................................21

*Hobson v. Wilson,*
       737 F.2d 1 (D.C. Cir. 1984) ............................................................................31

*Holland v. Cardem Ins. Co.,*
       2020 U.S. Dist. LEXIS 253998, 2020 WL 9439381 (D.D.C. June 22, 2020) .................49

*Humane Soc'y of U.S. v. Babbitt,*
       46 F.3d 93 (D.C. Cir. 1995) ............................................................................11

*Humane Soc'y of the United States v. Vilsack,*
       797 F.3d 4 (D.C. Cir. 2015) ............................................................................14

*Jackson v. District of Columbia,*
       254 F.3d 262 (D.C. Cir. 2001) ........................................................................47

*James v. Booz-Allen & Hamilton, Inc.,*
       206 F.R.D. 15 (D.D.C. 2002) ..........................................................................49

*Johnson v. Dunn,*
       2025 U.S. Dist. LEXIS 141805 (N.D. Ala. July 23, 2025) ..............................46

*Johnson-Tanner v. First Cash Fin. Servs.,*
       239 F. Supp. 2d 34 (D.D.C. 2003) ..................................................................41

*Jung v. Ass'n of Am Med. Colleges,*
       300 F. Supp. 2d 119 (D.D.C. 2004) ................................................................40

*Kernane v. AMTRAK,*
       743 A.2d 703 (D.C. 2000) ..............................................................................36

*Lacey v. State Farm Gen. Ins. Co.,*
       2025 U.S. Dist. LEXIS 90370 (C.D. Cal. May 5, 2025) ..................................46

*Lewis v. Kei,*
       708 S.E.2d 884 (Va. 2011) ..............................................................................22

*Lujan v. Defs. of Wildlife,*
       504 U.S. 555 (1992) ..........................................................................5, 6, 7, 13

*Lyles v. Micenko,*
       468 F. Supp. 2d 68 (D.D.C. 2006) ..................................................................21

*Mahoney v. District of Columbia,*
   662 F. Supp. 2d 74 (D.D.C. 2009) ...............................................................................18

*Mahoney v. Doe,*
   642 F.3d 1112 (D.C. Cir. 2011) ....................................................................................18

*Mandlekorn v. Patrick,*
   359 F. Supp. 692 (D.D.C. 1973) ..................................................................................39

*Mata v. Avianca, Inc.,*
   678 F. Supp. 3d 443 (S.D.N.Y. 2023) .........................................................................46

*Marshall v. Dist. of Columbia,*
   391 A.2d 1374 (D.C. 1978) ..........................................................................................21

*Malvitz v. Fincantieri Marine Grp., LLC,*
   2025 U.S. Dist. LEXIS 112053, 2025 WL 1663077 (D.D.C. June 12, 2025) ...............22

*McMullen v. Synchrony Bank,*
   164 F. Supp. 3d 77 (D.D.C. 2016) ................................................................................29

*Mitchell v. DCX, Inc.,*
   274 F. Supp. 2d 33 (D.D.C. 2003) ...............................................................................35

*Molecular Diagnostic Labs. V. Hoffmann-LaRoche, Inc.,*
   402 F. Supp. 2d 276 (D.D.C. 2005) ..............................................................................30

*Nat'l Sec. Counselors v. CIA,*
   898 F. Supp. 2d 233 (D.D.C. 2012) ..............................................................................12

*In re Navy Chaplaincy,*
   697 F.3d 1171 (D.C. Cir. 2012) ....................................................................................13

*NB ex rel. Peacock v. Dist. of Columbia,*
   682 F.3d 77 (D.C. Cir. 2012) ..................................................................................12, 13

*Novak v. World Bank,*
   703 F.2d 1305 (D.C. Cir. 1983) ....................................................................................49

*Ochs v. District of Columbia,*
   258 A.3d 169 (D.C. 2021) .............................................................................................18

*Ortberg v. Goldman Sachs Grp.,*
        64 A.3d 158, 166 (D.C. 2013) ................................................................................27

*Page v. Comey,*
        137 F.4th 806 (D.C. Cir. 2025) ............................................................................15

*Paul v. Howard Univ.,*
        764 A.2d 297 (D.C. 2000) ....................................................................................29

*Pietrangelo v. Refresh Club, Inc.,*
        2023 U.S. Dist. LEXIS 176296, 2023 WL 6388880 (D.D.C. Sept. 29, 2023) ..................15

*Plesha v. Ferguson,*
        760 F. Supp. 2d 90 (D.D.C. 2011) ........................................................................41

*In re Rembrandt Techs. LP Patent Litig.,*
        899 F.3d 1254 (Fed. Cir. 2018) ............................................................................45

*Reudiger v. U.S. Forest Serv.*
        427 F. Supp. 2d 975 (D. Or. 2005) ....................................................................9, 10

*Robertson v. District of Columbia,*
        762 F. Supp. 3d 34 (D.D.C. 2025) ........................................................................46

*Rollerson v. Dart Group Corp.,*
        1996 U.S. Dist. LEXIS 23050, 1996 WL 365406 (D.D.C. June 25, 1996) ........................36

*Romany v. Museum of the Bible*
        2019 D.C. Super. LEXIS 310 (D.C. Super. Ct. 2019) ................................2, 21, 23, 24

*S.H. Kress & Co. v. Musgrove,*
        149 S.E. 453 (Va. 1929) ......................................................................................22

*Saenz v. Roe,*
        526 U.S. 489 (1999) ............................................................................................10

*Sami v. United States,*
        617 F.2d 755 (D.C. Cir. 1979) ............................................................................24

*Sargeant v. Dixon,*
        130 F.3d 1067 (D.C. Cir. 1997) ..........................................................................11

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ................................................................................................43

*Shapiro v. Thompson,*
    394 U.S. 618 (1969) ................................................................................................10

*Shoppers Food Warehouse v. Moreno,*
    746 A.2d 320 (D.C. 2000) ......................................................................................39

*Singleton v. Darby,*
    609 Fed. Appx. 190 (5th Cir. 2015) .......................................................................17

*Smith v. Davis,*
    22 App. D.C. 298; 1903 U.S. App. LEXIS 5534 (D.C. 1903) ................................27

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) ................................................................................................24

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .....................................................................................6, 7, 8, 11

*Sprint Communications Co. v. APCC Servs., Inc.,*
    554 U.S. 269 (2008) ................................................................................................16

*Summers v. Earth Island Inst.,*
    555 U.S. 488, (2009) .................................................................................................7

*Tall v. Comcast of Potomac, LLC,*
    729 F. Supp. 2d 342 (D.D.C. 2010) .......................................................................40

*Taubman Realty Grp. Ltd. P'ship v. Mineta,*
    198 F. Supp. 2d 744 (E.D. Va. 2002), aff'd 320 F.3d 475 (4th Cir. 2003) ............9

*Tarpeh-Doe v. United States,*
    24 F.3d 120 (D.C. Cir. 1994) ..................................................................................35

*Terry v. Reno,*
    101 F.3d 1412 (D.C. Cir. 1996) .........................................................................2, 17

*Thomas v. City Lights Sch., Inc.,*
    124 F. Supp. 2d 707 (D.D.C. 2000) .......................................................................37

*Thomas v. Principi,*
        394 F.3d 970 (D.C. Cir. 2005) ................................................................................................5

*Thompson v. Trump,*
        590 F. Supp. 3d 46 (D.D.C. 2022) ...............................................................10, 29, 31, 44

*TransUnion LLC v. Ramirez,*
        594 U.S. 413, 425 (2021) ........................................................................................................7

*Tucci v. District of Columbia,*
        956 A.2d 684 (D.C 2008) .....................................................................................................27

*United States v. Alford,*
        89 F.4th 943 (D.C. Cir. 2024) .......................................................................................10, 19

*United States v. Bestfoods,*
         524 U.S. 51 (1998) ...............................................................................................................35

*United States v. Mollenhauer Labs, Inc.,*
        267 F.2d 260 (7th Cir. 1959) .............................................................................................45

*United States v. Tarantino,*
        846 F.2d 1384 (D.C. Cir. 1988) ........................................................................................30

*Votevets Action Fund v. McDonough,*
        992 F.3d 1097 (D.C. Cir. 2021) ........................................................................................31

*Wadsworth v. Walmart Inc.,*
        348 F.R.D. 489 (D. Wyo. 2025) .......................................................................................46

*Walker v. City of Birmingham,*
        388 U.S. 307(1967) ................................................................................................................1

*Warren v. Dist. Of Columbia,*
        353 F.3d 36 (D.C. Cir. 2004) ...............................................................................................5

*Warth v. Seldin,*
        422 U.S. 490 (1975) .............................................................................................................17

*Washington Mobilization Committee v. Cullinane,*
        566 F.2d 107 (D.C. Cir. 1977) ..........................................................................................10

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990*)* ................................................................................................17

<u>Rules & Statutes</u>

28 U.S.C. § 1927 ..............................................................................................................49

D.C. Code § 5-331.01 et seq. ...........................................................................................14

D.C. Code § 5-331.03 .......................................................................................................19

D.C. Code § 5-331.03(1) ...................................................................................................19

D.C. Code § 5-331.04 .......................................................................................................18

D.C. Code § 5-331.05(a) ...................................................................................................19

D.C. Code § 5-331.05(c) ...................................................................................................19

D.C. Code § 5-331.05(d) ...................................................................................................19

D.C. Code § 5-331.07 .......................................................................................................19

D.C. Code § 5-331.07(b)(1) ..............................................................................................20

D.C. Code § 5-331.07(e) ...................................................................................................20

D.C. Code § 13-423 .....................................................................................................38, 39

D.C. Code § 22-1307 ........................................................................................................20

D.C. Code § 22-1307(a) ....................................................................................................18

D.C. Code § 22-1323 ........................................................................................................27

Fed. R. Civ. P. 4(c)(1) ......................................................................................................15

Fed. R. Civ. P. 4(h) .............................................................................................45, 47, 48, 49

Fed. R. Civ. P. 8 ..................................................................................................42, 43, 44, 47

Fed. R. Civ. P. 8(a) ...........................................................................................................43

Fed. R. Civ. P. 8(a)(2) ......................................................................................................42

Fed. R. Civ. P. 11 ........................................................................................................50

Fed. R. Civ. P. 11(c) ...................................................................................................49

Fed. R. Civ. P. 11(c)(3) .............................................................................................49

Fed. R. Civ. P. 12(b) ...........................................................................................15, 50

Fed. R. Civ. P. 12(b)(1) ..............................................................................................5

Fed. R. Civ. P. 12(b)(5) .............................................................................................50

Fed. R. Civ. P. 12(b)(6) .......................................................................................5, 42

Fed. R. Evid. 801(d)(2)(A) ........................................................................................15

Fed. R. Evid. 801(d)(2)(E) ....................................................................................1530

Va. Code Ann. § 46.2-1200.1 ...................................................................................26

U.S. Const., art. III ...................................................................................6, 7, 8, 11

U.S. Const., amd. I ..............................................................................................17, 18

Other Authorities

Blackstone, William,
    *Commentaries of the Laws of England*, Ch. 8 (1768) ..............................................7, 8

Colvin, Gregory T. & Petit, Stephanie L.,
    *Fiscal Sponsorship: 6 Ways to Do it Right* (3d ed. 2019) ...........................................3, 32, 33

Fortgang, Tal,
    The Rise of Civil Terrorism,
    CITY J. (Winter 2025) ............................................................................................... 1

Grey, Betsy J.,
    The Future of Emotional Harm,
    83 FORDHAM L. REV. 2605 (2015) ..............................................................................10

IRS Private Letter Ruling 201712014,
    2016 PLR LEXIS 1103 (Dec. 29, 2016) ...............................................................33, 34

Kendrick, Leslie,
>   The Perils and Promise of Public Nuisance,
>   132 YALE L.J. 702 (2022) .................................................................................8

Morris, Walter
>   *3 arrested at pro-Palestinian rally outside Union Station*,
>   NBC4Washington, (Nov. 17, 2023) ...............................................................4

Restatement (Second) of Agency § 213(a) ...........................................................35

Restatement (Second) of Agency § 213(c) ...........................................................35

Restatement (Second) of Torts § 35 .....................................................................24

Restatement (Second) Torts § 36 .........................................................................26

Restatement (Second) of Torts § 36, comment a ...........................................25, 26

Restatement (Second) of Torts § 36, comment d ................................................10

Restatement (Second) of Torts § 37 .....................................................................24

Restatement (Second) of Torts § 37, comment a .................................................24

Restatement (Second) of Torts § 38 .....................................................................24

Restatement (Second) Torts § 40A .......................................................................23

Restatement (Second) of Torts § 821B .................................................................27

Restatement (Second) of Torts § 821C.............................................................12, 28

Restatement (Second) Torts § 821C(2)(c) .......................................................12, 28

Rev. Rul. 68-489, 1968-2 C.B. 210 ...................................................................35, 41

Rev. Rul. 75-384, 1975-2 C.B. 204 .......................................................................34

Saxena, Vivek,
>   *Reagan National warns of delays due to pro-Hamas group in vehicles 'exercising 1A*
>   *rights'*,
>   Biz Pac Review (Jan. 21, 2024).........................................................................4

## Introduction

Defendants' motions are long on rhetoric regarding the righteousness of their cause, but short on legal argument that supports dismissal. To begin with, Defendants are hardly engaged in the tradition of "civil disobedience" (ECF 46-1 at 3) that civil rights giants like Martin Luther King, Jr. practiced; instead, they are engaged in "civil terrorism." *See generally* Tal Fortgang, *The Rise of Civil Terrorism*, City J. (Winter 2025) (contrasting civil-rights movement with 21st century road blockade tactics). When King and his followers engaged in civil disobedience, they would violate unjust laws (say, by demanding service at a segregated Woolworth's lunch counter), and used the resulting arrests to publicize the injustice of those laws. *Id.* They may have challenged the constitutionality of the laws, but if their actions violated the law, they were not shielded on freedom-of-speech grounds. They were not "constitutionally free to ignore all the procedures of the law and carry their battle to the streets." *Walker v. City of Birmingham*, 388 U.S. 307, 321 (1967).

The "civil disobedience" here involved Defendants violating others' rights, by conspiring to organize and participating in a traffic blockade designed to "shut DC down" by illegally blocking critical roadways that served as chokepoints for commuters during rush hour throughout the region. ECF 1 ¶¶ 42-58. Defendants do not contend that the laws prohibiting road blockades and driver detainment are unconstitutional. They do not contend that citizens generally cannot bring false imprisonment torts against their victimizers if the elements of the tort are met. Now the victims whom Defendants caused pain seek redress. The law supports this.

Defendants' arguments to the contrary over 100 pages of briefing consistently rest on propositions of law or fact that are not so.

Defendants' Article III standing argument fundamentally misunderstands Supreme Court jurisprudence. Defendants make no effort to do the historical analysis the Supreme Court requires to reject standing.  For good reason: plaintiffs have standing when they

allege harm that is intangible and difficult to prove when the harm arises from a traditional common law cause of action —such as false imprisonment (Faoro's Count II). In any event, Faoro's alleged harm of loss of time, liberty, and the right to travel, as well as emotional injury and inconvenience in travel plans are sufficient injury to establish standing, and that injury is traceable to every Defendant's actions. *See* Section I.

A private plaintiff may bring a public nuisance claim seeking injunctive relief on behalf of a class without alleging special harm—just as Faoro does here. Defendants' assertions of lack of standing to do so misstate the law.  *See* Section I.B below.

Faoro plausibly alleges that his injury was caused by Defendants' blockade of traffic and details each Defendant's involvement and admissions in sufficient detail to meet the traceability requirement of standing. *See* Section II.C.

"Protesters have no First Amendment right to 'cordon off a street, or [the] entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.'" *Terry v. Reno*, 101 F.3d 1412, 1419 (D.C. Cir. 1996) (quoting *Cox v. Louisiana*, 379 U.S. 536, 555 (1965)). The First Amendment and the District of Columbia's First Amendment Assemblies Act ("FAAA") do not shield Defendants' wrongful conduct. *See* Section II.

A person engages in false imprisonment when they block the exit for someone, and the confinement they impose need not be for an extended period of time. *E.g.*, *Romany v. Museum of the Bible*, 2019 D.C. Super. LEXIS 310 at *17-*18 (D.C. Super. Ct. 2019). Faoro has a cause of action for false imprisonment. *See* Section III.A.

Defendants again assert that Faoro has not alleged a claim for public nuisance, but precedent establishes that blocking a highway constitutes an unreasonable interference with a right common to the public. *See* Section III.B.

WESPAC was the direct fiscal sponsor of Palestinian Youth Movement (PYM) which had no separate corporate structure or 501(c)(3) at the relevant time. Under direct fiscal

sponsorship, "the sponsor takes the project in-house," treating it as an internal program rather than a separate legal entity. Gregory T. Colvin and Stephanie L. Petit, *Fiscal Sponsorship: 6 Ways to Do It Right* 19 (3d ed. 2019) ("Colvin"). Faoro is not even asking the Court to "pierce the veil," because there's no veil to pierce. WESPAC is asking the Court to treat PYM as a separate corporate entity when WESPAC took none of the required steps to create that legal separation or shield. WESPAC is thus liable for PYM's actions as a matter of law, and the personal jurisdiction over PYM confers personal jurisdiction over WESPAC. *See* Section IV.

Defendants' arguments that Faoro's allegations are insufficient under Fed. R. Civ. Proc. 8 contradict the "short and plain" pleading standard and the rule's recognition that a defendant need only fair notice of the claims, particularly given there will be opportunity for discovery to narrowly define the disputed facts and issues. All of the Defendants have received adequate notice of Faoro's allegations. *See* Section V.

The motions to dismiss should be denied.

## Factual Background

The *Faoro* class sues over the February 1, 2024, traffic blockade that the Defendants conspired and acted in concert to cause. Defendants and hundreds of their co-conspirators descended on several highways and roads in the District of Columbia and blockaded traffic for up to two hours. These actions were part of a carefully planned and coordinated effort by Defendants, intended to disrupt daily life for as many people as possible. With Defendants and their co-conspirators blocking traffic at several critical chokepoints and exits of most of the major routes into downtown Washington, Foggy Bottom, and Capitol Hill, traffic into the District was impeded severely, and in many places, completely stopped for up to two hours. Thousands of commuters were late for or missed work or school, critical appointments, and other important events. Commuters were trapped in their

vehicles with no inkling as to when their freedom of movement would be restored or whether their plans for the day were salvageable. For his part, Faoro, a resident of Fairfax County, Virginia, who works in the District and regularly commutes to his office by automobile, was stuck in his vehicle on Route 50 on February 1, 2024. He was unable to reach his office and trapped at length before traffic barely cleared enough for him to navigate out of the blocked traffic to return home. *See* ECF 1 ¶¶ 34-36.

This traffic blockade was not an isolated illegal act of disruption taken by the Defendants. After the October 7, 2023, Hamas massacre, Defendants and other anti-Israel activists have engaged in several unlawful actions to interfere with the daily lives and legal rights of tens of thousands of people in and around the District of Columbia. For example, on October 18, 2023, activists, including members of defendant Jewish Voice for Peace, illegally occupied Congressional office buildings to disrupt Congress, resulting in 300 arrests.[1] In January 2024, at least four of the named defendants—PYM, Jewish Voice for Peace (as OccupationFreeDC), Maryland2Palestine (MD2P), and the Party of Socialism & Liberation (PS&L)—were allegedly involved in impeding traffic on the George Washington Parkway and blocking access to Reagan National Airport.[2] Faoro details in his complaint several other incidents in which anti-Israel activists engaged in similarly disruptive and unlawful activities. *See* ECF 1 ¶¶ 3-4.

Faoro filed this class action on January 31, 2025, to hold Defendants accountable for their illegal activities that harmed him and thousands of others. He alleges that defendants are liable for public nuisance, false imprisonment, and (in the alternative against defendant

---

[1] *See* Walter Morris, *3 arrested at pro-Palestinian rally outside Union Station*, NBC4Washington, (Nov. 17, 2023), *available at* https://tinyurl.com/mr2swz9p.

[2] *See* Vivek Saxena, *Reagan National warns of delays due to pro-Hamas group in vehicles 'exercising 1A rights'*, Biz Pac Review (Jan. 21, 2024), *available at* https://tinyurl.com/4mr6j7x3.

WESPAC) negligence or recklessness. Faoro seeks both damages and injunctive relief, among other remedies.

## Legal Standard

In resolving a Rule 12(b)(6) motion, "the court must treat the complaint's factual allegations—including mixed questions of law and fact—as true and draw all reasonable inferences therefrom in the plaintiff's favor." *Chelsea Condo. Unit Owners Ass'n v. 1815 A St.* 468 F. Supp. 2d 136, 145 (D.D.C. 2007). The Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002). "'[T]he accepted rule in every type of case' is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Chelsea Condo. Unit Owners Ass'n*, 468 F. Supp. 2d at 145 (quoting *Warren v. Dist. Of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004)).

Under Rule 12(b)(1), the court also "construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (internal quotations omitted). As the party invoking federal jurisdiction, Faoro bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (cleaned up).

**Argument**

## I.    Faoro has Article III standing to seek damages and injunctive relief for himself and the class.

Faoro has established each of the Article III standing requirements: injury-in-fact, traceability, and redressability. *Lujan*, 504 U.S. at 560-61. Defendants' arguments to the contrary rest on fundamental misunderstandings of standing jurisprudence and Faoro's complaint. First, false imprisonment is a common-law tort with historical roots. Thus the violation of the legal right itself constitutes injury for Article III purposes. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). *See* Section I.A. Second, public nuisance is also a common-law tort with historical roots, but because of its history as a public enforcement tool, the claim requires private plaintiffs to allege special harm *unless*, like Faoro, a plaintiff is seeking only injunctive relief as a representative of the class in a class action. *See* Section I.B. Third, Faoro alleges particularized injury traceable directly to Defendants' actions sufficient to establish Article III standing. *See* Sections I.A. and I.C. Finally, Defendants' defense of having engaged in First Amendment-protected activity is a merits defense that is not supported by the law, and, as such, cannot undermine Faoro's standing to bring these claims. *See* Section II.

### A.    Defendants misunderstand injury-in-fact requirements for historical common-law causes of action such as those alleged by Faoro.

Injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Defendants' arguments that Faoro's injuries are not concrete and particularized rely on inapplicable caselaw and faulty reasoning.

"Concrete" means that an injury must be real, rather than abstract. But "intangible injuries can nevertheless be concrete"—even if "difficult to prove"—provided that they bear a "close relationship to a harm that has traditionally been regarded as providing a

basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 340-41; *accord TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 433 (2021) (holding that standing requires "a close or common-law analogue" to the claim asserted). Thus, for example, if a defendant maintains false credit reports in violation of the Fair Credit Reporting Act, a plaintiff whose false credit report is disseminated has standing to sue over the statutory violation, while one whose credit report remains internal does not. *TransUnion*, 594 U.S. at 436-37. Disseminated false reports resemble defamation—a common-law tort with historical roots—while the undisclosed errors do not; statutory claims for technical violations of the statute must piggyback on concrete, historically cognizable harms. *Id.* at 433-34.

The reason the Supreme Court draws this distinction is because of the separation of powers. "Congress may enact legal prohibitions and obligations, but an injury in law is not an injury in fact." *TransUnion*, 594 U.S. at 427. Congress cannot create jurisdiction by fiat of a bare statutory violation. Otherwise, statutory claims risk turning courts into enforcers of abstract policy, exceeding Article III's bounds. *Lujan*, 504 U.S. at 577; *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). In *TransUnion*, Congress's attempt to confer standing through the Fair Credit Reporting Act without linking it to a harm with a "close historical or common-law analogue" impermissibly stretched Article III beyond its original scope. 594 U.S. at 433-34. Faoro need not piggyback, because he alleges only common-law tort claims with historical roots. *See Spokeo*, 578 U.S. at 344 (Thomas J., concurring) (offering examples of  trespass, intellectual property infringement, and unjust enrichment). This negates any standing concerns associated with bare technical statutory violations. In particular, Faoro alleges the common-law tort of false imprisonment, which predates the Founding and was noted by Blackstone as a civil action to recover "the damage sustained by the loss of time and liberty." 3 William Blackstone, *Commentaries of the Laws of England*, Ch. 8 at 137 (1768). Faoro also alleges the common-law tort of public nuisance. This "centuries-old doctrine" has historically addressed "unreasonable interference with a right common to the

public." Leslie Kendrick, *The Perils and Promise of Public Nuisance*, 132 Yale L.J. 702 (2022); *see also Crano v. 5 Star Nutrition, LLC*, 998 F.3d 686, 692 (5th Cir. 2021) (discussing history of the sovereign addressing public nuisance).[3]

The separation-of-powers concern does not arise when a plaintiff such as Faoro, using diversity jurisdiction, brings a cause of action that is not just a "close historical or common-law analogue," but **the actual common-law cause of action for particularized intangible harm itself**. Thus, common-law torts satisfy Article III scrutiny when injury is particularized because their harms were justiciable at the Founding. Common-law injuries reflect a historical judicial consensus about what counts as "real" harm, while statutory innovations face judicial skepticism unless tethered to that tradition. "Many traditional remedies for private-rights causes of action—such as for trespass, infringement of intellectual property, and unjust enrichment—are not contingent on a plaintiff's allegation of damages beyond the violation of his private legal right." *Spokeo*, 578 U.S. at 344 (Thomas, J., concurring) (comparing "placing [a] foot on another's property" with the Fair Credit Reporting Act's "regulatory duties"). So in *Spokeo*, the Court cited defamation and privacy torts as examples of intangible but concrete injuries: "[T]he law has long permitted recovery by certain tort victims even if their harms may be difficult to measure." 578 U.S. at 341 (citations omitted).

Defendants never perform the historical analysis the Supreme Court requires. That omission is unsurprising: common-law intentional torts are among the easiest, longest-standing, and most direct avenues to Article III standing. False imprisonment claims, Faoro's Count II, predate the Founding, and were discussed by Blackstone as a civil action to recover "the damage sustained by the loss of time and liberty." 3 William Blackstone,

---

[3] Because of the history of public nuisance as an enforcement tool by the Crown and the state, the claim has unique features when alleged by a private plaintiff that are addressed in the next subsection.

*Commentaries on the Laws of England* Ch. 8 at 137 (1768). Before that, false imprisonment was subsumed in trespass *vi et armis. See Ashton v. Brown*, 339 Md. 70, 121 n.25 (1995).

Defendants rely on inapplicable cases to argue that Faoro's injuries are not individualized because "regional traffic conditions" are a generalized grievance. The cases cited by Defendants PYM, PS&L, and Becker are readily distinguishable. *See* ECF 47 at 8 (citing *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 198 F. Supp. 2d 744 (E.D. Va. 2002), *aff'd,* 320 F.3d 475 (4th Cir. 2003) and *Reudiger v. U.S. Forest Serv.* 427 F. Supp. 2d 975 (D. Or. 2005)). Both *Taubman* and *Reudiger* asserted procedural injuries against government agencies for failing to follow administrative and environmental regulations. In neither instance did the plaintiffs allege an injury attributable to an intentional tort grounded in historical common-law.

In further contrast to the cited cases, Faoro's injury is not a gripe about a future effect on regional traffic conditions caused by a third-party non-defendant. His injury is his *personal* injury of having been trapped in his car on the highway, denied his liberty and freedom of movement, and impeded in his ability to reach his workplace as a direct result of Defendants' actions. None of the cases cited by Defendants involves a similar situation. *Taubman* was a lawsuit by shopping center developers seeking relief against government entities following approval of a rival developer's plans to construct a regional shopping center. The court dismissed the case for lack of standing because the "essence" of the plaintiffs' standing argument was the non-personalized injury of "adverse safety, environmental and traffic impacts to the region and to the employees and patrons" of the plaintiff's shopping center that construction of the rival shopping center would cause. 198 F. Supp. 2d at 757. Unsurprisingly, the court held that "[p]revention of 'safety, environmental, and traffic' related negative impacts to a 'region' clearly is not the type of concrete litigation-specific interest upon which a party may base a procedural injury." *Id.* Likewise, the plaintiffs in *Reudiger*, who also alleged a procedural violation by government

actors, included declarations that alleged only future *regional* impacts rather than any actual litigant-specific injury. 427 F. Supp. 2d at 982-83. Neither holding applies.

Defendants mischaracterize Faoro's injury as solely an emotional harm or mere inconvenience. ECF 47 at 10; ECF 49 at 4; ECF 50 at 5-6; ECF 52 at 6-7; ECF 55 at 13. But Faoro has alleged even greater harm, the theory of which must be accepted at the Rule 12 stage. He was deprived of his liberty and freedom of movement, as well as his constitutionally guaranteed right to interstate travel. ECF 1 ¶¶ 35-36, 76-77, 82; *see Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("[T]he constitutional right to travel from one State to another is firmly embedded in our constitution.").[4] And even if Faoro's injury were limited to emotional harm or inconvenience, that would be sufficient. "[T]he alleged intangible harm here—emotional distress—has long been accepted as a basis for certain types of suits in American courts." *Thompson v. Trump*, 590 F. Supp. 3d 46, 71 (D.D.C. 2022). "Additionally, '[c]ommon law ... traditionally recognized emotional harm claims as a component of trespassory torts like assault, *false imprisonment*, and defamation, allowing a presumption of damages without a showing of related physical injury.'" *Id.* at 72 (emphasis added)(quoting Betsy J. Grey, *The Future of Emotional Harm*, 83 FORDHAM L. REV. 2605, 2610

---

[4] Defendants cite Restatement (Second) of Torts § 36, comment d, asserting that it is only a privilege, rather than a right to travel on public highways and is not protected by a right of action. ECF 46-1 at 8; ECF 47 at 8; ECF 50 at 9; ECF 52 at 7. 13. But there is no case from the D.C. Court of Appeals adopting comment d as controlling authority. Moreover, comment d conflicts with federal holdings that firmly establish that interstate travel, including on public roads, is a right "so important that it is 'assertable against private interference as well as governmental action ... a virtually unconditional personal right, guaranteed by the Constitution to us all.'" *Saenz v. Roe*, 526 U.S. at 498 (quoting *Shapiro v. Thompson*, 394 U.S. 618, 643 (1969)). "[P]eople blocking traffic at a critical intersection may breach the peace as fully as those who hurl stones." *United States v. Alford*, 89 F.4th 943, 950 (D.C. Cir. 2024) (quoting *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 116 (D.C. Cir. 1977)). Because free movement is more than a "privilege," the police "have a duty to keep the streets and sidewalks open." *Wash. Mobilization Comm.*, 566 F.2d at 116.

(2015)); *see also Sargeant v. Dixon*, 130 F.3d 1067, 1069 (D.C. Cir. 1997) ("legally cognizable interest" for purposes of standing "means an interest recognized at common law"). This Circuit also has held that "inconvenience in travel plans," with wasted time and money is an injury sufficient to provide standing. *See Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 810 Fed App'x 1, 2 (D.C. Cir. 2020); *see also, e.g., Drs. For Am. v. OPM*, 766 F. Supp. 3d 39, 48 (D.D.C. 2025) (denial of information that "inhibited [doctors'] daily operations" caused concrete and specific injury).

*Humane Society of U.S. v. Babbitt*, relied upon by Defendants, is inapplicable because Faoro's injuries, including any emotional distress, are directly related to his legally protected interest in not being deprived of his liberty, freedom of movement, and right to interstate travel. 46 F.3d 93, 98 (D.C. Cir. 1995) (removal of Asian elephant from zoo does not invade a legally protected interest); *see also Armstrong v. Navient Solutions*, 292 F. Supp. 3d 464, 474 (D.D.C. 2018) (plaintiff can establish Article III injury in fact when "alleged harm stems from the infringement of some legally protected, or judicially cognizable, interest that is either recognized at common law or specifically recognized as such by the Congress" (cleaned up)) (cited by ECF 47 at 10; ECF 50 at 6).  Physical injury is not required; "the law has long permitted recovery by certain tort victims even if their harms may be difficult to measure." *Spokeo*, 578 U.S. at 371 (citations omitted).

*FDA v. Alliance for Hippocratic Medicine* is even farther afield. *Contra* ECF 47 at 9; ECF 50 at 5; ECF 55 at 12. There, the Court confronted plaintiffs who were attempting to use the judicial process to alter government policy, rather than vindicate rights or remedy an injury. 602 U.S. 367, 381-82 (2024). Unlike the plaintiffs in *Alliance for Hippocratic Medicine*, Faoro is not seeking to alter government policy toward "*others*." *Id.* at 393 (emphasis in original). Rather, he seeking redress to the direct harm *to him* and the class he represents—loss of liberty and freedom of movement—caused by Defendants' intentional unlawful conduct.

In short, Faoro alleges a "close historical or common law analogue" through his false imprisonment claim, a legally protected interest long recognized at common-law. *Cf. Farrell v. Blinken*, 4 F.4th 124, 133 (D.C. Cir. 2021) (noting that expatriation claim had historical analogue). Accordingly, Faoro satisfies the concrete injury prong of standing through this fact alone and also through the particularized injury he suffered.

### B.    Faoro has standing to pursue injunctive relief for public nuisance.

### 1.    Faoro need not allege special harm in this class action.

Faoro also has standing to seek injunctive relief for his public nuisance claim in this class action. Ordinarily, "as a general proposition only governmental authorities or other representatives of the general public have standing to attack a public nuisance in court" unless a plaintiff also alleges special damage distinct from the public. *B&W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 882 (D.C. 1982) (citing Restatement (Second) of Torts § 821C). But a special injury is not required "when the requested relief is to enjoin or abate the public nuisance" and when the plaintiff has "standing to sue … as a member of a class in a class action." Restatement (Second) Torts § 821C(2)(c). The reasoning behind this rule is that when a plaintiff brings a class action, he is suing "as a representative of the general public" to end the public nuisance. *See id.* The class action device thus serves its intended purpose of aggregating claims when the harm caused by a defendant is dispersed over a large group of injured parties and declaratory relief is appropriate respecting the class as a whole. Faoro has framed his complaint, including the public nuisance claim, as a class action and seeks only injunctive relief for this class as the remedy for public nuisance. Accordingly, he represents a broad class of individuals entitled to enjoin a public nuisance under § 821C, as recognized by the D.C. Court of Appeals in *B&W Management*.

### 2.    Faoro alleged Defendants are engaged in an ongoing practice.

Although when a plaintiff seeks "forward-looking injunctive … relief, past injuries alone are insufficient to establish standing," *NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d

77, 82 (D.C. Cir. 2012), a plaintiff can establish standing by alleging an ongoing pattern or practice. A "plaintiff is only required to put forth a plausible, 'more than … nebulous' assertion of the existence of an ongoing pattern or practice to establish standing." *Nat'l Sec. Counselors v. CIA,* 898 F. Supp. 2d 233, 260 (D.D.C. 2012). Here, Faoro's complaint identifies several times that the Defendants engaged in similar illegal blockades and disruptions in the District of Columbia metropolitan area both before February 1, 2024 and after, revealing their practice of engaging in this conduct. ECF 1 ¶¶ 3-4. None of the Defendants have denied their intention to engage in future illegal blockades. Instead, they have asserted, incorrectly, their right to continue to engage these actions as they please, no matter the harm to others. Faoro also pleaded that he regularly commutes by automobile from his home in Fairfax County, Virginia, to his office in the District of Columbia. *Id.* ¶ 8. This undisputed allegation demonstrates that Faoro has a legitimate concern he could be trapped in another illegal blockade and it is more than mere speculation.

Resolving prior infractions "does not necessarily make a problem less likely to recur" particularly when there is a history of the defendants engaging in the complained of conduct. *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 84 (D.C. Cir. 2012) ("[P]ast wrongs may serve as evidence bearing on whether there is a real and immediate threat of repeated injury."); *see also Fox v. Dist. of Columbia* 851 F. Supp. 2d 20, 29 (D.D.C. 2012) (putative class plaintiff had standing to pursue injunctive relief even though harm suffered was in the past). Moreover, the risk of future injury need not be certain; "absolute certainty is not required." *NB ex rel. Peacock*, 682 F.3d at 85; *see also In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (holding same). "Unlike plaintiffs in *Lujan*, [Faoro], to the extent he has any control over future injury, has alleged not mere '"some day" intentions' to [travel], but an actual, ongoing need for" commuting on DC roads. *NB ex rel. Peacock*, 682 F.3d at 85 (quoting *Lujan*, 504 U.S. at 564).

Defendants herald their mistaken belief that the blockade on February 1, 2024 was protected under the First Amendment and that their anti-Israel protest advocacy is crucial to their mission and identity. ECF 46-1 at 2-3; ECF 47 at 1; ECF 50 at 1; ECF 55 at 1-2. Thus, it is not mere conjecture or speculation that Faoro or other class members will confront the same fate that befell them on February 1, 2024, at the hands of the Defendants. Faoro thus has standing to pursue his claim to enjoin the public nuisance in this class action.

### C.    Faoro's injury is traceable to every Defendant's conduct.

Defendants' traceability arguments are just as meritless. They assert: (1) Faoro has failed to plausibly allege that his injury was caused by Defendants' blockading of traffic, rather than just normal traffic congestion or some other street protest (ECF 47 at 11; ECF 50 at 6; ECF 55 at 12); and (2) even if the Defendants' blockade caused the traffic jam in which Faoro was trapped, there is no causation because Defendants had a right to engage in such conduct under the District's First Amendment Assemblies Act ("FAAA"), D.C. Code § 5-331.01 *et seq. See* Section II. ECF 47 at 9; ECF 50 at 12; ECF 55 at 21. These arguments contradict the complaint and the law.

Defendants' first assertion fails because it contradicts the facts alleged in Faoro's complaint. At the motion-to-dismiss stage, the court must "accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in [Faoro's] favor." *Humane Soc'y of the United States v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). Thus, the court must accept as true Faoro's allegations in the complaint, supported by the accompanying declaration and exhibits (ECF 1-1). Defendants contend that Faoro's confinement in traffic was due to other lawful protest activities (ECF 47 at 11), or accidents or typical rush hour congestion (*Id.*), or blockaders ignoring supposed orders to disperse (ECF 47 at 12; ECF 50 at 5). But at the motion-to-dismiss stage, the court must ignore Defendants' speculative theories. Faoro's complaint contains ample factual allegations that the Defendants' conduct—the blockade—caused the traffic jam and caused him to be confined in his vehicle

14

stranded on Route 50. ECF 1 ¶¶ 29-30, 32, 34-36. Defendants used their social media

accounts to take credit for the blockades, both during and afterward. ECF 1 ¶¶ 47-58. The

reasonable inference to be drawn from these factual allegations is that of the Defendants

admitted causation by proclaiming "this was us and we are proud of it!" Nor is an inference

necessary because in at least two social media posts the Defendants admit that they did the

blockade and that they "shut down" the District and roadways entering the District, thereby

causing the traffic gridlock.[5] ECF 1 at ¶¶ 55-56; ECF 1-1 ¶¶ 65-66, Ex. 49 & 50. These posts

amount to non-hearsay, admissions by an opposing party under Fed. R. Evid. 801(d)(2)(A).

*See Pietrangelo v. Refresh Club, Inc.*, 2023 U.S. Dist. LEXIS 176296 at *29, 2023 WL 6388880

(D.D.C. Sept. 29, 2023). This is more than ample evidence of traceability and causation.

*Contrast Alliance for Hippocratic Med.*, 602 U.S. at 383 (cited by ECF 55 at 12) (allegations

based on "speculation about the unfettered choices made by independent actors before the

courts"). Faoro's allegations arise from the actual actions of the Defendants before this

Court. Thus, PYM's supposition that traffic "is caused by countless decisions by thousands

of people reacting to all sorts of circumstances" (ECF 50 at 6) could be something that, in

---

[5] Counsel for defendants suggested to Faoro's counsel that failure to serve the Hedley Declaration (ECF 1-1) along with the complaint and summons constituted defective service under Fed. R. Civ. P. 4(c)(1), and that the Court could not consider the contents of the declaration when considering any Rule 12(b) motions. No Defendant appears to be asserting that now and have thus forfeited the argument. In any event, the argument has no merit. All of the Defendants have received copies of the Hedley Declaration, and, even if they hadn't, the complaint adequately describes the contents and nature of the Declaration and its exhibits. Most of the exhibits are publicly available social media posts from Defendants' own social media accounts. *See Doe v. AFGE*, 554 F. Supp. 3d 75, 124 (D.D.C. 2021) (holding that failure to include exhibits to complaint did not prejudice the defendant because the complaint provided adequate notice to the defendant of the exhibits referenced). And at the motion-to-dismiss stage, "[t]he incorporation-by-reference doctrine permits courts to consider documents not attached to a complaint if they are referred to in the complaint and integral to the plaintiff's claim." *Page v. Comey*, 137 F.4th 806, 813-14 (D.C. Cir. 2025) (cleaned up).

theory, PYM could try to argue to a jury with evidence if any exists, but it contradicts Faoro's allegations and thus cannot be a basis for granting a motion to dismiss.

The only Defendants to raise the issue of traceability for their actions are Shraim, PYM, and PS&L and its founder and central organizer Brian Becker (ECF 1 ¶ 22)—and they do so in only cursory fashion. The complaint and accompanying declaration allege that each of these Defendants organized an action that intended to and did "shut down" DC and the surrounding roadways. There is no speculation involved in Faoro's allegation that in the days just before the February 1 shutdown, the social media accounts of PYM, PS&L, and MD2P (of which Shraim is co-chair and organizer (ECF 1 ¶ 24)) posted flyers and notices regarding a February 1 shutdown that stated that the organizers were, among others, PYM, PS&L, and MD2P. *Id.* ¶¶ 43-45; ECF 1-1 ¶¶ 47-52. Then, on February 1, these same Defendants published social media posts with photos of the blockades and participants being arrested, with the post noting, "Another major US-city was shutdown for Palestine" and explaining that the action caused "severe traffic jams all throughout the capital." ECF 1 ¶¶ 47-48; ECF 1-1 ¶ 53; *see also* ECF 1 ¶¶ 49-50; ECF 1-1 ¶¶ 54, 60, 64. Other posts by MD2P, PS&L, and PYM solicited support and assistance for activists who had been arrested. *Id.* ¶¶ 63, 67. These allegations specifically tie Faoro's injuries to these Defendants' involvement with their co-conspirators in the traffic blockade.

### D.    Redressability flows from Faoro's injury caused by Defendants' conduct.

Redressability and causation go hand-in-hand; they are "flip sides of the same coin." *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008). "If a defendant's action causes an injury, enjoining or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 381. Defendants do not dispute that the redressability element of standing is present here.

16

**II.     Neither the First Amendment nor the First Amendment Assemblies Act undermines Faoro's standing or provides grounds for dismissing his complaint.**

All of the Defendants attempt to characterize their unlawful conduct as protected First Amendment activity, and argue that Faoro's action will have a chilling effect on legitimate First Amendment protests. Defendants PS&L and Becker (ECF 47) rely on the District's First Amendment Assembly Act ("FAAA") to argue that the Defendants' blockade was lawful, thereby depriving Faoro of standing to sue, while two other Defendants argue that the FAAA protects their conduct such that Faoro has failed to state a claim. *See* ECF 47 at 9; ECF 50 at 12; ECF 55 at 21. Defendants are wrong on both counts.

To begin with, whether Defendants engaged in expressive activity protected by the First Amendment or the FAAA is a merits defense that does not affect the threshold question of whether Faoro has standing. Faoro suffered injury in fact from Defendants' conduct. Whether Defendants have a meritorious defense that will protect them from legal liability does not change that fact. *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing 'in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

On the merits of the defense, blockading roads and compelling innocent third-parties to become participants in a protest is simply not protected by the First Amendment. "Protesters have no First Amendment right to 'cordon off a street, or [the] entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.'" *Terry v. Reno*, 101 F.3d 1412, 1419 (D.C. Cir. 1996) (quoting *Cox v. Louisiana*, 379 U.S. 536, 555 (1965)). They have no right "to obstruct traffic or create hazards for others." *Singleton v. Darby*, 609 Fed. Appx. 190, 193 (5th Cir. 2015) (citing *Cox*, *inter alia*). Accordingly, Defendants' First Amendment arguments are foreclosed.

As to the FAAA, the law is not nearly as accommodating as Defendants portray. The law imposes on protestors reasonable time, place, and manner restrictions, and sets the standard for the District of Columbia's response, in particular the police's response, to First Amendment assemblies. *See Mahoney v. District of Columbia*, 662 F. Supp. 2d 74, 78 (D.D.C. 2009), *aff'd sub nom. Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011); D.C. Code § 5-331.04 (time, place, manner restrictions). It neither expands anyone's First Amendment rights nor absolves anyone from tort liability for unlawful action. Defendants do not cite a single case relying on the FAAA as a shield from civil liability by a non-government entity. Instead, the FAAA has been narrowly construed in cases not involving the DC Metropolitan Police Department's response to public assemblies. *See Ochs v. District of Columbia*, 258 A.3d 169, 171 (D.C. 2021) (FAAA "generally directs the Metropolitan Police Department (MPD) to recognize and implement" the policy). In *Ochs*, activists were arrested by the Capitol Police and subsequently prosecuted and convicted under D.C. Code § 22-1307(a), crowding, obstructing, or incommoding. The activists challenged their convictions, and pointed to the FAAA in defense. But the court held "that the specific provisions of the [Act] upon which [the activists] rely," including one provision cited by Defendants, "do not apply to the Capitol Police." 258 A.3d at 171.

Defendants selectively cite portions of the statute favorable to them when read in isolation, but conveniently omit the portions that undermine their assertion that blockades have "been expressly decriminalized." ECF 47 at 9. First, the FAAA doesn't apply to blockade conduct that the Supreme Court has explicitly ruled is not protected by the First Amendment. *See Cox v. Louisiana*, 379 U.S. at 555. The FAAA is limited to:

> peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia ... so [protesters] may be seen and heard, subject to reasonable restrictions designed to protect public safety, persons, and property, and to accommodate the interests of persons not participating in the assemblies to use the streets,

sidewalks, and other public ways to travel to their intended
destinations … .

D.C. Code § 5-331.03(1) (emphasis added). "People blocking traffic at a critical intersection
may breach the peace as fully as those who hurl stones." *Alford*, 89 F.4th at 950 (internal
quotation omitted). And it can hardly be said to be accommodating the free movement
interests of persons not participating in Defendants' civil terrorism.

True, the FAAA states that it is not an offense "to assemble or parade … without
having provided notice or obtained an approved assembly plan" (D.C. Code § 5-331.05(a)),
but this doesn't mean that the FAAA shields liability for civil torts such as the ones
orchestrated by Defendants. Defendants did not even comply with the FAAA. That
subsection of the FAAA adds that "a person or group who wishes to conduct a First
Amendment assembly on a District street, sidewalk, or other public way … **shall** give notice
and apply for approval of an assembly plan before conducting the assembly." D.C. Code § 5-
331.05(c) (emphasis added).[6] There is no evidence that Defendants sought a permit,
permission or provided notice with respect to the February 1, 2024 blockade. Indeed, the
Defendants intentionally misled authorities and the public by falsely promoting a protest at
Union Station, all the while orchestrating the blockades at the key chokepoints entering the
District. ECF 1 ¶ 46; ECF 1-1 ¶ 64. Thus, Defendants consciously side-stepped the FAAA's
mandatory notice requirement, and the imposition of any reasonable time, place and
manner restrictions. Moreover, the FAAA still allows for arrest and prosecution. Section 5-
331.07 dictates the procedures the MPD is supposed to follow when implementing the
policy established by § 5-331.03. MPD is required to first seek compliance with reasonable

---

[6] There are three exceptions to the mandatory notice requirement, none of which
apply to Defendants' February 1, 2024 conduct. Notice is not required if: (1) the assembly
takes place on public sidewalks and crosswalks, but does not impede pedestrians; (2)
fewer than 50 persons will participate and the assembly will not occur on a street; or (3)
the assembly is a spontaneous event in response to a public event. D.C. Code § 5-331.05(d).

time, place, and manner restrictions, before issuing orders to disperse or issuing citations and making arrests. D.C. Code § 5-331.07(b)(1). If the FAAA does not preempt reasonable content-neutral time, place, or manner restrictions, it certainly does not preempt speech-neutral common law torts like false imprisonment.

Further, the requirement that MPD issue "clearly audible and understandable orders to disperse" only applies to lawful First Amendment assemblies, which this was not. *See* D.C. Code § 5-331.07(e). The Defendants ignored the FAAA's mandatory notice requirement, thus MPD could not ask for voluntary compliance with or seek to enforce agreed upon time, place, and manner restrictions. Finally, the provision emphasizes that "[n]othing in this subsection is intended to restrict the authority of the MPD to arrest persons who engage in unlawful disorderly conduct." And that is exactly what happened. Law enforcement arrested and charged 23 of the blockaders with crowding, obstructing, or incommoding—the historical disorderly conduct statue in the District. ECF 1 ¶ 33; D.C. Code § 22-1307.

Contrary to Defendants' hyperbolic warnings, finding that Faoro has standing will not "open the flood gates" to litigation or permit bystanders to sue for generalized grievances. Only those that have been personally harmed by the intentional tort or unlawful conduct of activists like the Defendants here will have standing to sue. It is Defendants' intentional unlawful conduct that is a critical factor here. Their intentional, unlawful conduct and the resulting deprivation of Faoro's liberty and freedom of movement is not equivalent to motorcades, corporate 5k runs, or parades. In those cases, there is notice of the potential traffic disruptions, as well as a lack of intentional unlawful conduct. That was not the case with Defendants' conduct on February 1, 2024. And the Defendants' supposed parade of horribles that will result if Faoro has standing—unrestricted lawfare, chilling of free speech and legitimate protests (ECF 47 at 11)—also lacks merit. Defendants can easily avoid such negative consequences simply by following

the FAAA's policies and procedures—except that would defeat the true purpose of their civil terrorism, which was the disruption they contemporaneously cheered. Those that do not follow the guardrails of the FAAA can and should be held accountable for tortious conduct.

### III.    Faoro has pleaded valid false imprisonment and public nuisance conspiracies for which relief can be granted.

#### A.    False imprisonment is a valid claim.

"False imprisonment is defined, in [the District], as the restraint of one person of the physical liberty of another without consent or legal justification. A successful claim of false imprisonment requires a plaintiff to establish (1) the detention or restraint of one against his will and (2) the unlawfulness of the detention or restraint." *Hetta v. Museum of the Bible*, 2021 D.C. Super. LEXIS 134 at *7 (D.C. Super Ct. 2021) (cleaned up). "The evidence must establish a restraint against the plaintiff's will." *Faniel v. Chesapeake & Potomac Tel. Co.*, 404 A.2d 147, 151-52 (D.C. 1979). "Depriving someone of the ability to freely move for any amount time, either by real force or the threat of force, will be sufficient to bring a claim for … false imprisonment." *Lyles v. Micenko*, 468 F. Supp. 2d 68, 74 (D.D.C. 2006).

The deprivation of liberty need not be prolonged. In *Romany v. Museum of the Bible*, the plaintiff alleged that security officers at a museum questioned him about allegedly suspicious activity. But when they told the plaintiff he was free to go, they blocked his only manner of exit. Although his detention was brief, and he eventually could depart, his allegations were sufficient to state a claim for false imprisonment. 2019 D.C. Super. LEXIS 310 at *17-*18 (D.C. Super. Ct. 2019). "An unlawful deprivation of freedom of locomotion **for any amount of time**, by actual force or threat of force, is sufficient. … Intent is required, though malice is not." *Marshall v. Dist. of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978) (emphasis added); *see also Dist. of Columbia v. Gandy*, 450 A.2d 896, 899 (D.C. 1982).

Here, the Defendants and their co-conspirators' use of physical barriers to form an unlawful blockade resulted in Faoro and thousands of other motorists being confined against their will on roads and bridges leading into the District. ECF 1 ¶¶ 28, 30-32. This satisfies the prerequisites of a false imprisonment claim in D.C.[7]

Defendants again proffer their revisionist history to the events that took place on February 1, 2024, but their rewrite must be rejected. It is "the plaintiff's factual allegations that must be presumed true and should be liberally construed in his … favor" when a court is considering a motion to dismiss. *G'Sell v. Carven*, 724 F. Supp. 2d 101, 107 (D.D.C. 2010). In *G'Sell*, the court held that the plaintiffs alleged that one of the defendants had blocked the doors of an elevator from closing, thereby trapping the plaintiffs inside against their will. This was sufficient to make out a false imprisonment claim to survive a motion to dismiss. *Id.* at 110. Like the Defendants here, the defendant attempted to apply his own innocent factual spin on the allegations in the complaint, but the district court recognized that "it would be improper to assess the validity of plaintiffs' factual allegations on a motion to dismiss." *Id.* at 110 n.11.

---

[7] Defendants PS&L and Becker inexplicably argue that Faoro's false imprisonment claim would fail if the Court applies Virginia law. While Faoro contends that D.C. law applies, to the extent that any Defendant asserts otherwise, "in ruling on a motion to dismiss the court must apply the law of the forum state, which in this case is the District of Columbia." *Malvitz v. Fincantieri Marine Grp., LLC*, 2025 U.S. Dist. LEXIS 112053, at *17, 2025 WL 1663077 (D.D.C. June 12, 2025) (cleaned up). In any event, Faoro would still have a valid false imprisonment claim under Virginia law. "False imprisonment is the restraint of one's liberty without sufficient legal excuse." *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011). Just as under D.C. law, Virginia does not require physical restraint for false imprisonment. *See S.H. Kress & Co. v. Musgrove*, 149 S.E. 453, 455 (Va. 1929). And at least one court in this District has noted that there is no conflict between Virginia and D.C. law on this issue. *See Abourezk v. New York Airlines, Inc.*, 705 F. Supp. 656, 659 n.6 (D.D.C. 1989).

In particular, the Court must reject Defendants' unfounded assertion that Faoro voluntarily remained in his car and that his confinement was not total because the gridlock ended and he was eventually able to return home. ECF 46-1 at 7; ECF 47 at 24-25; ECF 50 at 10; ECF 52 at 12; ECF 55 at 15. Contrary to Defendants' assertions, Faoro did not voluntarily remain in his car. As he pleaded in his complaint, he was trapped in his car on a highway with thousands of other motorists similarly trapped, and his complaint states that he was confined to his car without moving on Route 50 near Fort Myer and without his consent. ECF 1 ¶¶ 35-36, 81, 83. He also pleaded that Defendants caused, took credit for, and celebrated the major traffic blockade and disruption to the lives of those commuting on the affected roadways. *See, e.g.*, *id.* ¶¶ 28-35, 37, 47-52, 55. Indeed, a contemporaneous social media post by the Defendants touted that they were "blocking traffic in and out of Washinton, DC" and included a traffic map showing the complete gridlock caused by their action. ECF 1-1 ¶ 54, Ex. 36. In another post taking credit for the blockade afterward, the Defendants proclaimed that they "brought inbound traffic to the US capitol … to a *standstill* during morning rush hour." ECF 1-1 ¶ 64, Ex. 48 (emphasis added). The reasonable inference to be drawn is that Faoro was involuntarily trapped in his car on the highway, unable to navigate out of the gridlock because thousands of other motorists were similarly confined and blocked by Defendants and their co-conspirators.

While a plaintiff must show that the restraint or detention was by force, an "assertion that individuals were physically blocking Plaintiff's only exit" is "sufficient to plead that Plaintiff was being detained by the threatened use of force." *Romany v. Museum of the Bible*, 2019 D.C. Super. LEXIS 310, at *15-*17 (July 25, 2019). "The confinement may be by submission to duress other than threats of physical force, where such duress is sufficient to make the consent given ineffective to bar the action." Restatement (Second) Torts § 40A. Even mere words or actions, rather than actual force or the threat of force, is sufficient when the words or actions create "a reasonable apprehension of present

confinement." *Dingle v. Dist. of Columbia*, 571 F. Supp. 2d 87, 95 (D.D.C. 2008) (citation omitted). "Liability for … false imprisonment has not been excluded merely because the instigator never laid hands on the victim." *Sami v. U.S.*, 617 F.2d 755, 765 n.16 (D.C. Cir. 1979) (citing Restatement (Second) of Torts §§ 35, 37), *partially overruled on other grounds*, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). "If an act is done with the intent to confine another, and such act is the legal cause of the confinement to another, it is immaterial whether the act directly or indirectly causes the confinement." Restatement (Second) of Torts § 37, comment. a.  The Restatement provides a useful illustration: "one who digs a pitfall in another's path is as fully liable if the other falls into it and is unable to get out, as if he had thrown the other into the pit." So too Defendants' blockades of key chokepoints into the District. Taking actions to cause confinement is sufficient force to state a claim.

There is no question that the Defendants intended to confine motorists to their vehicles and to blockade the highways entering into the District. "[C]onfinement may be by actual or apparent physical barriers." Restatement (Second) Torts § 38; *Romany*, 2019 D.C. Super. LEXIS 310, at *17 (physically blockading an exit constitutes confinement by force). Defendants and co-conspirators used actual physical barriers to blockade the key chokepoints, including chaining individuals together and using PVC piping to link arms— the sleeping dragon—to form human chains to block the roads. ECF 1 ¶ 32; ECF 1-1 ¶¶ 53, 60. These actual physical barriers then resulted in miles-long back-ups on the key highways leading into the District, which is what the Defendants intended, as they proclaimed using social media posts. For instance, one post showed the human chain blockades and proudly proclaimed the District "was shutdown for Palestine" and that their actions caused "severe traffic jams all throughout the capital." ECF 1 ¶ 48; ECF 1-1 ¶ 53. And less than a week after, the Defendants published to their social media accounts a video with accompanying text proclaiming that they had "SHUT DC DOWN" and "disrupt[ed]

business as usual." ECF 1 ¶ 55; ECF 1-1 ¶ 65. And in a similar social media post on February 9, the Defendants admitted that they "shut down 5 main roadways into downtown DC." ECF 1 ¶ 56; ECF 1-1 ¶ 66. The Court must reasonably infer that Defendants knew and intended that the consequences of their actions would be to confine innocent motorists like Faoro in their vehicles, trapped and immobile against their will on the major roadways leading into the District.[8] Defendants are thus incorrect when they assert (ECF 47 at 23; ECF 50 at 10; ECF 52 at 12-13; ECF 55 at 13) that the blockade did not establish fixed boundaries of confinement, because the Defendants' intent was to confine motorists like Faoro in their vehicles on gridlocked roadways leading into the District.

As noted above, Defendants' reliance on Restatement (Second) Torts § 36, comment d, is misplaced. And comment d does not even apply to Faoro's situation. By its own language (emphasis added):

> In order to make the actor liable for false imprisonment under the rule stated in § 35, it is necessary *that he shall have confined another in a particular area, the boundaries of which are fixed by the will of the actor*. It is not enough that the other's freedom of movement has been improperly restricted. Thus, one who blocks off a highway, intending to prevent the public from passing along it, is not liable for false imprisonment *to the one whose privilege to use the highway has been thus denied.*

This describes a scenario where, with the blockade already started, a commuter approaching one of the gridlock roads or highways, aborts his attempt to enter the highway. That commuter is not trapped on the roadway and, as a result, does not have a false imprisonment claim because he has not been detained. Faoro's motion for class certification does not include such drivers as class members. Comment d doesn't address motorists like Faoro who were already on the highway when the blockade began and

---

[8] A plaintiff may be restrained even if it is inside an automobile. *Faniel*, 404 A.2d at 151.

cannot exit the highway because Defendants' conduct has caused total gridlock constraining not only Faoro's movements, but the movement of thousands of other drivers. Contrast Illustration 11:

> A unlawfully encloses part of the highway. B enters the enclosure, and A prevents him from passing out of it on the other side, *but puts no obstacle in the way of his leaving by the way in which he entered*. This is not an actionable confinement of B, though B has the right or privilege of an unobstructed passage along the highway.

But Faoro did have an obstacle in the way of his leaving by the way he entered: by Defendants' design, there were hundreds or more cars similarly stopped and confined on Route 50 both in front and behind him, preventing him from turning around. Defendants would have this Court read comment d to excise the critical limiting clause in Illustration 11, and hold that a party can unlawfully blockade part of highway, trap the driver and thousand more on the highway so they cannot leave by the way they entered, and still have no liability. That is not a reasonable reading of comment d.

Moreover, Defendants' contention (ECF 46-1 at 8; ECF 47 at 22, 24; ECF 50 at 10; ECF 52 at 13; ECF 55 at 15) that Faoro was not involuntarily confined to his vehicle and was thus not restrained because he could have exited his vehicle is ridiculous. Doing so would have required Faoro to abandon his vehicle, exposing him to risk of criminal penalties. *See* Va. Code Ann. § 46.2-1200.1 (prohibiting abandonment of vehicles). The argument also contradicts the Restatement: a victim of false imprisonment "is not required to run any risk of harm to his person or to his chattels … to relieve the actor from a liability to which his intentional misconduct has subjected him." Restatement (Second) Torts § 36, comment a.

Accordingly, upon drawing all reasonable inferences in his favor, Faoro has sufficiently alleged a valid claim for false imprisonment.

**B.    Faoro's public nuisance claim is a valid claim for injunctive relief.**

The Court of Appeals for the District looks to the Restatement to define a public nuisance. *See Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 166 n.3 (D.C. 2013). Restatement (Second) of Torts § 821B defines a public nuisance as "an unreasonable interference with a right common to the general public." Circumstances that point to a public nuisance are: (1) whether the conduct involves a significant interference with public safety or public convenience; (2) whether the conduct is prescribed by a statute or ordinance; and (3) whether the actor knows or has reason to know that the conduct has a significant effect upon a public right. The D.C. Municipal Code includes a provision that specifically bars willingly and knowingly obstructing the bridges connecting the District to Virginia. D.C. Code § 22-1323. As noted previously, the Constitution guarantees the right to interstate travel. And Faoro has detailed throughout his opposition that his complaint alleges that Defendants knew (and intended) that their conduct would have a significant effect on the public right to interstate travel. Thus, the February 1, 2024 blockade checks all three boxes of the Restatement definition of public nuisance.

"A public nuisance is an unreasonable interference with a right common to the general public." *B&W Management, Inc.,* 451 A.2d at 881 (quoting Restatement (Second) of Torts § 821B(1)). And contrary to Defendants' assertions (ECF 47 at 16; ECF 50 at 9; ECF 55 at 14) "[t]he obstruction of a public highway may be a public nuisance." *Tucci v. District of Columbia*, 956 A.2d 684, 696 n.11 (D.C 2008); *see also Smith v. Davis*, 22 App. D.C. 298, 311; 1903 U.S. App. LEXIS 5534 (D.C. 1903) ("It is well settled that . . . the placing of materials . . . for an unreasonable time or in an unreasonable manner, upon a street or highway without the sanction of the legislature, is a public nuisance.").

The cases cited by Defendants (ECF 47 at 16; ECF 50 at 9) offer no support for the assertion that blockading a highway cannot be a public nuisance. Those cases addressed issues related to the licensing of drivers by the state or the plaintiff's actual physical ability

to drive. By contrast, Faoro's complaint addresses the right to freely travel on roads without intentional interference, and includes class members who were not driving, but rather were passengers in vehicles blockaded by Defendants and their co-conspirators. ECF 1 ¶ 7. Furthermore, the notion that the gridlock caused by Defendants' conduct was simply usual, commonly experienced rush hour traffic is (1) contrary to the facts alleged in Faoro's well-pleaded complaint, and (2) belied by their own social media admissions in which conspirators bragged that they "SHUT DC DOWN," "disrupt[ed] business as usual," and "shut down 5 main roadways into downtown DC." ECF 1 ¶¶ 51, 55-56.

Defendants contest (ECF 46-1 at 6; ECF 47 at 13-14; ECF; ECF 49 at 4; ECF 50 at 7; ECF 52 at 9; ECF 55 at 14) Faoro's public nuisance claim by focusing almost exclusively on his decision not to allege special damages distinct from the general public, but this is irrelevant.. *B&W Management* emphasized that "as a general proposition only governmental authorities *or other representatives of the general public* have standing to attack a public nuisance in court." 451 A.2d at 882 (citing Restatement (Second) of Torts § 821C) (emphasis added). Faoro doesn't need to allege special damages. His public nuisance claim is viable under Restatement (Second) Torts § 821C(2)(c), which specifically states that a special injury is unneeded to pursue a public nuisance claim "when the requested relief is to enjoin or abate the public nuisance" as long as the plaintiff has "standing to sue … as a member of a class in a class action." So pleading damages or even special damages is unnecessary, because Faoro seeks solely injunctive relief and pursues the claim as a class action. ECF 1 ¶ 79; ECF 42 at 12 (motion to certify class under Rule 23).[9]

---

[9] Defendants mistakenly assert (ECF 47 at 15) that because Faoro's counsel dropped a public nuisance claim from an amended complaint in a similar lawsuit in the Northern District of Illinois, that this is an acknowledgment that the claim has no merit. *Manhart* is distinguishable, because the plaintiff was injured traveling to the airport rather than on his regular commute, which did not support pursuing a claim for injunctive relief under existing Supreme Court precedent.

Defendants also incorrectly argue that Faoro has failed to plead underlying tortious conduct required pursue a nuisance claim. ECF 47 at 15; ECF 50 at 9; ECF 52 at 10; ECF 55 at 14. But as explained above, Faoro has alleged that Defendants and their co-conspirators planned and executed the intentional tort of false imprisonment. *See* Section II.A.

### C.    Faoro has adequately pleaded that Defendants engaged in a conspiracy.

To prevail upon a civil conspiracy claim, a plaintiff must prove: (1) an agreement between two or more persons, (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one or the parties to the agreement in furtherance of the common scheme. *Paul v. Howard Univ.*, 764 A.2d 297, 310 (D.C. 2000); *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 96-97 (D.D.C. 2016). The agreement can be express or tacit. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). Circumstantial evidence of a tacit agreement is enough to survive a motion to dismiss. *Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 213 (D.D.C. 2022).

A plaintiff "need not show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished." *Dist. of Columbia v. Proud Boys Int'l, LLC*, 2023 U.S. Dist. LEXIS 57433, at *17, 2023 WL 2733767 (D.D.C. Mar. 31, 2023). There is no need for a plaintiff to allege that the conspirators "ever met, let alone sat down" with each other. *Thompson v. Trump*, 590 F. Supp. 3d at 101 (a "tacit agreement" is sufficient). "All coconspirators must share in the general objective, though they need not know all the details of the plan or even possess the same motives," and [t]hey need not know the identities of other coconspirators." *Id.* at 97. Thus, perfect knowledge and perfect alignment among co-conspirators is not necessary.

Faoro's "burden to establish a conspiracy [at the motions to dismiss stage] is lighter than it would be following discovery." *Thompson v. Trump*, 590 F. Supp. 3d at 97. Here there

is more than sufficient evidence to satisfy that burden. Faoro need not allege more specific information or details about the conspiracy or concerted activity at the motion-to-dismiss stage, particularly when those details are in possession of the alleged co-conspirators. *See Molecular Diagnostic Labs. v. Hoffmann-LaRoche, Inc.*, 402 F. Supp. 2d 276, 286-88 (D.D.C. 2005). Here, however, the Defendants have supplied ample proof, including outright admissions of their unlawful concerted actions.[10]

Defendants mistakenly contend that Faoro's allegations about the conspiracy are conclusory and unsupported. ECF 46-1 at 4; ECF 47 at 17-21; ECF 49 at 5; 50 at 12; ECF 52 at 14-15. Once again, however, the Defendants impermissibly seek to have the Court draw inferences in their favor, accepting their representations that: (1) the flyers promoting the faux Union Station protest and general strike on February 1 were not decoys designed to fool police—as the Defendants touted in a social media post (ECF 1 ¶ 46; ECF 1-1 ¶ 64 Ex. 48); (2) the Union Station protest happened and was wholly independent of the blockades (ECF 47 at 19; ECF 50 at 12; ECF 52 at 15), but for which the Defendants inexplicably never posted any social media content; and (3) the social media posts during and after the blockade were simply in support of like-minded activists acting independently who just happened to engage in a coordinated blockade of key chokepoints into the District the same day as Defendants' Union Station "general strike protest" (what an unlucky coincidence). Even if the Court could consider Defendants' factual revisionism, those are not reasonable inferences. And even if Defendants' revisionism were plausible, "a complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are

---

[10] "Under [Fed. R. Evid.] 801(d)(2)(E), a co-conspirator's statement is attributed on an agency rationale to each of the co-conspirators, and so it is classified as non-hearsay and may be admitted against each co-conspirator as if it were *his own* statement." *United States v. Tarantino*, 846 F.2d 1384, 1418 (D.C. Cir. 1988).

plausible." *Votevets Action Fund v. McDonough*, 992 F.3d 1097, 1104 (D.C. Cir. 2021)
(cleaned up).

Faoro's allegations of conspiracy are neither speculative nor unsupported. Faoro
has alleged that the Defendants organized a blockade at key chokepoints in the District and
promoted it with deceptive flyers and social media posts in the days just before February 1,
2024. ECF 1 ¶¶ 42-45; ECF 1-1 ¶¶ 47-52. And the Defendants' social media posts during the
blockade and immediately afterward confirm that this was a well-executed plan to
blockade major roadways. For instance, the Defendants posted on their Instagram accounts
images and videos of activists chained together blocking key intersections. These posts
included text stating, "HAPPENING NOW! Pro-Palestine, anti-Zionist protestors stage an act
of mass civil disobedience today, blocking traffic in and out of Washington, DC while
Congress is in session." ECF 1 ¶ 49, ECF 1-1 ¶ 54. Another similar post included a caption
and text that read "NO BUSINESS AS USUAL FOR WAR CRIMINALS," "FIVE major roadways
blocked coming into DC." ECF 1 ¶ 51; ECF 1-1 ¶ 62. This is just a sampling of the social
media content Defendants published that day related to the blockades. ECF 1 ¶ 52.
Defendants seek to minimize their social media posts during the blockade and in the days
afterward as protected speech simply in support of like-minded activists. ECF 46-1 at 4;
ECF 47 at 21; ECF 50 at 12; ECF 52 at 15. But "a pattern of mutually supportive activity
over a period of time provides a reasonable basis for inferring that parties are engaged in a
common pursuit." *Hobson v. Wilson*, 737 F.2d 1, 53 (D.C. Cir. 1984)(cleaned up); *see also*
*Thompson v. Trump*, 590 F. Supp. 3d at 104 (after-the-fact social media posts could be
reasonably inferred as ratifying unlawful in-concert conduct). And at least two social media
posts on February 6 and February 9, respectively, are admissions by the Defendants that
they acted in concert by "join[ing]" with each other "to SHUT DC DOWN" by blocking an
"intersection for two and half hours to disrupt business as usual," and that they "shut down

31

5 main roadways into downtown DC." ECF 1 ¶¶ 55-56; ECF 1-1 ¶¶ 65-66. Accordingly, Faoro's conspiracy allegations are neither speculative nor conclusory.

**IV.    Faoro has properly alleged claims against WESPAC based on its fiscal sponsorship of PYM, and D.C.'s long-arm statute triggers personal jurisdiction.**

    **A.    WESPAC is liable for the actions of PYM.**

    **1.    WESPAC's direct fiscal sponsorship of PYM, which has no separate corporate entity or 501(c)(3) status, imposes liability on WESPAC.**

Faoro's complaint alleges that PYM was part of WESPAC at the time of the blockade, and that PYM has no separate corporate structure or 501(c)(3) tax-exempt status. ECF 1 ¶¶ 11-14; ECF 1-1 ¶¶ 9, 15, Ex. 1 (describing nature of fiscal sponsorship). WESPAC acted as PYM's direct fiscal sponsor, which represents a structured legal and financial relationship where a tax-exempt organization assumes responsibility for the activities of a non-exempt group lacking its own tax-exempt status. This arrangement enables the non-exempt entity to operate under the sponsor's tax-exempt umbrella, receiving tax-deductible donations and pursuing permissible charitable goals without securing its own 501(c)(3) recognition. Gregory T. Colvin and Stephanie L. Petit, *Fiscal Sponsorship: 6 Ways to Do it Right* 14-17 (3d ed. 2019) ("Colvin"). The sponsored group here, PYM, lacks independent tax-exempt status and relies on the 501(c)(3) status of its sponsor—WESPAC on February 1, 2024, and later Honor the Earth after WESPAC dropped them—to receive tax-deductible contributions. ECF 1-1 ¶¶ 18-19. Under direct fiscal sponsorship, "the sponsor takes the project in-house," treating it as an internal program rather than a separate legal entity. Colvin 19. "The project has no separate legal existence." *Id.* The sponsored group operates as an extension of the sponsor, lacking a separate legal identity—its actions are legally attributable to the sponsor. *Id.* at 16-17, 23, 109. "Legally, [the] project is no different than any other activity carried out by the sponsor directly." *Id.* at 17. Thus the actions of PYM are directly attributable to WESPAC as its fiscal sponsor.

WESPAC contests that its fiscal sponsorship of PYM triggers either personal jurisdiction or liability. WESPAC's reliance on the district court's holding in *Pollak* (ECF 49 at 6; ECF 49-1) is misplaced. In that case, the plaintiffs primarily relied on an agency theory of vicarious liability and failed to cite the Colvin treatise, the leading authority on fiscal sponsorship. Moreover, contrary to WESPAC's assertion (ECF 49 at 6), Faoro is not seeking to hold WESPAC liable solely for providing financial support to PYM, which is what the district court in *Pollak* erroneously focused on when it held that the financial link was not sufficient "to support liability or personal jurisdiction." ECF 49-1 at 33. Instead, Faoro is seeking to hold WESPAC accountable for the obligations and responsibilities it undertook when it agreed to be PYM's direct fiscal sponsor, and that includes responsibility for PYM's liabilities. ECF 1-1. ¶ 9, Ex. 1. To hold otherwise would mean that the fiscal sponsorship was merely a charade, and that WESPAC was simply a money-laundering and tax fraud conduit for PYM.

IRS Private Letter Ruling 201712014 illustrates this point. 2016 PLR LEXIS 1103 (Dec. 29, 2016). There the IRS re-affirmed the revocation of the tax-exempt status of an organization that, like WESPAC, acted as a fiscal sponsor for other groups in addition to pursuing its own tax-exempt activities. The Ruling noted several critical factors in reaching its determination. The sponsorship agreements required the sponsored projects or groups to submit semi-annual reports to the organization to account for expenditures. But the IRS held that this was insufficient to exercise effective discretion and control over the sponsored groups, and regardless, there was no evidence the sponsored projects submitted the required reports. 2016 PLR LEXIS 1103, at *23-*27, *60-*61, Thus, the organization could not verify that it had discretion and control over the tax-deductible donations because they could not confirm that the funds were used for appropriate tax-exempt purposes. *Id.* at *16, *27. The Ruling also emphasized that the organization and sponsored groups/projects pursued overtly non-exempt activities like political activities, private

benefits, and unlawful conduct (support of designated terrorist organization), in addition to the organization's failure to exercise effective oversight of sponsored projects/groups to prevent such activities. *Id.* at *27-*28, *69-*71.[11] Thus, the IRS concluded that the organization "acted more as a conduit than as a fiscal sponsor" because it "fail[ed] to retain control and discretion over the use of funds and maintain records establishing that the funds were used for [exempt] purposes." *Id.* at *80. Accordingly, the Letter Ruling reinforces that tax-exempt entities are legally responsible and accountable for the projects or groups for which they act as fiscal sponsor. WESPAC complains (ECF 49 at 14) that there are no cases to support Faoro's suggestion that fiscal sponsorship creates a principal-agent relationship. But that is a mischaracterization of Faoro's argument because Faoro is not arguing that there is a principal-agent relationship between WESPAC and PYM. Rather, Faoro argues that by agreeing to a direct fiscal sponsorship relationship, WESPAC agreed to take PYM under its umbrella, thereby becoming legally indistinguishable from PYM. And it is no surprise that there are no on-point cases (ECF 49 at 15-16), because it is likely that other tax-exempt entities more carefully adhere to their responsibility to follow IRS guidance and exercise appropriate supervision and control over the projects for which they agree to act as fiscal sponsor, lest they forfeit their exempt status like the entity in the above Letter Ruling.

During the relevant time, WESPAC and PYM elected to have no distinct and separate corporate structure, yet WESPAC now argues that such non-existent formalities be honored and that WESPAC and PYM must be treated as distinct legal entities. ECF 49 at 12. But corporate structure matters. WESPAC and PYM chose to structure their fiscal sponsorship

---

[11] The Letter Ruling also noted that the organization jeopardized its exempt status because it or its sponsored projects engaged in civil disobedience which the Service had previously determined was not a valid exempt purpose. 2016 PLR LEXIS 1103 at *31, *42-*43 (citing Rev. Rul. 75-384, 1975-2 C.B. 204 (denying exempt status to organization engaged in civil disobedience, including blocking traffic)).

without two independent corporate entities. And now WESPAC demands that the Court treat it and PYM as distinct entities without citing any case law or statutory authority. It would be one thing if Faoro was asking the Court to "pierce the veil" of a wholly owned subsidiary with a separate corporate structure (*cf. United States v. Bestfoods*, 524 U.S. 51, 62-64 (1998)), but here there is no veil to pierce. On February 1, 2024, WESPAC and PYM were the same legal entity, and therefore WESPAC is legally accountable for the actions of PYM. If it did not want to undertake that responsibility, it could have structured its relationship with PYM differently, or not agreed to act as PYM's fiscal sponsor, something that it discontinued after PYM began exposing WESPAC to legal liability.

### 2. In the alternative, Count III plausibly alleges that WESPAC breached its duty to supervise PYM, and it is liable for PYM's conduct for that reason.

PYM's liabilities are WESPAC's liabilities, and that should end the matter. But Faoro also alleged, in the alternative, that WESPAC is liable for failing to supervise PYM as IRS guidelines required it to do. The IRS permits a 501(c)(3) entity to fund non-exempt activities if they further the exempt entity's purposes and goals, but only if the sponsor retains "control and discretion" over the funds. Rev. Rul. 68-489, 1968-2 C.B. 210.

The District of Columbia recognizes the tort of negligent supervision and relies on the Restatement (Second) of Agency. *See Tarpeh-Doe v. U.S.*, 24 F.3d 120, 123 (D.C. Cir. 1994) (citing § 213 of the Restatement). But a plaintiff alleging negligent supervision need not show a principal-agent relationship or rely on a theory of *respondeat superior. See Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 40 (D.D.C. 2003); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 753, 760 n.11 (D.C. 2001). A person or entity is liable for negligent supervision if they "fail[] to make proper regulations," or they are negligent "in the supervision of the activity." Restatement (Second) Agency § 213(a) & (c). In this case, IRS guidelines imposed on WESPAC the responsibility to exercise control and discretion over the funds distributed to PYM and to ensure that the distributions to PYM were used to further WESPAC's own

exempt purposes. Accordingly, it is reasonable to infer that the fiscal sponsorship agreement between WESPAC and PYM included provisions that would provide some assurances to WESPAC that PYM did not jeopardize WESPAC's tax exempt status and that PYM engaged in lawful activism that aligned with WESPAC's mission and goals. If WESPAC failed to include appropriate guardrails with respect to PYM's activities, or it failed to enforce such guardrails, then it was negligent in its supervision of PYM, its sponsored project. *See, e.g.*, *Rollerson v. Dart Grp. Corp.*, 1996 U.S. Dist. LEXIS 23050 at * 22-*23, 1996 WL 365406 (D.D.C. June 25, 1996) (denying motion for summary judgment because there was material factual dispute whether defendant failed to craft proper regulations or failed to supervise adherence to those regulations).

WESPAC, however, contends that it owed no duty to Faoro. ECF 49 at 15. Whether a defendant owes a plaintiff a duty "depends on the 'foreseeability of harm' test." *Doe v. Roman Cath. Diocese of Greenburg*, 581 F. Supp. 3d 176, 198 (D.D.C. 2022). "[F]oreseeability does not require that the negligent [party] should have been able to foresee the injury in the precise form in which it occurred. Rather, it is sufficient if the negligent [party] might reasonably have foreseen that injury might occur." *Kernane v. AMTRAK*, 743 A.2d 703, 715 (D.C. 2000).

Here, it is reasonable to infer that WESPAC could foresee that PYM's anti-Zionist activism could expose it to liability if not properly supervised. WESPAC makes no secret that, at least on February 1, 2024, it and PYM were aligned with respect to a mission of anti-Zionist activism and support of the Palestinian cause. ECF 49 at 1, 15. Thus, it is reasonable to infer that WESPAC was aware of and fully supported PYM's activism, especially following the October 7, 2023 Hamas attack on Israel and Israel's subsequent offensive against Hamas in Gaza. During this time, PYM and similar organizations (including others that WESPAC fiscally sponsored) and associated individuals began a nationwide campaign of disruptive protests—some lawful, others not—in support of

Hamas and to condemn Israel's military operation in Gaza. ECF 1 ¶ 3; ECF 1-1 ¶ 46.
Accordingly, it was foreseeable that PYM's activism could cause harm if it engaged in
unlawful protest activity. Indeed, discovery is likely to reveal the reasons why WESPAC
discontinued its sponsorship of PYM, and it is reasonable to infer that it did so out of
concern that PYM's actions were exposing WESPAC to liability. *See, e.g.*, *Thomas v. City
Lights Sch., Inc.*, 124 F. Supp. 2d 707 (D.D.C. 2000) (declining to dismiss complaint where
plaintiff potentially could prove defendant owed a duty based on foreseeability of harm).

Pertinent to this, discovery is also likely to reveal communications between
WESPAC and its insurer in which WESPAC's demand for insurance coverage indicates that
it had represented to third-parties that it exercised supervision and control over PYM. *Cf.
Alliance of Nonprofits for Ins. Risk Retention Grp. v. WESPAC Found., Inc.*, ECF 1, 1:25-cv-
1320 (S.D.N.Y. Feb. 13, 2025). That case was a declaratory action filed against WESPAC by
its insurance carrier (since voluntarily dismissed without prejudice), related to its fiscal
sponsorship of an organization similar to PYM that is being sued for a similar unlawful
blockade conduct in the Northern District of Illinois. WESPAC's carrier disclaimed any
coverage or liability for indemnification because WESPAC failed to disclose fiscal
sponsorship to the insurer. A reasonable inference to draw from this collateral litigation is
that WESPAC considered the possibility that it could make a claim on its insurance policy
related to the potential liabilities of the groups it fiscally sponsored, and its insurance
carrier sought to disabuse WESPAC of that notion because it had failed to follow the terms
of the liability policy. Accordingly, Faoro has plausibly alleged that WESPAC had an
obligation to competently supervise PYM as its fiscal sponsor to prevent harmful and
unlawful protests, and that duty extended to Faoro and other class members.

**B.    The Court has personal jurisdiction over WESPAC because it has specific personal jurisdiction over PYM and the other co-conspirator Defendants.**

**1.    Defendants, including PYM, are subject to specific personal jurisdiction.**

To satisfy the test for specific jurisdiction, "the plaintiff must allege some specific facts evidencing purposeful activity by the defendants in the District of Columbia by which they invoked the benefits and protections of the law of the District of Columbia." *Bigelow v. Garrett,* 299 F. Supp. 3d 34, 44 (D.D.C. 2018).  Factual discrepancies concerning the existence of personal jurisdiction must be resolved in favor of the non-moving plaintiff. *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004).

There are two means by which a plaintiff may assert personal jurisdiction over a defendant: general and specific. General jurisdiction permits a plaintiff to assert personal jurisdiction over a defendant regardless of the underlying plaintiff's claim because the defendant's contacts with the forum are sufficient to treat the defendant as being at home in the jurisdiction without reference to the plaintiff's claim. By contrast, specific personal jurisdiction arises only with claims based on the actions of defendant that touch or concern the forum. *See Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 227 (D.D.C. 2005). In this case, the District's long-arm statute, D.C. Code § 13-423 is the way Faoro asserts specific personal jurisdiction over the Defendants, including WESPAC. Under the long-arm statute, a District of Columbia court has personal jurisdiction "over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—(1) transacting any business in the District of Columbia; [or] … (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia." D.C. Code §§ 13-423(a)(1) & (3).

Here the conduct of PYM, WESPAC's sponsored entity, satisfies both these subsections of the statute. PYM and the other Defendants deliberately aimed their conduct at the District on February 1, 2024, thereby availing themselves of the laws and protections of the District. *Arm. Genocide Museum & Mem'l, Inc. v. Cafesian Fam. Found., Inc.*, 607 F.

38

Supp. 2d 185, 189 (D.D.C. 2009) ("voluntary and deliberate" contacts with the District sufficient to meet low nexus threshold). Defendants, including PYM, publicized the purported "protest" and "general strike" at Union Station in the weeks and days just before the February 1 blockade. ECF 1 ¶ 42; ECF 1-1 47, 50, 52. This is sufficient nexus with the District and is specifically related to the allegations in Faoro's complaint.

A non-resident defendant need not have been physically present in the District to be subject to personal jurisdiction under the District's long-arm statute. *First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1121 (D.D.C. 1996). Thus, even though WESPAC is in New York, its project, PYM, was present in the District and engaged in tortious conduct. PYM and the other conspirators' unlawful conduct on February 1 caused Faoro's injury, his loss of liberty and freedom of movement. Specific personal jurisdiction is triggered "whenever the defendant has purposefully directed its activities at residents of the forum, and the litigation has resulted from alleged injuries that arise out of or relate to those activities." *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330 (D.C. 2000). "Once … the claim is related to acts in the District, § 13-423 does not require that the scope of the claim be limited to activity with this jurisdiction." The Defendants' actions of conspiring to blockade roadways in the District on February 1, 2024, brings them within the scope of the long-arm statute.

Moreover, the fact that Faoro was traveling in Virginia and suffered his loss of liberty there, rather than in the District does not undermine the applicability of § 13-423(a)(3). *Mandlekorn v. Patrick*, 359 F. Supp. 692 (D.D.C. 1973), confirmed personal jurisdiction is satisfied for non-resident defendants even when some of the injured class members were from outside the District and at least some of the injury occurred outside the District. Although Faoro was in Virginia when he suffered his injury, there were class members in the District who suffered identical injuries because they were in closer

proximity to the blockades. And the act—the blockades—and their immediate effect took place in the District. Faoro's injury emanated from this act in the District.

Finally, the unnamed Doe co-conspirators represent the 23 individuals arrested on February 1 for engaging in the blockades. "So long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all the members of the conspiracy." *Jung v. Ass'n of Am Med. Colleges*, 300 F. Supp. 2d 119, 141 (D.D.C. 2004). Here the Doe blockaders, along with many other individual co-conspirators participated in the unlawful blockades on February 1 within the District, thereby conferring personal jurisdiction upon all the Defendants, including PYM. And contrary to WESPAC's assertion (ECF 49 at 16), Faoro has more than sufficiently alleged that PYM helped plan, organize and execute the blockade. ECF 1 ¶¶ 42, 44, 48-49; ECF 1-1 ¶ 54. Indeed, PYM posted social media content admitting that it executed the blockade along with the other Defendants. ECF 1 ¶ 54; ECF 1-1 ¶ 64.

### 2.  WESPAC is subject to personal jurisdiction because it is legally indistinguishable from PYM as its fiscal sponsor, and at the very least Faoro is entitled to jurisdictional discovery.

The subsection above shows that specific personal jurisdiction applies to the only Defendants who challenged it—to PYM and to WESPAC because it is legally indistinguishable from PYM. Accordingly, the WESPAC/PYM direct fiscal sponsorship relationship is analogous to an alter ego analysis–except here, there were never two distinct corporate structures and thus PYM's contacts are WESPAC's. "[A] corporation's contacts with a forum may not be attributed to other parties, [except] where other party is an alter ego ... of the defendant." *Tall v. Comcast of Potomac, LLC*, 729 F. Supp. 2d 342, 342 (D.D.C. 2010).

Faoro has alleged that there is a unity of purpose and interest between WESPAC and PYM that is sufficient to confer personal jurisdiction under the D.C. long-arm statute. To maintain a valid fiscal sponsorship relationship according to the IRS, WESPAC was

obligated to exercise direction and control over PYM. *See* Rev. Rul. 68-489, 1968-2 C.B. 210 (fiscal sponsors are required to "retain control and discretion over the use of funds" allocated to the sponsored project). This is a key factor of the alter ego analysis. *See Johnson-Tanner v. First Cash Fin. Servs.*, 239 F. Supp. 2d 34, 38 (D.D.C. 2003). "[B]ut this control does not have to amount to actual day-to-day control or supervision." *Id.*

Courts have expressed a reluctance to dismiss complaints for lack of personal jurisdiction in instances where there is an open question whether an alter ego relationship exists or, analogously here, a direct fiscal sponsorship without separate corporate identities. *See Blount v. U.S. Sec. Assocs.*, 930 F. Supp. 2d 191, 197 (D.D.C. 2013) (permitting jurisdictional discovery when there is good faith belief that alter ego relationship exists to establish personal jurisdiction); *see also See Plesha v. Ferguson*, 760 F. Supp. 2d 90, 93 (D.D.C. 2011) ("The Court cannot dismiss a plaintiff's claims against a defendant for lack of personal jurisdiction without affording him an opportunity to develop facts supporting jurisdiction through appropriate discovery."). If there truly is a question about the relationship between WESPAC and PYM, then the proper procedure is for the court to allow jurisdictional discovery—not dismiss the complaint. "[A] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery." *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996); *see also Est. of Manook v. Rsch. Triangle Inst., Int'l*, 683 F. Supp. 2d 4, 15 (D.D.C. 2010) (permitting limited jurisdictional discovery focused on financial information). But WESPAC never denies that it was a direct fiscal sponsor, and never denies that PYM has no distinct corporate structure or 501(c)(3) status.

WESPAC acted as the fiscal sponsor for PYM and held itself out as the entity to which donors could make tax-deductible contributions to support PYM. WESPAC contends that Faoro "cannot truthfully allege that WESPAC transmitted any money to PYM … knowing or intending that it would be used in connection with this protest." ECF 49 at 12. Perhaps, but Faoro has plausibly alleged that WESPAC was PYM's fiscal sponsor, and as such had

received tax-deductible donations intended for PYM and was then responsible for distributing and overseeing the use of such donations to ensure that the use of the funds aligned with WESPAC's tax-exempt mission. Limited discovery, like that permitted in the foregoing cases, might help address whether WESPAC did or did not provide funding for the February 1 blockade. It also might reveal whether WESPAC maintained a liability insurance policy that also covers the liabilities of sponsored projects like PYM. And it might also show the contours of the sponsorship agreement, including the rights and responsibilities of both WESPAC and PYM. Or discovery might simply reveal that WESPAC acted as a pass-through front for PYM, which essentially would be a concession that it engaged in tax fraud and money laundering. As the above cases demonstrate, Faoro at least deserves an opportunity to conduct jurisdictional discovery on these issues.

## V.    Faoro's complaint satisfies Rule 8.

A complaint satisfies the pleading standard of Fed. R. Civ. Proc. 8(a)(2) when it contains "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). A complaint challenged under Rule 12(b)(6) "does not need detailed factual allegations." *Id.* "'Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues.'" *Chelsea Condo. Unit Owners Ass'n*, 468 F. Supp. 2d at 144 (quoting *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957)). "It is not necessary for the plaintiff to plead all elements of his prima facia case in the complaint or plead law or match facts to every element of a legal theory." *Id.* (cleaned up). Rule 8 "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the illegal conduct. *Twombly*, 550 U.S. at 556. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual

proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.*
(quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Faoro's 85-paragraph complaint, with 51 attached exhibits illustrating his claims,
readily meets these standards. Every defendant is on notice of the claims and the role that
Faoro alleges they played. While discovery is likely to uncover more evidence to support
his claims (as in any case), Faoro's complaint contains far more than the "short and plain"
statement required by Rule 8(a).

### A.    The allegations against Becker and Shraim are sufficient under Rule 8.

Becker and Shraim both argue (ECF 47 at 18-19, 26; ECF 55 at 17-19) that the
allegations in Faoro's complaint are insufficient to tie them to the alleged conspiracy and
unlawful blockade, because the complaint does not contain specifics implicating them in
the conspiracy. But such detail and specificity is not required by Fed. R. Civ. P. 8. "[U]nder
the notice pleading regime of [Rule 8], a lack of specificity is not fatal as long as the
defendant is given 'fair notice' of the plaintiff's claim." *Arent v. Shalala*, 70 F.3d 610, 618
(D.C. Cir. 1995).

Faoro alleges that Becker and Shraim held leadership positions in Defendants PS&L
and MD2P, respectively. ECF 1  ¶ 22 (alleging PS&L's online newspaper lists Becker as a
founder and central organizer of PS&L); *id.* ¶ 24 (alleging Shraim is co-chair of MD2P and
her social media account described herself as an organizer of the group); ECF 1-1 ¶¶ 37, 43.
The complaint alleges that Becker was listed as the Person in Charge on a National Park
Service public gathering permit for a protest against Israeli President Netanyahu's speech
before Congress. ECF 1 ¶ 22. The complaint also alleges that Shraim's and MD2P's
Instagram accounts highlight that she regularly appeared as the featured speaker at
protests and rallies sponsored by MD2P. ECF 1 ¶ 24. Thus it is reasonable to infer that both
participated in the planning and execution of the direct-action protest sponsored by PS&L
and MD2P on February 1, 2024, in the form of a traffic blockade, whether or not they

directly participated on site. It is also reasonable to infer that Becker and Shraim or other close associates working in concert with them or under their authority had control over the content published to PS&L and MD2P's social media accounts, which were key tools used to organize and promote the February 1 blockades.

The recent *Thompson v. Trump* case is instructive. There, the Oath Keepers moved to dismiss conspiracy claims related to their role in the January 6, 2021, events at the U.S. Capitol, arguing that the complaint lacked sufficient details "such as names of the leaders" who posted incriminatory social media content, and "that they [were] being held responsible for the acts of the group's members." 590 F. Supp. 3d at 107. Proud Boy leader, Enrique Tarrio, similarly argued that there were insufficient allegations tying him to the alleged conspiracy. *Id.* The Court declined to dismiss the conspiracy claims against both Tarrio and the Oath Keepers, emphasizing that "Rule 8's notice-pleading rules" applied, that there were "sufficient facts to establish *respondeat superior* liability at this stage," and that it was reasonable to infer that Tarrio, as a leader, would have been involved in planning activities "sufficient to plausibly establish" him as a conspirator. *Id.* Notably, Tarrio was not even in the District on January 6, 2021, so the pre-discovery lack of allegations that Becker and Shraim were physically present during the February 1 blockades is irrelevant. Becker's and Shraim's arguments that Faoro's allegations are insufficient are analogous to those rejected by the court in *Thompson v. Trump*, and the Court should similarly deny their motions to dismiss.

### B. Shraim's brief includes phony citations that suggest improper reliance on AI or excessive carelessness and may require court attention.

Shraim's brief on this issue is particularly troublesome. ECF 55 at 18-19. She cites several cases that do not appear to support the proposition asserted; includes quotes that are not found in the cases; and even cites a case that doesn't exist.

Shraim cites *Ciox Health, LLC v. Azar* for two propositions: (1) that a conspiracy or aiding-and-abetting claim must allege facts showing communication or coordination among co-conspirators; and (2) that a complaint must establish a direct connection between a defendant's conduct and the alleged harm. In both instances, Shraim quotes from the opinion, including one quote that is itself a quote from a D.C. Circuit case, *Doe v. U.S. Capitol Police*. But *Ciox Health* is a case involving an APA challenge to regulatory actions by the Department of Health and Human Services and had nothing to do with conspiracy, aiding-or-abetting, or the notion that a complaint must tie defendant's conduct to the alleged harm suffered. *See* 435 F. Supp. 3d 30 (D.D.C. 2020). Moreover, the purported quotes that Shraim cites do not exist, and neither does the *Doe v. U.S. Capitol Police* case. Indeed, there appears to be no reported D.C. Circuit case of that name, and the reporter citation in Shraim's brief, 899 F.3d 1279, 1284 (D.C. Cir. 2018), is to a completely different case from the Federal Circuit, *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254 (Fed. Cir. 2018).

As another example, Shraim quotes *Abourezk v. New York Airlines, Inc.* for the proposition that a defendant must personally participate or authorize the unlawful act to be found liable, but then incongruously includes a parenthetical regarding service of process under Rule 4(h). Further, the quote Shraim attributes to *Abourezk* is nowhere to be found in the opinion. *See* 705 F. Supp. 656 (D.D.C. 1989).

Similarly, Shraim cites *Douglas v. United States* for the proposition that a defendant must be present at the site of the protest for liability to attach, and again includes a parenthetical quote. But the case does not remotely stand for the proposition asserted by Shraim and the parenthetical quote is nowhere in the opinion. *See* 796 F. Supp. 2d 1354 (M.D. Fla. 2011).

Likewise, Shraim cites the Seventh Circuit case *United States v. Mollenhauer Labs, Inc.* (Shraim's brief incorrectly reverses the party names) for the proposition that vicarious

liability is applicable if money or financial support is provided for the alleged wrongful act. But that case dealt solely with the issue of whether service of process was proper on a corporation. 267 F.2d 260 (7th Cir. 1959).

Shraim cites a recent opinion from this district, *Robertson v. District of Columbia*, for the proposition that a defendant that belongs to or associates with an organization is insufficient to put a defendant on notice, and cited two apparent quotes from the opinion. But the case involves statutory claims under the Individuals with Disabilities in Education Act and related discrimination claims under the Americans with Disabilities Act and related statutes, and is totally unrelated to the proposition for which it is cited. *See* 762 F. Supp. 3d 34 (D.D.C. 2025). Moreover, the two purported quotes from the opinion do not exist.

For these reasons, the Court, at a minimum, should completely disregard Shraim's arguments about the supposed lack of factual allegations in the complaint against Shraim. And while Faoro is acutely mindful of the danger of threatening sanctions haphazardly, he notes that several courts have found sanctions appropriate in similar situations. *See, e.g.*, *Johnson v. Dunn*, No. 2:21-cv-1701, 2025 U.S. Dist. LEXIS 141805 (N.D. Ala. July 23, 2025) (publicly reprimanding attorneys and referring matter to state bar where attorneys filed motions containing citations that were "completely made up" by ChatGPT); *Lacey v. State Farm Gen. Ins. Co.*, No. CV 24-5205, 2025 U.S. Dist. LEXIS 90370 (C.D. Cal. May 5, 2025) (imposing litigation and financial sanctions against plaintiff and lawyers who used AI to generate and submit brief containing numerous phony quotations and false and misleading legal quotations); *Wadsworth v. Walmart Inc.*, 348 F.R.D. 489 (D. Wyo. 2025) (imposing monetary sanctions where attorneys filed motions citing cases that were not real but "hallucinated by an AI platform"); *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443 (S.D.N.Y. 2023) (seminal case to do so).

**C.    To the extent that the Court believes Rule 8 is not met because of the absence of factual allegations, dismissal with leave to amend is appropriate.**

The Defendants' challenge to the allegations in the complaint as being speculative, conclusory and unsupported by facts asks this Court to unlawfully expand Rule 8. All the rule requires is enough to detail to give notice and make a claim plausible; "a lack of specificity is not fatal as long as the defendant is given 'fair notice' of the plaintiff's claim." *Arent*, 70 F.3d at 618.

But to the extent that the Court accepts Defendants' arguments that *more* detail and specificity is required, despite that this is a pleading the Court has already characterized as "somewhat verbose" and it attaches 171 pages of declaration and exhibits, Faoro should get the chance to amend the complaint with the Court's guidance on where it believes the complaint has fallen short in making allegations. The standard approach is narrow dismissal with leave to re-plead. This case is in the opening innings and dismissal without prejudice and leave to re-plead will not prejudice the Defendants. *Cf. Jackson v. District of Columbia*, 254 F.3d 262, 267 (D.C. Cir. 2001) (noting that leave to amend should be freely given absent bad faith, undue delay, or prejudice to the opposing party).

## VI.    Service of Process on Shraim and Maryland2Palestine was valid.

Faoro personally served Shraim in her personal capacity and also as the officer or authorized agent of Defendant MD2P. ECF 16-17. Although Shraim is critical of how she was served with the complaint and summons, ECF 55 at 9, she does not appear to contest that service of process as to herself was proper under Fed. R. Civ. P. 4. Instead, Shraim and MD2P contend that service on MD2P was improper under Rule 4(h), asserting that Shraim had no affiliation or leadership role with MD2P since August 2023, and therefore there has been no valid service of MD2P. ECF 55 at 10.

MD2P is an unincorporated association with no formal legal existence or transparent leadership structure. ECF 1 ¶ 23. Shraim states (ECF 55 at 11) that it is

"undisputed" that she resigned from MD2P by at least August 2023, but offers no evidence of that. And she never mentions who assumed her leadership role or who might be a good candidate to accept service. The complaint counters that Shraim and MD2P identified Shraim as the co-chair and organizer of the entity. ECF 1 ¶ 24. The complaint also notes that Shraim acted as the public face of MD2P throughout 2024, often being the featured speaker at MD2P protests and rallies, and her formerly publicly available Instagram account represented throughout 2024 that she as an organizer for @md2palestine. ECF 1 ¶ 24; ECF 1-1 ¶ 43, Ex. 25-27.

Courts have shown flexibility regarding Rule 4(h), recognizing "[t]he purpose of the rule is to bring home to the defendant notice of the filing of the action." *American Football League v. National Football League*, 27 F.R.D. 264, 269 (D. Md. 1961) ("*NFL*"). For instance, in *NFL*, the court permitted service upon the coaches of two professional football teams because they were "so integrated with the organization that [they] will know what to do with the papers." *Id.* Similarly, in *Direct Mail Specialists, Inc. v. Eclat Computerized Tech., Inc.*, the court held that service of the receptionist employed by a partnership affiliated with the defendant, a small company, satisfied the predecessor of Rule 4(h). "Generally, service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable, and just to imply the authority on his part to receive service." 840 F.2d 685, 688 (9th Cir. 1988) (cleaned up); *see also Estate of Kleinman v. Palestinian Auth.*, 547 F. Supp. 2d 8, 15 (D.D.C. 2008) (quoting *Eclat* favorably).

MD2P is an intentionally opaque, informal organization that does not disclose publicly on its website its leadership or organizational structure. By all appearances, it consists of a small group of anti-Israel activists in the DC and Maryland area. Serving Shraim, who before Faoro filing his complaint, was very much the public face and leader of MD2P, is both fair and reasonable. Even if Shraim is no longer affiliated with MD2P— something that is debatable and was not apparent throughout 2024 and early 2025—she is

in a position to know what to do with the served complaint, and thus it is fair and reasonable to have served her as an authorized representative of MD2P. *Estate of Kleinman*, 547 F. Supp. 2d at 13.

Even if service of Shraim on behalf of MD2P is treated as invalid under Rule 4(h), the Court has discretion to quash the service, rather than dismiss the case. "[D]ismissal is not appropriate when a reasonable prospect that proper service can be obtained exists." *Novak v. World Bank*, 703 F.2d 1305, 1310 (D.C. Cir. 1983); *see also Bullock v. Hana Indus., Inc.*, 2024 U.S. Dist. LEXIS 25374 at *4, 2024 WL 620440 (D.D.C. Feb. 14, 2024) (quashing service with instructions to validly serve defendants); *James v. Booz-Allen & Hamilton, Inc.*, 206 F.R.D. 15, 18 (D.D.C. 2002) (same). If the Court deems service invalid, Faoro asks the Court to grant limited jurisdictional discovery of Shraim so that Faoro may identify the individuals affiliated with MD2P that meet the requirements for service under Rule 4(h). *Cf. Holland v. Cardem Ins. Co.*, 2020 U.S. Dist. LEXIS 253998 at *41, 2020 WL 9439381 (D.D.C. June 22, 2020) (recommending granting motion for jurisdictional discovery in response to Rule 12(b)(5) motion), *adopted & accepted*, 2020 U.S. Dist. LEXIS 253999, 2020 WL 9439376 (D.D.C. Sept. 2, 2020).

Here, all indications are that MD2P is a small, informal organization and that Shraim was an organizer and leader of its operations and activities for several years. She is well acquainted with the person or persons who filled the leadership role that she only now asserts she surrendered two years ago.

## VII.    Defendants' request for sanctions.

All the Defendants, except WESPAC, have asked the Court to impose sanctions pursuant to 28 U.S.C. § 1927 or under the Court's inherent authority. Dissenters and Shraim/MD2Palestine also asked the Court to impose sanctions on its own initiative under Fed. R. Civ. P. 11(c)(3). WESPAC reserved the right to move for sanctions at a later date, and sent Faoro's counsel a letter pursuant Rule 11(c)'s notice requirement. Dissenters and

Shraim/MD2P, however, failed to provide separate notice as required by Rule 11, and simply ask the Court to impose sanctions on its own initiative. ECF 46-1 at 8; ECF 55 at 23. And on July 29, 2025, counsel for PS&L and Becker sent Faoro's counsel a letter indicating that they intended to file a Rule 11 motion.

Because the Court denied without prejudice the requests for sanctions as premature, Faoro will not burden the Court with briefing on this issue. Faoro views these requests as baseless litigation scare tactics. If the Defendants renew their motions or the Court decides to consider their sanctions requests, Faoro respectfully requests a full opportunity to respond.

### Conclusion

For these reasons, Faoro respectfully asks the Court deny Defendants' Rule 12(b) motions, or alternatively grant Faoro jurisdictional discovery with respect to WESPAC's motion to dismiss for personal jurisdiction and MD2P's motion to dismiss for improper service under Rule 12(b)(5).

Dated:  July 30, 2025                    Respectfully submitted,


                                    By:    */s/ Anna St. John*
                                            Anna St. John (DC Bar No. 983914)
                                            Neville S. Hedley (DC Bar No. 458259)
                                            (admitted but not yet sworn)
                                            HAMILTON LINCOLN LAW INSTITUTE
                                            1629 K Street NW, Suite 300
                                            Washington, DC 20006
                                            Telephone: (917) 327-2392
                                            anna.stjohn@hlli.org
                                            Telephone: (312) 342-6008
                                            ned.hedley@hlli.org

                                            *Attorneys for Plaintiff Daniel Faoro*

**Certificate of Service**

I certify that on July 30, 2025 I served a copy of the above on all counsel of record by filing a copy via the ECF system.

Additionally, I served a copy of this motion and the accompanying documents on by first-class U.S. Mail to the following recipients:

*Defendants Harriet's Wildest Dreams, Inc. and Dornethia "Nee Nee" Taylor*:

Harriet's Wildest Dreams, Inc.
Dornethia "Nee Nee" Taylor
6368 Coventry Way, Suite 313
Clinton, MD 20735-2265

Harriet's Wildest Dreams, Inc.
Dornethia "Nee Nee" Taylor
3215 Martin Luther King, Ave., SE,
Washington, DC 20032

Dated: July 30, 2025

*/s/ Anna St. John*
Anna St. John